## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **EDUARDO YATCO, M.D.,** | § | |
| | § | |
| **Plaintiff,** | § | **C.A. No.:  08-342** |
| | § | |
| v. | § | |
| | § | |
| | § | |
| **NANTICOKE HEALTH SERVICES, INC.** | § | **Trial by Jury Demanded** |
| | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## COMPLAINT

Plaintiff alleges, upon information and belief, except for the allegations that pertain to the Plaintiff himself which are alleged upon knowledge, as follows:

1.     The jurisdiction of this Court is founded upon 15 U.S.C. § 78(a)(a), 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

2.     Plaintiff is a citizen of the State of Delaware.  During the period alleged herein Plaintiff operated a medical office at 8866 Riverside Drive, Seaford, Delaware 19973 and practiced medicine as a general surgeon with specialties in Thoracic and Vascular surgery.

3.     Defendant Nanticoke Health Services, Inc. is a corporation of the State of Delaware and is the operator of Nanticoke Memorial Hospital at 801 Middleford Road, Seaford, Delaware 19973.   (Nanticoke Health Services, Inc. and Nanticoke Memorial Hospital are referred to collectively herein as "Nanticoke")

4.     The matter in controversy exceeds the value of $75,000.00, exclusive of interest and costs.

5.    The claims herein arise, *inter alia*, under the Due Process Clause of the Constitution of the United States.

6.    Nanticoke Memorial Hospital is a regional medical center serving patients in the Delaware, Maryland and Virginia area.

7.    This is an action by Plaintiff against Nanticoke for violating Plaintiff's Constitutional due process and contract rights which culminated in the withdrawal of his surgical privileges, without cause.   As will be shown herein, Nanticoke was in a position to bar physicians from performing various types of surgery and otherwise treating their patients in a hospital setting and it abused its authority by hindering and ultimately preventing Plaintiff from using its facilities for the purpose of performing carotid endarterectomies   As a result of Nanticoke's actions, Plaintiff was unable to receive referrals for carotid endarterectomies, which resulted in a significant negative impact on his practice and credibility as a vascular surgeon. Ultimately, the revocation of his privileges caused him to close his practice due to a substantial decline in patients and income.

8.    Nanticoke is located 30 miles from the nearest hospital and, because it has little or no direct competition from other hospitals, it is able to dictate the standards of care and to regulate, by withholding or granting privileges, which physicians may or may not practice within its geographic area.   On information and belief, Nanticoke receives Federal and State Funds under a variety of Government sponsored programs.

9.    Plaintiff established his practice in the area served by Nanticoke in July of 1979 and practiced medicine and performed surgery at Nanticoke from 1979 through December 31, 2007.

2

10.     Among the procedures performed by Plaintiff at Nanticoke were carotid endarterectomies and cerebral angiograms. In fact, Plaintiff introduced carotid endarterectomies at Nanticoke and also pioneered the use of angiography there. He was credentialed for and performed both of these procedures at Nanticoke for over 25 years.

11.     Although, Plaintiff introduced carotid endarterectomy and angiography in Southern Delaware and performed these procedures for over twenty-five years at Nanticoke, thereby providing a valuable service to local residents, he was nonetheless subjected by Nanticoke and certain of its affiliated physicians to a pattern of harassment and outright attacks on his professional credentials and ability to practice throughout that period.

12.     As a result of these actions, the number of surgeries which Plaintiff was able to perform at Nanticoke never reached the levels they would have, but for these actions, and, in fact, declined significantly in later years when the pattern of harassment increased.

13.     Among the actions taken against Plaintiff specifically were the following:

        a)     During Plaintiff's tenure as Chairman of Nanticoke's Department of Surgery, he was pressured to resign his position by the administrative staff of Nanticoke and to further resign from active staff to favor another group of surgeons.

        b)     Nanticoke excluded Plaintiff from membership on its Trauma Committee and, even though he made himself available and was fully qualified, Plaintiff was also excluded from taking calls in the emergency room in his area of specialization.

        c)     Plaintiff's Privileges to perform Operative Thoracoscopy were wrongfully delayed despite the fact that he is a qualified thoracic surgeon and had undergone special training for this procedure.

d)     Plaintiff was restricted to surgeries solely within his specialties and his other general surgery privileges were curtailed.  At the same time, Nanticoke permitted other surgeons to perform a broad range of surgeries, including surgeries in specialties where they were not formally trained.

e)     Plaintiff's surgeries were subjected to arbitrary audit and review while other cases involving death or complications were not submitted for committee review.

f)     Other examples of the day-to-day harassment that Plaintiff endured over the years, were:

i.  On one occasion, Plaintiff's MRA films on his patient scheduled for surgery were sent to another surgeon in Baltimore without his knowledge or consent resulting in the cancellation of the surgery.

ii.  On another occasion Plaintiff was barred from performing surgery on a patient without valid reasons.

iii.  The Vascular Laboratory established by the Plaintiff in 1980 was turned over to another department without his knowledge, and in violation of established protocols.

iv.  Plaintiff was also wrongfully accused of wrongdoing and violation of the rules and regulations of the Medical Staff and the Hospital.  He was threatened with administrative disciplinary action and suspension of his privileges.  He was accused of putting the patient and the hospital at risk and was told to refrain from admitting patients to Nanticoke.

14.     Nanticoke's harassment of Plaintiff and its attempts to limit his practice culminated in November, 2006 when it wrote to him advising that it had adopted new

credentialing standards. The new standards adopted by Nanticoke were based on the number of surgeries performed and, as Plaintiff later learned, were nicknamed the "Leap Frog" standards.

15.     In November of 2006, after the adoption of the new standards, the Credentials Committee of Nanticoke decided to restrict Plaintiff's ability to practice by reducing his clinical privileges and prohibiting him from performing carotid endarterectomies and cerebral angiograms. In a letter written by Harry Anthony, Jr., M.D., Nanticoke on November 7, 2006, he requested on behalf of Nanticoke's Credentials Committee that Plaintiff amend his reappointment application to remove carotid endarterectomies and cerebral angiograms.

16.     The purported basis of Dr. Anthony's request was that Nanticoke's Credentials Committee had performed research which showed that a physician must perform a minimum number of certain types of surgery in order to maintain proficiency. Because the surgeries performed by Dr. Yatco fell below those numbers, Dr. Anthony asked him to withdraw his application to perform carotid endarterectomies and cerebral angiograms.

17.     Dr. Anthony advised further that the Credentials Committee would review the matter on November 13, 2006 and closed his letter by threatening to report Dr. Yatco to the Medical Practitioners' Databank if Plaintiff persisted in applying to perform these procedures. (A copy of Dr. Anthony's November 7, 2006 letter is attached as Exhibit A.)

18.     Plaintiff received Dr. Anthony's letter on November 16th, after he returned from vacation. He responded immediately by asking for the minutes of the Credentials Committee Meeting (a copy of Dr. Yatco's November 16, 2006 letter is attached as Exhibit B),

19.     Dr. Anthony replied on December 4, 2006, by denying Plaintiff's, request stating that the minutes were confidential and could not be released and repeating his earlier statement, which was that the credentials committee had performed research "... which revealed the Leap

Frog recommendations of performing a minimum of ten to fifty per year to maintain competence." He offered to take any concerns that Plaintiff might have to the Credentials Committee. (A copy of Dr. Anthony's December 4, 2006 letter is attached as Exhibit C.)

20.    Not only was Plaintiff not provided with an opportunity to explain or counter the research purportedly conducted by Nanticoke, but also he was never given a copy of that research.

21.    On December 7, 2006, without providing an opportunity for Plaintiff to respond to Dr. Anthony's December 4, 2006 letter or to refute the basis for the Credentials Committee's recommendations or affording him a hearing, the Board of Directors of Nanticoke terminated Plaintiff's privileges to perform carotid endarterectomies and angiograms. (a copy of the December 7, 2006 Board of Directors letter authored by Douglas J. Connell, President and CEO of Nanticoke is attached as Exhibit D)

22.    Article 5.a.4 (b) of Nanticoke's Medical Staff Bylaws specifically provides that in the event that the Credentials Committee is considering a termination of some or all clinical privileges, the Chairperson of the committee must notify the individual doctor and "… invite the individual to meet prior to any final recommendation being made." The bylaws provide further that the individual doctor "… should be informed of the general nature of information supporting the recommendation contemplated and will be invited to discuss, explain or refute it." .

23. Nanticoke further violated Plaintiff's due process rights by failing to provide him with the right to a hearing after the recommendation was passed. Plaintiff should have been afforded the right to an appeal and a full hearing once the recommendation was made. Under Article 7, Hearing and Appeal Procedures, Plaintiff is entitled to a hearing as follows: "An individual is entitled to request a hearing whenever the Executive Committee makes one or more

6

of the following recommendations:  (5) revocation of clinical privileges." Article 7.A.1(a)(5)

further, under Article 7.A.3, when an adverse recommendation has been made, the (CEO) will

promptly give special notice of a recommendation which entitles an individual to request a

hearing.  This notice shall contain:  (a) a statement of the recommendation and the general reason

for it; (b) a statement that the individual has the right to request a hearing on the recommendation

within 30 days of receipt of this notice; and (c) a copy of the Article.  This was not provided to

Plaintiff.

24.     Despite the clear mandate of its own bylaws, as well as the clear mandate of the

law, Nanticoke and its Credentials/Executive Committee did not afford Plaintiff a hearing before

terminating his privileges.  Additionally, Nanticoke did not provide Plaintiff with a special notice

of recommendation as required under Article 7.A.3.

25.     By letter dated January 16, 2007, Plaintiff requested that Nanticoke reconsider its

decision (a copy of Plaintiff's request of January 16, 2007 is attached as Exhibit E).

26.     On January 26, 2007, without comment, Nanticoke wrote to Plaintiff and advised

that it had restored his privilege to perform cerebral angiograms.  (a copy of the January 26, 2008

letter by Douglas J. Connell, President and CEO of Nanticoke, notifying Plaintiff that this one

privilege had been restored is attached as Exhibit F)

27.     Plaintiff heard nothing further until February 12, 2007.  Without any hearing or

other chance for Plaintiff to present information, Nanticoke's Medical Executive Committee,

again advised Plaintiff that he could not perform carotid endarterectomies.  This time however,

Nanticoke developed a wholly new rationale for depriving Plaintiff of the privilege to perform

carotid endarterectomies.  Thus, in a letter dated February 12, 2007, Christopher Roberts, M.D.,

the Credentials Committee's Chairperson, advised Plaintiff that Nanticoke was unable to

7

maintain staff competency to support carotid endarterectomies and reaffirmed its decision revoking Plaintiff's privileges. This was the first time this reason was given for denying Plaintiff the privilege of performing carotid endarterectomies and there is no factual or scientific basis to support this action. (a copy of the February 12th letter from Christopher Roberts, M.D is attached as Exhibit G).

28.    As shown above, in the period of three short months, Nanticoke, and its Credentials and Board of Directors Committees removed Plaintiff's privileges based on alleged research which they had conducted concerning his competence and then restored one of those privileges, the right to perform cerebral angiograms, without any explanation. Nanticoke continued to deny Plaintiff the privilege of performing cerebral endarterectomies, but changed its rationale from a concern over Plaintiff's competence to a concern over the competence of Nanticoke's own hospital staff. All of this was performed without ever affording Plaintiff the fundamental privilege, as guaranteed by Plaintiff's bylaws and the law, of a hearing or even sharing with him the facts or research upon which Nanticoke relied.

29.    The only evidence cited by Nanticoke to terminate Plaintiff's privileges was the "Leap Frog" recommendations referred to in Dr. Anthony's letter of December 4, 2006. These recommendations are not based on any scientific research but are instead the product of a medical advocacy group who used their own subjective beliefs to develop the Leap Frog standard and who do not have any empirical data to support it. The Leap Frog standard is not therefore a true standard based on scientific data or upon any analysis of the competence of surgeons. It is instead based on the non-scientific desires of the members of the advocacy group which published them and nothing more.

30.    Both before and after Nanticoke's use of the Leap Frog standards, no independent research was conducted by Nanticoke's Credentials Committee, nor is there any research which supports the action of Nanticoke or its Credentials Committee.   In fact, Plaintiff has discovered that the advocacy group that published the Leap Frog standard has since disavowed it, finding that the number of procedures performed has little effect on the success rate for carotid endarterectomies.   It is clear that the selective application of the Leap Frog standard to Plaintiff was merely a pretext for curtailing Plaintiff's privileges to perform surgery at Nanticoke.

31.    The net result of Defendants' actions has been to deprive Plaintiff of the opportunity and privilege to practice surgery and perform procedures in his specialties, i.e., thoracic and vascular surgery.

**COUNT I**

**DUE PROCESS VIOLATION**

32.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 31 above.

33.    As a federal and state funded and regulated hospital, Nanticoke has adopted medical staff bylaws as well as rules and regulations governing the practice of medicine within its confines.   Among other things, the staff bylaws and rules and regulations of Nanticoke provide that Nanticoke will accord fundamental due process in administering its credentialing processes.

34.    Article 5.a.4 (b) of the Nanticoke's Medical Staff Bylaws specifically provides that in the event that the Credentials Committee is considering a reduction in clinical privileges, the Chairperson of the committee must notify the individual doctor and "…invite the individual to meet prior to any final recommendation being made."   The bylaws provide further that the

individual doctor "...should be informed of the general nature of information supporting the recommendation contemplated and will be invited to discuss, explain or refute it."    Further, Article 7.A.1(a)(5) specifically provides that whenever a recommendation has been made by the Executive Committee to terminate a Medical Staff member's privileges, that member shall be afforded the right to a hearing.    Article 7.A.3. provides that in the event of an adverse recommendation by the Executive Committee under Article 7.A.1, the Executive Committee shall provide the individual with a special notice or recommendation which shall include a statement of the recommendation and the general reasons for it; (b) a statement that the individual has the right to request a hearing on the recommendation within 30 days of receipt of this notice; and, (c) a copy of this Article.

35.    Nanticoke violated its own rules and regulations and abused the trust placed in it by Plaintiff by doing the following:

a.    Adopting credentialing standards which had no scientific basis.

b.    Applying the non-scientific credentialing standards which it adopted discriminatorily to Plaintiff.

c.    Failing to invite Plaintiff to meet prior to making its recommendation.

d.    Refusing to provide Plaintiff copies of its minutes and otherwise failing to inform him of the general nature of information supporting the Credentials Committee's proposed action in detail sufficient for him to prepare a response.

e.    Failing to provide Plaintiff with sufficient notice of its proposed action and making its final decision before Plaintiff could refute its basis or otherwise respond.

f.    Failing to provide Plaintiff notice of his right to a hearing.

g.　　Failing to provide Plaintiff a right to hearing to contest the recommendation of the hospital.

36.　　Plaintiff relied upon Nanticoke to follow its own rules and to accord him basic due process rights before taking action which would deprive him of the ability to pursue his chosen profession. By taking action as aforesaid, Nanticoke deprived Plaintiff of the right to practice without following its own rules and without first according him his basic due process rights.

## COUNT II

## VIOLATION OF CONTRACTUAL DUTIES

37.　　Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 36 above.

38.　　Based upon his belief that Nanticoke would follow its own rules and would permit him to practice in accordance with those rules, Plaintiff established his practice within the area served by Nanticoke and provided services and other valuable consideration to Nanticoke during the period he practiced. When Nanticoke violated its own rules as well as commonly accepted practices of good faith and fair dealing, it breached its contractual obligations to Plaintiff and, as a result, Plaintiff was harmed and suffered damages.

39.　　As a result of Plaintiff's conduct as recounted in Counts I and II above, Plaintiff has suffered:

A.　　Great pain and emotional distress, harm, and anguish;

B.　　Loss of his ability to practice medicine.

C.　　Loss of income and benefits.

11

WHEREFORE, Plaintiff demands relief in his favor and against Defendant as follows:

(a)     Awarding Plaintiff compensatory and punitive damages as a result of the actions of Defendant,

(b)     Awarding Plaintiff his costs and disbursements in this action, including reasonable attorneys' fees and experts' fees; and,

(c)     Awarding plaintiff pre and post judgment interest; and,

(d)     Awarding plaintiff such other and further relief as this Court may deem just and proper.

**BIGGS AND BATTAGLIA**


Robert D. Goldberg, Esquire (# 631)
921 North Orange Street
P.O. Box 1489
Wilmington, Delaware 19899-1489
(302) 655-9677
Attorneys for Plaintiff Eduardo Yatco, M.D.

DATED: June 9, 2008

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

EDUARDO YATCO, M.D.

**DEFENDANTS**

NANTICOKE HEALTH SERVICES

**(b)** County of Residence of First Listed Plaintiff    SUSSEX
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    SUSSEX
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

ROBERT D. GOLDBERG, ESQUIRE
BIGGS & BATTAGLIA

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | **PERSONAL INJURY** | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 362 Personal Injury - Med. Malpractice | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 365 Personal Injury - Product Liability | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 650 Airline Regs. | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
U.S. Constitution Article XIV.

Brief description of cause:
Denial of Due Process in credentialing of surgeon.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
6/9/08

SIGNATURE OF ATTORNEY OF RECORD
_(signature)_

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse  (Rev. 12/07)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.      (a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.      Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

**III.      Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.      Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.      Origin.**  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

**VI.      Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**.          Example:          U.S. Civil Statute: 47 USC 553
                                                                        Brief Description: Unauthorized reception of cable service

**VII.      Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.      Related Cases.**  This section of the JS 44 is used to reference related pending cases if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 8 - 3 4 2 _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

_____
(Date forms issued)

_____
(Signature of Party or their Representative)

_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action