IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDUARDO YATCO, M.D., | : | |
| | : | C.A. No. 08-342 SLR |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NANTICOKE HEALTH SERVICES, | : | |
| INC., | : | |
| | : | |
| Defendant. | : | |

OPENING BRIEF
IN SUPPORT OF MOTION TO DISMISS

David R. Hackett, Esquire (#424)
GRIFFIN & HACKETT, P.A.
Attorneys for Defendant, Nanticoke Health
Services, Inc.
116 W. Market Street
P.O. Box 612
Georgetown, DE 19947
302-856-9066

FILED:  August 1, 2008

F:\debbie\Nan9\YATCO\Brief_Op MTD.wpd

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING  . . . . . . . . . . . . . . . . . .  1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

    I.       STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

    II.      PLAINTIFF FAILS TO SATISFY THE BURDEN UNDER RULE 12(b)(1) OF PROVING THE EXISTENCE OF SUBJECT MATTER JURISDICTION.  . . . . . . . .  10

    III.     THE COMPLAINT FAILS TO CONTAIN A STATEMENT OF CLAIM SHOWING THAT THE PLAINTIFF IS ENTITLED TO RELIEF.  . . . . . . . . . . . . . . . . . . . . .  14

    IV.     BECAUSE THE COMPLAINT FAILS TO STATE A FEDERAL CLAIM, THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER THE SUPPLEMENTAL STATE LAW CLAIM.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

    V.      DEFENDANT IS ENTITLED TO AN AWARD OF ATTORNEY'S FEES PURSUANT TO 42 U.S.C. § 1988(b).  . . . . . . . . . . . . . . . . . . . . . . . .  22

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

## TABLE OF AUTHORITIES

**Cases**

Acosta v. Tyrone Hosp., 410 F. Supp. 1275 (W. D. Pa. 1976) . . . . . . . . . . . . . . . . . . . 18

Adelman v. Mercy Catholic Med. Ctr., C.A. No. 95-7256, 1996 U.S. Dist. LEXIS
        16238 (E.D. Pa. Oct. 30, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40 (1999) . . . . . . . . . . . . . . . . . . . . . . 15

Antinoro v. Wilmington Med. Ctr., Inc., C.A. No. 74-162, 1975 U.S. Dist. LEXIS
        14702 (D. Del. Dec. 19, 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Avallone v. Wilmington Med. Ctr., Inc., 553 F. Supp. 931 (D. Del. 1982) . . . . . . . . . . . 17

Beam v. Downey, 2005 U.S. App. LEXIS 22008 (3rd Cir. Oct. 12, 2005) . . . . . . . . . .  22, 23

Blumb v. Yaretsky, 457 U.S. 991 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 17

Brown v. Borough of Chambersburg, 903 F.2d 274 (3rd Cir. 1990) . . . . . . . . . . . .  22, 23

Canady v. Providence Hosp., 903 F. Supp. 125 (D.D.C. 1995) . . . . . . . . . . . . . . . . . . 18

Christianburg Garment Co. v. EEOC, 434 U.S. 412 (1978) . . . . . . . . . . . . . . . . . . . . 22

D'Alessandro v. ACLU, Civ. No. 06-212-GMS, 2006 U.S. Dist. LEXIS 82237
        (D. Del. Nov. 8, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Davis v. Prudential Securities, Inc., 59 F.3d 1186 (11th Cir. 1995) . . . . . . . . . . . . . . . 15

Deshaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189 (1989) . . . . . . . . . . 15

Dukes v. U.S. Healthcare, Inc., 57 F.3d 350 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . 12

Ehart v. Odessa Fire Co., Civ. No. 02-1618-SLR, 2005 U.S. Dist. LEXIS 2244
        (D. Del. Feb. 2, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Field v. Hall, C.A. No. 93-415 MMS,1995 U.S. Dist. LEXIS 8418 (D. Del. May 19, 1995) . . . 16

Floyd v. Saturn of Newark, C.A. No. 04-944-JF, 2006 U.S. Dist. LEXIS 2466
        (D. Del. Jan. 24, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Franchise Tax Bd. of California v.  Constr. Laborers Vacation Trust for
        Southern California, 463 U.S. 1 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Freilich v. Bd. of Dirs. of Upper Chesapeake Health, Inc., 142 F. Supp. 2d
        679 (D. Md. 2001), affirmed, 313 F.3d 205 (4th Cir. 2002) . . . . . . . . . . . . . . . . . 18

Hodge v. Paoli Mem'l Hosp., 576 F.2d 363 (3d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . 18

Holton v. Crozer-Chester Med. Cntr., 419 F. Supp. 334 (E.D. Pa. 1976),
    vacated on other grounds, 560 F.2d 573 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . 18

Hughes v. Rowe, 49 U.S. 5 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Human Genome Scis., Inc. v. Amgen, Inc., 552 F. Supp.2d 466 (D. Del. 2008) . . . . . . . 8, 9

Humes v. State of Del. Court of Common Pleas, Civ. No. 06-59-SCR, 2006
    U.S. Dist. LEXIS 68729 (D. Del. Sept. 25, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Jackson v. Metro. Edison Co., 419 U.S. 345 (1974) . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Jeung v. McKrow, 264 F. Supp. 557 (E.D. Mich. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 19

Kokkomen v. Guardian Life Ins. Co. of Am., 511 U.S. 375 (1994) . . . . . . . . . . . . . . . . . 8

Langdon v. Google, Inc., 474 F. Supp.2d 622 (D. Del. 2007) . . . . . . . . . . . . . . . . . . . . 17

Luban v. Crittenden Hosp. Assoc., 713 F.2d 414 (8th Cir. 1983) . . . . . . . . . . . . . . . . . 13

Lugar v. Edmundson Oil Co., 457 U.S. 922 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58 (1987) . . . . . . . . . . . . . . . . . . . . . . . 11

Miller v. Indiana Hosp., 562 F. Supp. 1259 (W. D. Pa. 1983) . . . . . . . . . . . . . . . . . . . . 18

Modaber v. Culpepper Mem'l Hosp., Inc., 674 F.2d 1023 (4th Cir. 1982) . . . . . . . . . . . 18

N. Mich. Hosps., Inc. v. Health Net Fed. Servs., LLC, C.A. No. 07-039 and
    07-069, 2008 U.S. Dist. LEXIS 42587 (D. Del. May 30, 2008) . . . . . . . . . . . . . . . . . . 8

Neitzke v. Williams, 490 U.S. 319 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Pamintuan v. Nanticoke Mem'l Hosp., Inc., C.A. No. 96-233-SLR, 1997 U.S.
    Dist. LEXIS 3300 (D. Del. Feb. 24, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Phillips v. Pitt County Mem'l Hosp., Inc., 503 F. Supp.2d 776 (E.D. N.C. 2007) . . . . . . . . 19

Pinhas v. Summit Health Ltd., 894 F.2d 1024 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . 18

Quinn v. Kent General Hospital, Inc., 617 F. Supp. 1226 (D. Del. 1985) . . . . . . . . . . . . . 17

Royal Oak Entm't., LLC v. City of Royal Oak, 46 F. Supp.2d 675 (E.D. Mich. 2007) . . . . . 23

Sament v. Hanemann Med. Coll. and Hosp., 413 F. Supp. 434 (E.D. Pa. 1976) . . . . . . . . 18

Sarin v. Samaritan Health Ctr., 813 F.2d 755 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . 18

Slavcoff v. Harrisburg Polyclinic Hosp., 375 F. Supp. 999 (Mid. D. Pa. 1974) . . . . . . . . 18

Smith v. Delaware First Fed. Credit Union, 395 F. Supp.2d 127 (D. Del. 2005) . . . . . . . 13

Thompson v. Cmty. Action of Greater Wilmington, Inc., 567 F. Supp. 1159
    (D. Del. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Wong v. Stripling, 881 F.2d 200 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Statutes**

15 U.S.C. § 78 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 11-13, 20

28 U.S.C. § 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10, 11

28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11, 20, 21, 24

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13, 14, 16, 22, 23

42 U.S.C. § 1988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22-24

**Other Authorities**

Fed. R. Civ. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Internal Revenue Code § 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

U.S. Const. amend V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Const. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

On June 9, 2008, the Plaintiff, Eduardo Yatco, M.D. ("Dr. Yatco"), filed his Complaint[1] naming Nanticoke Health Services, Inc. ("NHS") as Defendant, seeking compensatory and punitive damages as a result of the failure on the part of NHS to afford him a hearing in connection with discontinuance of the availability of privileges to perform carotid endarter-ectomies at Nanticoke Memorial Hospital (the "Hospital") and breach of contract.

Herewith, NHS has filed its Motion to Dismiss Dr. Yatco's Complaint under Federal Rules of Civil Procedure ("Fed. R. Civ. P." or "Rule") 12(b)(1) because the Court lacks jurisdiction of the subject matter, and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted.

This is NHS's Opening Brief in Support of its Motion to Dismiss.

---

[1] References to the Complaint will be cited as "D.I.1. ¶ ___ ."  References to Exhibits attached to the Complaint will be cited as "D.I.1. Ex. ___."

## SUMMARY OF ARGUMENT

1.    Dr. Yatco attempts to show that the Court has subject matter jurisdiction under 28 U.S.C. § 1331, claiming denial of due process guaranteed by the due process clause of the Constitution of the United States, but he fails to allege jurisdictional facts demonstrating state action in this case.

2.    Should this Court determine that Dr. Yatco properly has pleaded a federal question sufficient to invoke subject matter jurisdiction, Count I of the Complaint, nevertheless, should be dismissed pursuant to Fed. R. Civ. R. 12(b)(6) for the reason that Dr. Yatco fails to establish that NHS was acting "under color of state law" at the time the acts complained of occurred.

3.    If the Court should dismiss Count I of the Complaint, then it should decline to exercise supplemental jurisdiction over the state law claims in Count II.

4.    Dr. Yatco's alleged federal claim is frivolous, unreasonable or without foundation, and the Court may, in its discretion, award NHS attorney's fees pursuant to 42 U.S.C. § 1988.

## STATEMENT OF FACTS

Dr. Yatco's Complaint claims liability on the part of NHS for compensatory and punitive damages, costs and disbursements in this action, including attorney's fees and expert's fees, and pre-judgment and post-judgment interest arising from a due process violation on the part of NHS (Count I), and violation of contractual duties on the part of NHS (Count II).

The following statement of facts is based upon allegations in the Complaint; facts set forth in exhibits attached to the Complaint; and facts with reference to which the Court can take judicial notice.

1.     **THE PARTIES.**

A.     **Eduardo Yatco, M.D.**  Dr. Yatco is a citizen of the State of Delaware.  During the period alleged in the Complaint, Dr. Yatco operated a medical office at 8866 Riverside Drive, Seaford, Delaware, and practiced medicine as a general surgeon with specialties in thoracic and vascular surgery.  D.I.1. ¶2.  Dr. Yatco established his practice in the area served by the Hospital in July of 1979 and practiced medicine and performed surgery as a member of the Medical Staff of the Hospital from 1979 through December 31, 2007.  Id. at ¶9.

B.     **Nanticoke Health Services, Inc.**   NHS is a Delaware non-profit corporation exempt from taxation under Internal Revenue Code ("IRC") § 501(c)(3).  NHS is the parent corporation of the Hospital.  NHS, acting by and through its Board of Directors, serves as the governing body of the Hospital.  D.I.1. at ¶3 and Ex. F and G.

C.     **Nanticoke Memorial Hospital, Inc.**  Although the acts complained of in the Complaint are attributable solely to the Hospital, the Hospital has not been joined as a party.  See D.I.1. ¶¶ 3, 6, 13.f)iv and Ex. A, C, and D for specific references to the Hospital.  The Hospital is a Delaware non-profit corporation exempt from taxation under IRC § 501(c)(3).  The Hospital

owns and operates a 119-bed primary acute care hospital facility located at 801 Middleford Road, Seaford, Delaware (the "Hospital Facility"), and has a service area of western Sussex County, Delaware and eastern Dorchester County, Maryland.  The Hospital has organized and established within the Hospital Facility a medical staff ("Medical Staff") consisting of all physicians, dentists and podiatrists who have been granted the right to exercise clinical privileges within the Hospital Facility and which has been delegated the responsibility of pro-viding appropriate and necessary professional care to the Hospital's patients and the responsi-bility for the quality of care provided to the patients in the Hospital Facility.  The Medical Staff has adopted By-laws, including a Credentials Policy governing the organization, operation and self-discipline of the Medical Staff and such Rules and Regulations as are necessary to implement the general principles found within such By-laws; to promote, assure and improve the delivery of quality health care within the Hospital Facility, and to provide for efficient operation of the Hospital (collectively, the "Medical Staff By-laws").  D.I.1. ¶¶ 22, 23, 24, 34, and 35.

2.    **JURISDICTIONAL FACTS**.

Dr. Yatco alleges that the jurisdiction of this Court is founded upon "15 U.S.C. § 78(a)(a)."  D.I.1. ¶1.  15 U.S.C. § 78aa grants the District Court exclusive jurisdiction of viola-tions of the Securities Exchange Act of 1934 or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by the Act or the rules and regulations thereunder.  See 15 U.S.C. § 78aa and 15 U.S.C. § 78a.  Dr. Yatco did not allege any facts showing a violation of the Securities Exchange Act, and the Complaint clearly shows that the action claimed therein is not brought to enforce any liability or duty created by the Act.

Dr. Yatco also claims that the jurisdiction of this Court is founded upon 28 U.S.C. § 1332. D.I.1. ¶1. He alleges that the matter in controversy exceeds the value of $75,000, exclusive of interest and costs, but does not allege diversity of citizenship. See Id. at ¶¶ 1-4. Dr. Yatco alleges that he is "a citizen of the State of Delaware." Id. at ¶2. He further alleges that NHS "is a corporation of the State of Delaware and is the operator of Nanticoke Memorial Hospital, Inc. at 801 Middleford Road, Seaford, Delaware 19973." Id. at ¶3.

Finally, Dr. Yatco alleges supplemental jurisdiction over certain state law breach of contract claims set forth in Count II of the Complaint pursuant to 28 U.S.C. § 1367. D.I.1. ¶1; see also, Count II of the Complaint. Id. at ¶¶ 37-39.

In the Complaint, Dr. Yatco does not specifically allege that the Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), but alleges in paragraph 5 thereof as follows: "The claims herein arise, *inter alia,* under the due process clause of the Constitution of the United States." D.I.1. ¶ 5. Dr. Yatco attempts to state a federal question in Count I of his Complaint that would give rise to subject matter jurisdiction under 28 U.S.C. § 1331. See Id. ¶¶ 32-36.

Count I of the Complaint is entitled "DUE PROCESS VIOLATION." Jurisdictional facts alleged in Count I and elsewhere in the Complaint, ostensibly to demonstrate subject matter jurisdiction under 28 U.S.C. § 1331, are as follows:

- By letter dated February 12, 2007 to Dr. Yatco from Christopher Roberts, M.D., Credentials Chairperson, Dr. Yatco was informed that the governing body of the Hospital "has determined that the staff does not have the current training and volume to support doing carotid endarterectomies." The letter further stated: "The privileges therefore are not available at this time." See D.I.1. ¶27 and Ex. G.

- In connection with the discontinuance of the availability of the privilege to perform carotid endarterectomies, Dr. Yatco was not afforded "any hearing or other chance for [Dr. Yatco] to present information . . . ."  D.I.1 ¶27; see also, Id. at ¶28 ("All this was performed without ever affording Plaintiff the fundamental privilege, as guaranteed by Plaintiff's By-laws and the law, of a hearing . . . .").

- "As a federal and state funded and regulated hospital, Nanticoke has adopted Medical Staff bylaws as well as rules and regulations governing the practice of medicine within its confines.  Among other things, the staff bylaws and rules and regulations of Nanticoke provide that Nanticoke will accord fundamental due process in administering its credentialing processes."  D.I.1. ¶33.

- "Further, Article 7.A.1(a)(5) [of the Medical Staff By-laws] specifically provides that whenever a recommendation has been made by the Executive Committee to terminate a Medical Staff member's privileges, the member shall be afforded the right to a hearing."  D.I.1. ¶34; see also, Id. at ¶35.f. and g.

- "Plaintiff relied upon Nanticoke to follow its own rules and to accord him basic due process rights before taking action which would deprive him of the ability to pursue his chosen profession.  By taking action as aforesaid, Nanticoke deprived Plaintiff of the right to practice without following its own rules and without first according him his basic due process rights."  D.I.1. ¶36.

- Simply stated, Dr. Yatco accuses NHS of not abiding by the Hospital's Medical Staff By-laws due process rights when the Hospital discontinued the availability of carotid endarterectomies privileges.  See D.I.1. ¶¶ 34 and 35 "e" and "g" and Ex. G.

3.    **FACTS RELATED TO THE MERITS.**

If Dr. Yatco is attempting to allege that his federal due process rights were violated and that NHS is liable to him under 42 U.S.C. § 1983, then he must allege that violation of his federal due process rights is "fairly attributable to the state."  See, e.g., <u>Lugar v. Edmundson Oil Co.</u>, 457 U.S. 922, 937 (1982).  The only facts alleged by Dr. Yatco, ostensibly to demonstrate state action in this case, are as follows:

- NHS is a "federal and state funded and regulated hospital . . . ."  D.I.1. ¶33.

## ARGUMENT

**I.    STANDARD OF REVIEW.**

NHS brings its Motion to Dismiss under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

**A.    Rule 12(b)(1).**

In <u>Human Genome Scis., Inc. v. Amgen, Inc.</u>, 552 F. Supp.2d 466 (D. Del. 2008), the

Court stated:

> When subject matter jurisdiction is challenged under Rule 12(b)(1), the party
> asserting subject matter jurisdiction bears the burden of proving its existence;
> the District Court is to regard the pleadings as mere evidence and may consider
> evidence outside the pleading without converting the proceeding to one for
> summary judgment.

Challenges to subject matter jurisdiction may be facial or factual:  "Facial attacks contest the

sufficiency of the pleadings, while factual attacks contest the existence of subject matter

jurisdiction in fact." <u>N. Mich. Hosps., Inc. v. Health Net Fed. Servs., LLC</u>, C.A. No. 07-039 and

07-069, 2008 U.S. Dist. LEXIS 42587, at *9 (D. Del. May 30, 2008) (**Exhibit A**).  "For a facial at-

tack, the court must consider the complaint's allegations as true and draw all reasonable

inferences in the Plaintiff's favor.  Conversely, for a factual attack, the trial court does not

presume these allegations to be true, and it is free to weigh evidence relating to jurisdiction

to satisfy itself as to the existence of the power to hear the case." <u>Id.</u> at *9.

The United States Supreme Court has stated:  "It is to be presumed that a cause lies

outside [the District Court's] limited jurisdiction, and the burden of establishing the contrary

rests upon the party asserting jurisdiction." <u>Kokkomen v. Guardian Life Ins. Co. of Am.</u>, 511

U.S. 375, 377 (1994) (citations omitted).  A court must dismiss pleadings that do not satisfy

this burden under Rule 12(b)(1).  See Fed. R. Civ. P. 12(h)(3) (requiring the Court to dismiss

an action "whenever it appears by suggestion of the parties or otherwise that the Court lacks

jurisdiction of the subject matter").

NHS will show that Dr. Yatco does not and cannot satisfy his burden of proving that subject matter jurisdiction exists.

**B.    Rule 12(b)(6).**

In Human Genome Scis., Inc. v. Amgen, Inc., the court states:

> In considering a motion to dismiss under Rule 12(b)(6), the defendant/movant bears the burden of showing that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The court must accept all factual allegations in the complaint as true and take them in the light most favorable to plaintiff. Nevertheless, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. A complaint does not need detailed factual allegations; however, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. The factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact).

552 F. Supp.2d 466.

NHS will show that Dr. Yatco can prove no set of facts in support of his claim of due process violation on the part of NHS, a private entity and the parent corporation of a non-governmental hospital, which would entitle him to relief.

## II.    PLAINTIFF FAILS TO SATISFY THE BURDEN UNDER RULE 12(b)(1) OF PROVING THE EXISTENCE OF SUBJECT MATTER JURISDICTION.

The Federal Rules of Civil Procedure require each pleading that sets forth a claim for relief to also set forth "a short and plain statement of the grounds upon which the court's jurisdiction depends." Fed. R. Civ. P. 8(a)(1).

Dr. Yatco attempts to state the grounds upon which the Court's jurisdiction depends in the Complaint, as follows:

- **15 U.S.C. § 78aa**

In paragraph 1 of the Complaint, Dr. Yatco alleges as follows: "The jurisdiction of this Court is founded upon 15 U.S.C. § 78(a)(a) [SIC] . . . ." D.I.1. ¶1.  15 U.S.C. § 78aa grants the District Courts exclusive jurisdiction of violations of the Securities Exchange Act of 1934 or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by the Act or the rules and regulations thereunder.  See 15 U.S.C. § 78aa and 15 U.S.C. § 78a.  Dr. Yatco did not allege any facts showing a violation of the Securities Exchange Act, and the Complaint clearly shows that the action claimed therein is not brought to enforce any liability or duty created by the Act.  The Court does not have subject matter jurisdiction under 15 U.S.C. § 78aa.

- **28 U.S.C. § 1332**

In paragraph 1 of the Complaint, Dr. Yatco alleges:  "The jurisdiction of this Court is founded upon . . . 28 U.S.C. § 1332 . . . ." D.I.1. ¶1.  This statute grants original jurisdiction to the District Courts where there is diversity of citizenship of the parties and the matter in controversy exceeds $75,000.  See 28 U.S.C. § 1332.  Dr. Yatco alleges: "The matter in controversy exceeds the value of $75,000.00, exclusive of interest and costs."  See D.I.1. ¶4.

However, Dr. Yatco does not allege diversity of citizenship.  To the contrary, he states that

he is a citizen of Delaware and that NHS is a corporation of the State of Delaware.  See D.I.1.

¶¶ 2-3.  The Court does not have subject matter jurisdiction under 28 U.S.C. § 1332.

- **28 U.S.C. § 1331**

In paragraph 5 of the Complaint, Dr. Yatco asserts that the Court has federal question

jurisdiction, alleging as follows:  "The claims herein arise, *inter alia*, under the Due Process

Clause of the Constitution of the United States."  However, as will be shown below, Dr. Yatco

fails to satisfy the burden of proving subject matter jurisdiction under 28 U.S.C. § 1331, which

grants the District Courts' original jurisdiction "of all civil actions arising under the Constitu-

tion, laws or treaties of the United States."  See 28 U.S.C. § 1331.

- **28 U.S.C. § 1367**

Dr. Yatco alleges, in paragraph 1 of the Complaint, that the Court has supplemental

jurisdiction over the state law breach of contract claim set forth in Count II of the Complaint

under 28 U.S.C. § 1367.  See D.I.1. ¶¶1 and 37-39.  There is nothing federal about this claim

and, therefore, it cannot support federal question jurisdiction.  If the Court grants NHS's

Motion to Dismiss on other claims for the reason that it lacks subject matter jurisdiction, it

may decline to exercise supplemental jurisdiction over the state claims under 28 U.S.C.

§ 1367a.  See 28 U.S.C. § 1367(c)(3).

Dr. Yatco attempts to invoke the Court's federal question jurisdiction under 28 U.S.C.

§ 1331 in Count I of his Complaint, entitled "DUE PROCESS VIOLATION".

To determine whether a claim "arises under" federal law, the Court must apply the

"well-pleaded complaint rule."  See Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63 (1987).

Under this rule, a civil action "arises under" federal law only if a federal question is presented

on the face of the plaintiff's properly pleaded complaint. Dukes v. U.S. Healthcare, Inc., 57 F.3d 350, 353 (3d Cir. 1995).

In Count I of the Complaint, Dr. Yatco alleges that NHS violated due process rights afforded him under the Medical Staff By-laws by not granting a hearing in connection with the Hospital's notice to him on February 12, 2007 that the Medical Staff privilege to perform carotid endarterectomies was no longer available at that time.[2] See D.I.1. Count I and Ex. G. Dr. Yatco's accusation is not a federal claim that would support this Court's jurisdiction under 28 U.S.C. § 1331. See Adelman v. Mercy Catholic Med. Ctr., C.A. No. 95-7256, 1996 U.S. Dist. LEXIS 16238, at *10 (E.D. Pa. Oct. 30, 1996) (A physician's accusation that a hospital did not abide by its procedures manual in suspending his privileges is not a federal claim that would support the Court's jurisdiction under 28 U.S.C. § 1331.) (**Exhibit C**).

Pursuant to 28 U.S.C. § 1331, federal courts have federal question jurisdiction over "cases in which a well pleaded complaint establishes either that the federal law creates the cause of action or the plaintiff's rights to relief necessarily depends on resolution of a substantial question of federal law." Franchise Tax Bd. of California v. Constr. Laborers Vacation Trust for Southern California, 463 U.S. 1, 27-28 (1983). Dr. Yatco has alleged no facts which establish that federal law creates the cause of action asserted in the Complaint whereby relief could be granted pursuant to federal law or that his right to relief necessarily depends upon resolution of a substantial question of federal law. Dr. Yatco has not pled a federal question,

---

[2] It is doubtful that Dr. Yatco can prevail on the merits of this claim. It has been held in Delaware that where, as here, medical staff by-laws provide for a hearing where the privileges of a physician are diminished because of ethical and clinical competence issues, a physician is not entitled to a hearing when his privileges are not renewed because of administrative issues or a management decision. Kramer v. Kent General Hosp., C.A. No. 85C-AU-20 (Kent), 1992 Del. Super. LEXIS 160, at *20 (Del. Super. Feb. 28, 1992) (**Exhibit B**).

and this matter should be dismissed.  See, e.g., <u>Floyd v. Saturn of Newark</u>, C.A. No. 04-944-JF,

2006 U.S. Dist. LEXIS 2466 (D. Del. Jan. 24, 2006) (Rule 12(b)(1) Motion to Dismiss granted for

failure to plead a federal question) (**Exhibit D**); see also, <u>Smith v. Delaware First Fed. Credit</u>

<u>Union</u>, 395 F. Supp.2d 127, 131-132 (D. Del. 2005) (Plaintiff fails to identify any applicable

federal law, and the court concluded that Plaintiff's allegations failed to support federal ques-

tion jurisdiction.)  Finally, in the case of <u>Luban v. Crittenden Hosp. Assoc.</u>, 713 F.2d 414  (8th

Cir. 1983), a physician brought a civil rights action pursuant to 42 U.S.C. § 1983 against a

private Hospital, alleging that disciplinary action by the hospital deprived him of due process.

The court found that the hospital was a private, non-profit tax-exempt organization located

on county land and in a building owned by the county; received local funds; received federal

funds, including Hill-Burton funds and Medicare and Medicaid reimbursement; and was subject

to extensive governmental regulations as a health care facility.  The court held:  "It is well

established that if the action of the hospital was purely private action, then Section 1983

affords no basis for federal jurisdiction and [the physician's] claim was property dismissed for

lack of subject matter jurisdiction."  <u>Id.</u> at 415.

The Court does not have subject matter jurisdiction under 28 U.S.C. § 1331.

III.    **THE COMPLAINT FAILS TO CONTAIN A STATEMENT OF CLAIM SHOWING THAT THE PLAINTIFF IS ENTITLED TO RELIEF.**

Federal Rule of Civil Procedure 8 requires each complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If the Complaint does not satisfy the standard, it must be dismissed under Fed. R. Civil P. 12(b)(6).

If Dr. Yatco is attempting to allege that his federal due process rights afforded under the Fourteenth Amendment were violated and that NHS is liable to him under 42 U.S.C. § 1983,[3] the claim must be dismissed under Rule 12(b)(6) for the reason that Dr. Yatco fails to allege that the asserted violation of his federal due process rights is "fairly attributable to the state." See Lugar, 547 U.S. at 937; see also, Ehart v. Odessa Fire Co., Civ. No. 02-1618-SLR, 2005 U.S. Dist. LEXIS 2244, at *8 (D. Del. Feb. 2, 2005) ("A prima facia case under Section 1983 requires a plaintiff to demonstrate: (1) a person acting under color of state law; (2) deprived plaintiff of a federal right.") (**Exhibit E**).

As stated above, Dr. Yatco accuses NHS of violating the due process rights available to him under the Medical Staff By-laws when it failed to afford him a hearing in connection with the NHS February 12, 2007 notice that the Medical Staff privilege to perform carotid endarterectomies was no longer available at this time. See D.I.1. Count I and Ex. G. Dr. Yatco does not allege that NHS violated his Constitutional due process rights under 42 U.S.C. § 1983 by

---

[3] 42 U.S.C. § 1983 provides, in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other property proceeding for redress . . . "

failing to afford him a peer review hearing in connection with the discontinuance of the availability of carotid endarterectomy privileges. The only facts alleged by Dr. Yatco in the Complaint, apparently intended to support a claim of state action or action under color of state law, appear in paragraph 33 of the Complaint, which reads, in part, as follows: "As a federal and state funded and regulated hospital, Nanticoke has adopted medical staff bylaws as well as rules and regulations governing the practice of medicine within its confines." D.I.1. ¶33. Clearly, Dr. Yatco's allegations of due process violations fail to state a claim upon which relief can be granted.

Both NHS and the Hospital are private entities. The Supreme Court has recognized that:

> [N]othing in the language of the Due Process Clause itself requires the state to protect the life, liberty and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the state's power to act, not as a guarantee of certain minimal levels of safety and security.

Deshaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189, 196 (1989). The state action requirement for Fourteenth Amendment violations and the under-color-of state-law requirement of Section 1983 "converge." See Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 n.8 (1999). Both requirements "exclude [ ] from [their] reach merely private conduct, no matter how discriminatory or wrongful." Id. at 50 (internal quotation omitted). Indeed, "it is axiomatic that Constitutional due process protections do not extend to 'private conduct abridging individual rights.' " Davis v. Prudential Sec., Inc., 59 F.3d 1186, 1190 (11th Cir. 1995), citing Nat'l Collegiate Athletic Ass'n. v. Tarkanian, 488 U.S. 179, 191 (1988). Therefore, to assert an actionable claim under Section 1983 against a non-governmental defendant, the plaintiff must demonstrate a sufficiently close nexus between the state and the challenged

action of the defendant private entity to justify treating the conduct as "that of the state itself." Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974). Accordingly, every successful Section 1983 claim against a private entity must allege state involvement so pervasive that the challenged action can be said to be fairly attributable to the state, whether that involvement is effectuated through state coercion, state influence, state reliance or delegation of state power. See, e.g., Blumb v. Yaretsky, 457 U.S. 991, 1004 (1982).

In the case of Pamintuan v. Nanticoke Mem'l Hosp., Inc., C.A. No. 96-233-SLR, 1997 U.S. Dist. LEXIS 3300 (D. Del. Feb. 24, 1997) ( **Exhibit F**), the physician plaintiff claimed that the Hospital's actions in terminating her Medical Staff privileges violated her due process rights. The Hospital filed a Motion to Dismiss, arguing that "plaintiff cannot sustain a due process claim in the absence of any alleged state action . . . ." Id. at *2. The Court states: "Plaintiff [  ] acknowledges that she has not alleged any state action on the part of [the Hospital], and that in the absence of state action she cannot state a due process claim. Accordingly, [the due process claim of] the Complaint will be dismissed without further discussion." Id. at *23.

In Field v. Hall, C.A. No. 93-415 MMS,1995 U.S. Dist. LEXIS 8418 (D. Del. May 19, 1995) (**Exhibit G**), the plaintiff filed a civil rights suit under 42 U.S.C. § 1983, naming Beebe Medical Center, Beebe personnel and others as defendants, claiming violations of his Fourth, Fifth and Fourteenth Amendment rights under the Constitution of the United States. The Court held:

> Plaintiff has the burden of demonstrating that the [hospital] defendants deprived him of a federal right and, in doing so, they deprived him of that right while acting under color of state law. If plaintiff cannot show that [the hospital] and its staff were state actors in his alleged deprivation of constitutional rights, privileges or immunities, there is no liability under § 1983 for these defendants not acting under color of law.

Id. at 23.

The Supreme Court has developed a variety of approaches to assist in determining if state action exists, and this Court has utilized a number of these approaches. See, e.g., the recent case of Langdon v. Google, Inc., 474 F. Supp.2d 622, 631 (D. Del. 2007), a case applicable here, where, citing Blumb v. Yaretsky, 457 U.S. 991 (1982), the court found "there are insufficient allegations in the amended complaint that 'there is a sufficiently close nexus between the State and the challenged action of the [defendants] so that the action[s] of the latter may be fairly treated as that of the state itself'."

Dr. Yatco implicitly argues that NHS is a state actor for the reason that it is "a federal and state funded and regulated hospital." See D.I.1. ¶33. This theory was soundly rejected in the case of Avallone v. Wilmington Med. Ctr., Inc., 553 F. Supp. 931, 933-34 (D. Del. 1982), where, citing Blumb v. Yaretsky, 457 U.S. 991, the court held:  (1) "[t]he receipt of Medicare and Medicaid funds is insufficient to convert WMC's [Wilmington Medical Center] private actions into conduct actionable under the Fourteenth Amendment[,]" and (2) "[f]urthermore, the fact that WMC is licensed by the state and is subject to state health regulations is likewise insufficient as a matter of law to render WMC's conduct towards plaintiff state action."  See also, Antinoro v. Wilmington Med. Ctr., Inc., C.A. No. 74-162, 1975 U.S. Dist. LEXIS 14702, at *11 (D. Del. Dec. 19, 1975) (None of the plaintiff's examples of state involvement with the hospital, e.g., the hospital is subject to regulation by the state and the hospital has received substantial money from the state, indicate that the state is responsible for the hospital's actions.) (**Exhibit H**); and Quinn v. Kent General Hosp., Inc., 617 F. Supp. 1226, 1234-35 (D. Del. 1985) (Neither state administered subsidies nor state regulations confers upon the activities of a private hospital the status of state action for purposes of Section 1983.).

After Jackson v. Metro. Edison Co., 419 U.S. 345 (1974), courts in the Third Circuit have

declined to find state action by private hospitals in circumstances similar to those alleged by Dr. Yatco (state funding and state regulation). See, e.g., <u>Hodge v. Paoli Mem'l Hosp.</u>, 576 F.2d 363, 564 (3d Cir. 1978) (The receipt of Hill-Burton construction funding, Medicare and Medicaid funds, and state licensing requirements for non-profit hospitals do not constitute state action under Section 1983); <u>Slavcoff v. Harrisburg Polyclinic Hosp.</u>, 375 F. Supp. 999 (Mid. D. Pa. 1974); <u>Holton v. Crozer-Chester Med. Cntr.</u>, 419 F. Supp. 334 (E.D. Pa. 1976), vacated on other grounds, 560 F.2d 573 (3d Cir. 1997); <u>Sament v. Hanemann Med. Coll. and Hosp.</u>, 413 F. Supp. 434 (E.D. Pa. 1976); <u>Acosta v. Tyrone Hosp.</u>, 410 F. Supp. 1275 (W. D. Pa. 1976); <u>Miller v. Indiana Hosp.</u>, 562 F. Supp. 1259 (W. D. Pa. 1983). Indeed, the clear weight of authority holds that non-governmental hospitals are not state actors as a matter of law. See, e.g., <u>Sarin v. Samaritan Health Ctr.</u>, 813 F.2d 755, 759 (5th Cir. 1987) (In matters relating to revocation of a physician's privileges, no state action exists even though the hospital is licensed by the state and received federal funds); <u>Pinhas v. Summit Health Ltd.</u>, 894 F.2d 1024 (9th Cir. 1989) (holding that hospital's peer review process did not constitute state action); <u>Wong v. Stripling</u>, 881 F.2d 200 (5th Cir. 1989) (State procedural regulations applicable to hospital's suspension of physician's privileges do not suffice to establish the degree of joint participation required to convert private action into state action); <u>Modaber v. Culpepper Mem'l Hosp., Inc.</u>, 674 F.2d 1023 (4th Cir. 1982) (The withdrawal of medical staff privileges by a private hospital was not attributable to the state because it received federal funds, accepted Medicare and Medicaid patients, and was subject to extensive state and federal regulations); <u>Canady v. Providence Hosp.</u>, 903 F. Supp. 125, 127 (D.D.C. 1995) ("A decision to restrict staff privileges does not constitute state action."); <u>Freilich v. Bd. of Dirs. of Upper Chesapeake Health, Inc.</u>, 142 F. Supp. 2d 679 (D. Md. 2001), affirmed, 313 F.3d 205 (4th Cir. 2002) (state regulation of hospi-

tal's credentialing process did not make a hospital a state actor when it terminated physician's privileges);  Phillips v. Pitt County Mem'l Hosp., Inc., 503 F. Supp.2d 776 (E.D. N.C. 2007) (The receipt of state and federal funding and regulations does not transform a private hospital's suspension of physician's privileges into state action); and Jeung v. McKrow, 264 F. Supp. 557, 571 (E.D. Mich. 2003) (Private hospitals operating as tax-exempt organizations and receiving public funds through federal welfare programs are not thereby converted to state actors within the meaning of Section 1983 in connection with a withdrawal of medical staff privileges).

Dr. Yatco has clearly failed to demonstrate state action on the part of NHS.  Given the weight of authority holding that non-governmental hospitals are not state actors as a matter of law, Dr. Yatco can prove no set of facts in support of his claim of due process violations which would entitled him to relief.  Count I of his Complaint should be dismissed.

IV.    **BECAUSE THE COMPLAINT FAILS TO STATE A FEDERAL CLAIM, THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER THE SUPPLEMENTAL STATE LAW CLAIM.**

In Count II of the Complaint, entitled "VIOLATION OF CONTRACTUAL DUTIES," Dr. Yatco alleges:  "When Nanticoke violated its own rules as well as commonly accepted practices of good faith and fair dealing, it breached its contractual obligations to Plaintiff and, as a result, Plaintiff was harmed and suffered damages."  When dismissing a case under Rule 12(b)(1) for failure to present a federal question under 28 U.S.C. § 1331, the court held:  "Nor may plaintiff avail himself of alternate bases of federal subject matter jurisdiction.  Breach of contract claims are governed by state law and do not present a federal question under 28 U.S.C. § 1331 or § 1334."  Humes v. State of Del. Court of Common Pleas, Civ. No. 06-59-SCR, 2006 U.S. Dist. LEXIS 68729, at *24 (D. Del. Sept. 25, 2006) (**Exhibit I**).

In the case of Thompson v. Cmty. Action of Greater Wilmington, Inc., 567 F. Supp. 1159 (D. Del. 1983), this court held that a private entity was a state actor but there was no state action because the deprivation was not of a state-created right.  Id. at 1167.  When considering the plaintiff's pendent state law claims, the court held:  "Having found both an absence of state and federal action, all of the federally cognizable aspects of this litigation are eliminated."  Under such circumstances, the court may decline pendent jurisdiction over the plaintiff's supplemental law claim and dismiss the pendent claim.  Id. at 1167; see also, D'Alessandro v. ACLU, Civ. No. 06-212-GMS, 2006 U.S. Dist. LEXIS 82237, at *8-9 (D. Del. Nov. 8, 2006) (**Exhibit J**), (holding that because the Complaint fails to state a federal claim pursuant to 42 U.S.C. § 1983, the court declines to exercise jurisdiction over the plaintiff's supplemental law claim (citing 28 U.S.C. § 1367, and DeAsencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003)).

As shown above, Dr. Yatco fails to show federal question jurisdiction and fails to state a claim upon which relief can be granted and, therefore, his alleged federal claims should be dismissed.  If the Court grants NHS's Motion to Dismiss on all claims which, if properly stated, the Court would have original jurisdiction, it may decline to exercise supplemental jurisdiction over Dr. Yatco's state law breach of contract claim under 28 U.S.C. § 1367(a) and dismiss Count II of the Complaint.  See 28 U.S.C. § 1367(c)(3), which reads, in relevant part:

(c)  the District Courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if - -

(3)  the District Court has dismissed all claims over which it has original jurisdiction . . . .

V.    **DEFENDANT IS ENTITLED TO AN AWARD OF ATTORNEY'S FEES PURSUANT TO 42 U.S.C. § 1988(b).**

NHS is entitled to an award of attorney's fees under 42 U.S.C. § 1988(b).

A.    **Legal Standard.**

Title 42 U.S.C. § 1988(b) provides, in relevant part, as follows:   "Attorney's Fees.  In any proceeding to enforce a provision of [42 U.S.C. § 1983] . . . , the Court, in its discretion, may allow the prevailing party, . . . reasonable attorney's fee as part of the cost . . . ."  Under 42 U.S.C. § 1988, "a District Court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable or without foundation even though not brought in subjective bad faith."  Christianburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978).  The Supreme Court went on to state:  "[A] plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." Id. at 422; see also, Hughes v. Rowe, 49 U.S. 5, 14 (1980). (The Supreme Court extended the "Christianburg standard" for awarding attorney's fees under Section 1988 to a prevailing defendant in two civil rights actions under 42 U.S.C. § 1983.)  In Hughes v. Rowe, the Supreme Court went on to state that "[T]he plaintiff's action must be meritless in the sense that it is groundless or without foundation." Id. at 14; see also, Neitzke v. Williams, 490 U.S. 319, 325 (1989) (An action is frivolous if "it lacks an arguable basis, either in law or in fact.")  In Brown v. Borough of Chambersburg, 903 F.2d 274 (3rd Cir. 1990), the Court considered the appropriateness of the District Court's order assessing fees against a plaintiff.  The Court applied the standards established in Christianburg Garment Co. v. EEOC and Hughes v. Rowe.  The Court held that "[I]mplicit in this approach is the premise that plaintiff knew or should have known the legal or evidentiary deficiencies of his claim." Id. at 277.

In Beam v. Downey, 2005 U.S. App. LEXIS 22008 (3rd Cir. Oct. 12, 2005) (**Exhibit L**), the

Court reviewed an award of attorney's fees to the defendant by the District Court. The plaintiff asserted that the District Court erred in awarding attorney's fees in her Section 1983 claim under Section 1988 because her suit was not frivolous or groundless. The Circuit Court held: "The Court correctly found each of [the plaintiffs] claims meritless, without any grounds for support." Id. at *4. The Court noted: "In her Section 1983 claim, [plaintiff] failed to alleged state action. [Plaintiff] also did not state a property right to support a due process violation . . . ." Id. at *4 n.2. The Court further held that the defendants "were the prevailing parties because they succeeded in having each claim dismissed." Id. at *5. The Court affirmed the District Court's award of attorney's fees to the defendants.

B.    Analysis.

Given the overwhelming weight of authority holding that a private hospital is not a state actor for purposes of a Section 1983 claim. Dr. Yatco knew or should have known the legal or evidentiary deficiencies of his claim. See Brown, 903 F.2d at 277; see also, Royal Oak Entmt., LLC v. City of Royal Oak, 46 F. Supp.2d 675, 678-79 (E.D. Mich. 2007) (Awarding attorney's fees to defendants, the Court held: "Plaintiffs should have been aware of the law governing their federal claim . . . ." And rudimentary legal research would have shown the plaintiffs that they did not have a legal basis for their claim.)

Dr. Yatco's alleged federal action is frivolous for the reason that it lacks an arguable basis either in law or in fact, as shown above. See Neitske v. Williams, 490 U.S. at 325. As a result of this "frivolous" action, NHS was required to incur unnecessary and substantial attorney's fees. NHS is entitled to an award of attorney's fees under 42 U.S.C. § 1988.

## CONCLUSION

For the reasons set forth in the Motion to Dismiss and the foregoing Brief, NHS respectfully requests that this Court dismiss Count I (due process violation) of this action for lack of subject matter jurisdiction under Rule 12(b)(1) or under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and decline supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) and dismiss all state law claims, Count II.  NHS is also entitled to an award of attorney's fees under 42 U.S.C. § 1988.

GRIFFIN & HACKETT, P.A.
Attorneys for Defendant, Nanticoke Health Services, Inc.

/s/  David R. Hackett
David R. Hackett, Esquire (ID #424)
116 W. Market Street, P.O. Box 612
Georgetown, Delaware 19947
(302) 856-9066

DATE:   July 31, 2008

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that two copies of Defendant's OPENING BRIEF IN

SUPPORT OF MOTION TO DISMISS were served by U.S. First Class Mail, postage prepaid, upon the

individual named below, on the 31st day of August, A.D. 2008:

**Robert D. Goldberg, Esquire**
**921 N. Orange Street**
**P.O. Box 1489**
**Wilmington, DE 19899-1490**

By: s/s  David R. Hackett
    David R. Hackett

# EXHIBIT "A"

2 of 65 DOCUMENTS

**NORTHERN MICHIGAN HOSPITALS, INC., and GIFFORD MEDICAL CENTER, INC., Plaintiffs, v. HEALTH NET FEDERAL SERVICES, LLC (f/k/a HEALTH NET FEDERAL SERVICES, INC.), Defendant. LAKEWOOD HEALTH SYSTEM and NORTHWEST MEDICAL CENTER, Plaintiffs, v. TRIWEST HEALTHCARE ALLIANCE CORP., Defendant.**

Civil Action No. 07-039 GMS, Civil Action No. 07-069 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2008 U.S. Dist. LEXIS 42587*

**May 30, 2008, Decided**

COUNSEL: [*1] For Northern Michigan Hospitals Inc. (1:07-cv-00039-GMS), Plaintiff: Matt Neiderman, LEAD ATTORNEY, Gary William Lipkin, Duane Morris LLP, Wilmington, DE; Gregory Brodek; Michael Gottfried; Patricia R. Rich.

For Gifford Medical Center Inc., for themselves and on behalf of all other similarly situated class members (1:07-cv-00039-GMS), Plaintiff: Matt Neiderman, LEAD ATTORNEY, Gary William Lipkin, Duane Morris LLP, Wilmington, DE; Gregory Brodek; Michael Gottfried.

United States for the use and benefit of MPI Mechanical Inc., a corporation of the State of Delaware (1:07-cv-00039-GMS), Plaintiff, Pro se.

For Health Net Federal Services Inc. (1:07-cv-00039-GMS), Defendant: Jennifer Gimler Brady, LEAD ATTORNEY, Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE; Arthur N. Lerner; Christopher Flynn; Kathleen Taylor Sooy; Tracy A. Roman.

For Lakewood Health System, Northwest Medical Center, for themselves and on behalf of all others similarly situated class members (1:07-cv-00069-GMS), Plaintiffs: Matt Neiderman, LEAD ATTORNEY, Duane Morris LLP, Wilmington, DE; Gregory Brodek; John Soroko; Patricia R. Rich; Robert M. Palumbos; Seth Goldberg.

For TriWest Healthcare Alliance Corp. [*2] (1:07-cv-00069-GMS), Defendant: Katherine J. Neikirk, Morris James LLP, Wilmington, DE; Robert S. Ryland; Scott M. Abeles.

JUDGES: Gregory M. Sleet, CHIEF, UNITED STATES DISTRICT JUDGE.

OPINION BY: Gregory M. Sleet

OPINION

MEMORANDUM

I. INTRODUCTION

On January 19, 2007, two hospitals, Northern Michigan Hospitals, Inc., ("Northern Michigan") and Gifford Medical Center, Inc., ("Gifford Medical") filed the above-captioned putative class action against Health Net Services, LLC ("Health Net"). (C.A. No. 07-039, D.I. 1 (Compl.); D.I. 3 (Am. Compl.).) Health Net is a private contractor that underwrites health care services relating to TRICARE, a federal health care program for the armed services. On February 7, 2007, two other hospitals, Lakewood Health System ("Lakewood") and Northwest Medical Center ("Northwest Medical"), filed the second above-captioned putative class action against TriWest Healthcare Alliance Corp. ("TriWest"), also a private contractor that underwrites health care services relating to TRICARE. (C.A. No. 07-069, D.I. 1 (Compl.).) In each action, the hospitals allege that the private contractor breached an implied-in-fact contract and was unjustly enriched when the contractor failed to reimburse the hospitals [*3] for certain charges according to TRICARE regulations. Now before the court are the private contractors' motions to dismiss for lack of subject-matter jurisdiction, for failure to join a necessary and indispensable party, and for failure to state a claim upon which relief can be granted. (Northern Michigan D.I. 17; Lakewood D.I. 11.)[1] For the following reasons, the court will grant Health Net's and TriWest's motions.

> 1 Because these two actions are closely related, the court will dispose of the motions in a single

Case 1:08-cv-00342-SLR   Document 5-2   Filed 08/01/2008   Page 3 of 8

Page 2
2008 U.S. Dist. LEXIS 42587, *

opinion. The court will cite to related filings in the two actions as (Northern Michigan D.I.   ; Lakewood D.I.         ), the first citation corresponding to C.A. No. 07-039 and the second to C.A. No. 07-069.

## II. BACKGROUND

### A. CHAMPUS and TRICARE

In 1967, the United States Department of Defense (the "Defense Department") established CHAMPUS, a health care program for retired armed forces members and their dependents. [2] *See 10 U.S.C. § 1071; see also 32 C.F.R. § 199.3* (designating beneficiaries). The Defense Department administered CHAMPUS using claims processors, called "fiscal intermediaries," to process health care services claims under the CHAMPUS program. The contracts between      [*4] fiscal intermediaries and the Defense Department indemnified the fiscal intermediaries against claims arising from their performance of duties under the CHAMPUS contract. The indemnification provision identified the United States, rather than the fiscal intermediary, as the real party in interest in any civil lawsuit arising out of disbursement of funds under CHAMPUS.

> 2    CHAMPUS stands for "Civilian Health and Medical Program of the Uniformed Services."

In 1995, the Defense Department established TRICARE, a managed health care program covering the same beneficiaries as CHAMPUS. (The court will refer to CHAMPUS and TRICARE collectively as TRICARE.) The TRICARE Management Activity, a government entity formerly known as the Office of CHAMPUS, manages and administers the TRICARE program.

### B. Regional Contracts with Managed Care Support Contractors

As part of its management responsibilities, the TRICARE Management Activity selects and contracts with managed care support contractors ("MCS contractors") to financially underwrite and otherwise manage the provision of health care services to TRICARE beneficiaries. Thus, on January 23, 1996, upon TRICARE's implementation, the Defense Department and      [*5] the TRICARE Management Activity entered into seven contracts with seven MCS contractors, including Health Net and TriWest, to manage twelve defined TRICARE regions across the United States ("Regional Contracts"). In 2002, the TRICARE Management Activity consolidated the TRICARE program into three larger regions, each managed by one MCS contractor. Both Health Net and TriWest competed for and were each awarded a Regional

Contract for one of the newly defined regions. Thus, in 2003, Health Net became the MCS contractor for the North Region, signing a Regional Contract with a cumulative potential value of approximately $ 2.2 billion over six years, and began providing health care services in June or July 2004. TriWest signed a similar contract in 2003 for the West Region worth approximately $ 10 billion and began providing health care services soon thereafter. These Regional Contracts between the TRICARE Management Activity and the MCS contractors lacked the indemnity provisions contained in the earlier fiscal-intermediaries contracts.

### C. The MCS Contractors and the Hospitals

As MCS contractors, Health Net and TriWest were responsible for establishing regional networks of health care providers [*6] ("Providers") to provide health care services to TRICARE beneficiaries. Providers can be institutions, such as hospitals, or non-institutional providers, such as doctors, and fall into various categories. "Network Providers" are Providers with whom an MCS contractor forms a network agreement setting rates of reimbursement. "Non-Network Providers" are Providers that do not enter into these network agreements. Some Non-Network Providers choose to participate in the TRICARE system by providing health care to TRICARE beneficiaries in exchange for reassignment of benefits from those beneficiaries. These are called "Non-Network Participating Providers." [3] *See 32 C.F.R. § 199.6*. The plaintiffs in these two actions are all hospitals that are Non-Network Participating Providers ("Non-Network Participating Hospitals"). TRICARE regulations govern how a Non-Network Participating Hospital submits claims to the MCS contractor for reimbursement based on the reassigned benefits.

> 3    Those Non-Network Providers who bill the TRICARE beneficiaries directly, rather than "participating" in the TRICARE program by accepting assignment of benefits from the TRICARE beneficiaries, are called "Non-Network Non-Participating [*7] Providers."

TRICARE regulations also govern the amount of reimbursement to which the Non-Network Participating Hospitals are entitled. Specifically, the TRICARE Management Activity has promulgated regulations setting the CHAMPUS maximum allowable charges ("CMACs") for ten categories of outpatient services provided by hospitals. *32 C.F.R. § 199.14(a)(5)(i)-(x)*. TRICARE regulations do not set a CMAC for an additional category called "facility charges," however:

> Facility charges. TRICARE payments for hospital outpatient facility charges that would include the overhead costs of

providing the outpatient service would be paid as billed. For the definition of facility charge, see § 199.2(b). [4]

*Id.* at § 199.14(a)(5)(xi). Thus, rather than being reimbursed according to a preset maximum amount, facility charges are "paid as billed." *Id.*

> 4  "The term 'facility charge' means the charge, either inpatient or outpatient, made by a hospital or other institutional provider to cover the overhead costs of providing the service. These costs would include building costs, i.e. depreciation and interest; staffing costs; drugs and supplies; and overhead costs, i.e., utilities, housekeeping, maintenance, etc." 32 C.F.R. § 199.2(b).

The [*8] TRICARE Management Activity has also established an extensive appeal and rehearing procedure for disputes between MCS contractors and Providers who have submitted claims for payment. *See* 32 C.F.R. § 199.10; TRICARE Operations Manual, Ops. Man. Ch. 13 (Northern Michigan D.I. 19 at A33-A61; Lakewood D.I. 12 at A19-A52). The appeals process begins with a determination by the MCS contractor. At the next level, a TRICARE Management Activity hearing officer reviews the MCS contractor's initial finding. The final level of review consists of appealing the hearing officer's decision to the TRICARE Management Activity Director, who can adopt or reject the hearing officer's decision, or refer the issue to the Assistant Secretary of Defense.

### D. The Litigation

On January 19, 2007, Northern Michigan and Gifford Medical filed their complaint in this action against Health Net, claiming that Health Net had violated an implied-in-fact contract with the hospitals by failing to reimburse them for their claimed facility charges in violation of TRICARE regulations. (Northern Michigan D.I. 1; D.I. 3.) Lakewood and Northwest Medical followed suit on February 7, 2007, against TriWest. (Lakewood D.I. 1.) On March [*9] 15 and 16, 2007, respectively, Health Net and TriWest moved to dismiss on various grounds. (Northern Michigan D.I. 17; Lakewood D.I. 11.) On August 31, 2007, the United States filed a Statement of Interest pursuant to 28 U.S.C. § 517 addressing the actions and the MCS contractors' motions. (Northern Michigan D.I. 28; Lakewood D.I. 22 ("Statement of Interest").) The parties submitted supplemental briefing in response. On April 2, 2008, the court held a hearing on the motions and stayed the action pending the issuance of this opinion.

### III. STANDARD OF REVIEW

Pursuant to *Rule 12(b)(1)*, the court should dismiss if it lacks subject-matter jurisdiction over the complaint. *Fed. R. Civ. P. 12(b)(1)*. Challenges to subject-matter jurisdiction under *12(b)(1)* may be factual or factual in form: facial attacks contest the sufficiency of the pleadings, while factual attacks contest the existence of subject-matter jurisdiction in fact. *Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).* For a facial attack, the court must consider the complaint's allegations as true and draw all reasonable inferences in the plaintiff's favor. *Id.* Conversely, for a factual attack, the trial court [*10] does not presume those allegations to be true, and is free to weigh evidence relating to jurisdiction to satisfy itself as to the existence of its power to hear the case. *Id.; United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007).*

*Rule 12(b)(7)* permits a defendant to move for dismissal of a complaint for "failure to join a party under *Rule 19*," that is, for failure to join a necessary and indispensable party. *Fed. R. Civ. P. 12(b)(7); see Fed. R. Civ. P. 19.* If a necessary party cannot be joined, the court must determine whether, "in equity and good conscience," the action should proceed or be dismissed. *Fed. R. Civ. P. 19(b).*

*Rule 12(b)(6)* permits a defendant to move for dismissal of a complaint for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6).* To state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," *Fed. R. Civ. P. 8(a)(2)*, thus "giv[ing] the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)* (internal citations omitted). The court must accept [*11] all factual allegations in a complaint as true and construe them in the light most favorable to plaintiff. *Erickson v. Pardus, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007); Christopher v. Harbury, 536 U.S. 403, 406, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002).* But the court need not accept as true legal conclusions couched as allegations of fact. *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986).* The motion may be granted only if the complaint, despite its factual allegations being taken as true, fails to "raise a right to relief above the speculative level." *Twombly, 127 S. Ct. at 1965; Phillips v. County of Allegheny, 515 F.3d 224, 232-34 (3d Cir. 2008).*

### IV. DISCUSSION

#### A. TRICARE Does Not Preempt the Hospitals' Claims.

TriWest moves for dismissal under *Rule 12(b)(1)*, arguing that this court lacks subject-matter jurisdiction

over the hospitals' claims because TRICARE expressly preempts the hospitals' state law claims. (Lakewood D.I. 12.) TRICARE does contain a preemption provision. *10 U.S.C. § 1103.* As the hospitals point out, however, the provision only preempts certain state and local laws from applying to "any contract entered into pursuant to this chapter *by the Secretary of Defense or the administering Secretaries. . . ." Id.* (emphasis added). [*12] In other words, such preemption applies only to the Regional Contracts between MCS contractors and the Government. *See 32 C.F.R. § 199.17(a)(7)(ii)* (TRICARE preempts state and local laws "in connection with TRICARE regional contracts."). On its face, therefore, TRICARE's preemption provision does not apply to the dispute before the court.

Nonetheless, TriWest argues that TRICARE also preempts contracts between an MCS contractor and another private party because those contracts, although not with the United States, "*relat[e] to* health insurance, prepaid health plans, or other health care delivery or financing methods." *10 U.S.C. § 1103* (emphasis added). But TriWest's interpretation overstates the bounds of TRICARE preemption. *See N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995)* (cautioning against overbroad interpretation of "relating to" language in preemption context); *10 U.S.C. § 1103* (TRICARE preempts State and local laws from applying to contracts entered into by the Government). Furthermore, TriWest's reliance on ERISA and Railway Labor Act ("RLA") cases to support its overbroad preemption claims is misplaced because ERISA [*13] and RLA regimes, unlike TRICARE, provide for exclusive remedial schemes. *10 U.S.C. § 1103; cf. Ingersoll-Rand Co. v McClendon, 498 U.S. 133, 142, 111 S. Ct. 478, 112 L. Ed. 2d 474 (1990)* (wrongful discharge action preempted by ERISA's remedial scheme); *Capraro v. United Parcel Serv. Co., 993 F.2d 328 (3d Cir. 1993)* (pilot's state law claims preempted by RLA remedial scheme). Simply put, these two actions arise from contracts between private parties, namely, the hospitals and the MCS contractors, over certain charges for services rendered. As such, TRICARE's preemption provision, which applies to contracts between the Government and private parties, does not bar the hospitals' claims. [5]

> 5  The court notes that the Government, in its Statement of Interest, did not assert that TRICARE preempts the hospitals' state law claims for breach of contract and unjust enrichment.

## B. The United States Is Not the Real Party in Interest.

Health Net and TriWest also argue that the court should dismiss the hospitals' claims pursuant to *Rule 12(b)(1)* because the hospitals have not sued the real party in interest, the United States. *See Fed. R. Civ. P. 17.* And if the hospitals had done so, Health Net and TriWest argue, their claims could only [*14] be brought in the United States Court of Federal Claims. The United States is the real party in interest if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Pennhurst State Sch. & Hospital v. Halderman, 465 U.S. 89, 102 n.11, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984).*

The United States Court of Appeals for the Federal Circuit recently addressed whether, in the TRICARE context, the United States was the real party in interest in a breach of contract claim brought by Network Provider hospitals against an MCS contractor. *Bd. of Trustees of Bay Med. Ctr. et al. v. Humana Military Healthcare Servs., Inc. et al., 447 F.3d 1370 (Fed. Cir. 2006)* ("Bay Medical"). In *Bay Medical,* the hospitals had also brought declaratory judgment claims directly against the Defense Department and the TRICARE Management Activity, among others. Nonetheless, the Federal Circuit rejected the contractor's argument that the United States was the real party in interest with respect to the breach of contract claim. *Id. at 1374-76.* Because the claim was against the MCS contractor [*15] based on a private agreement between the MCS contractor and the hospitals, and because the United States had not indemnified the MCS contractor against liability, the Federal Circuit concluded that "the proper defendant for the Hospitals' contract claims is [the MCS contractor], not the government." *Id. at 1375.*

The court finds the reasoning in *Bay Medical* persuasive. Here, like *Bay Medical,* the hospitals bring claims against MCS contractors based on private agreements between private parties. There is no privity of contract between the hospitals and the Government. In addition, the MCS contractors' potential liability for breaching these agreements is not directly chargeable to the Government. [6] *Cf. Bay Medical, 447 F.3d at 1375-76; Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., 368 F.3d 894, 901 (6th Cir. 2004)* (in TRICARE context, MCS contractor's liability for its breach of contract with provider not directly chargeable to the Treasury); (Statement of Interest at 18 (MCS contractors alone liable for any potential judgment).) Nor has the United States asserted its interest in this case. *Cf. Hofmann v. Hammack, 82 F. Supp. 2d 898, 899 (N.D. Ill. 2000)* (in [*16] CHAMPUS case against fiscal intermediary, United States asserted it was real party in interest). As such, the court finds that the United States is not the real party in interest in this case. Like in *Bay Medical,* the proper defendants for the hospitals' contract claims are the MCS contractors.

6   In contrast to the asserted contracts here, the cases cited by the MCS contractors on this issue involved fiscal-intermediary contracts containing indemnification provisions. *E.g., Vanderberg v. Carter, 523 F. Supp. 279, 285 (N.D. Ga. 1981), aff'd without opinion, 691 F.2d 510 (11th Cir. 1982).*

## C. The United States Is Not a Necessary and Indispensable Party.

Next, Health Net and TriWest contend that the court should dismiss the hospitals' claims for failure to join the United States, which the MCS contractors argue is a necessary and indispensable party to the litigation. *Fed. R. Civ. P. 12(b)(7); Fed. R. Civ. P. 19; Angst v. Royal Maccabees Life Ins. Co., 77 F.3d 701, 705 (3d Cir. 1996).* Under *Rule 19(a),* the joinder of a party is required or "necessary" if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or

> (B) that person claims an interest relating [*17] to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

*Fed. R. Civ. P. 19(a)(1).*

The United States is not a necessary party in this case. Contrary to the MCS contractors' assertions, complete relief can be accorded among them and the hospitals: if the hospitals prevail in their claims, they may recover fully from the MCS contractors, the hospitals' alleged contractual counterparties. *See Fed. R. Civ. P. 19(a).* Moreover, resolving these actions would not impair or impede the United States' ability to protect its interests relating to TRICARE, since the United States would not be bound by the courts' interpretations of the private contracts at issue. Indeed, the United States has explicitly disclaimed a desire to be a party; surely, if its interests were at stake, it would have said so. (Statement of Interest at 12); *cf. Gardiner v. Virgin Islands, 145 F.3d 635, 641, 39 V.I. 519 (3d Cir. 1998)* (United States' [*18] disinclination to become a party "strongly suggest[s] that its interests will not be impeded if the suit goes forward without it."). Finally, resolving the suit between the current parties would not risk exposing the MCS contractors to "double, multiple, or otherwise

inconsistent obligations." *Fed. R. Civ. P. 19(a)(1).* If the hospitals prevail, Health Net's and TriWest's obligations to hospitals under the implied contracts with the hospitals would not be inherently inconsistent with their obligations to the United States under their separate TRICARE Regional Contracts. Therefore, the court concludes the United States is not a party whose joinder is required under *Rule 19(a).* Accordingly, the court need not address whether the United States is an "indispensable" party under *Rule 19(b)* and will deny the MCS contractors' motions for dismissal for failure to join a necessary and indispensable party. *Gen. Refractories Co. v. First State Ins. Co., 500 F.3d 306, 312-14 (3d Cir. 2007).*

## D. The Hospitals Have Failed to Exhaust Their Administrative Remedies.

Health Net and TriWest also argue that the court should dismiss the hospitals' claims because the hospitals have failed to exhaust their administrative [*19] remedies. Generally, parties must exhaust available administrative remedies before seeking relief from the federal courts. *McCarthy v. Madigan, 503 U.S. 140, 144, 112 S. Ct. 1081, 117 L. Ed. 2d 291 (1992).* The hospitals respond that they cannot pursue their claims administratively because their claims are not appealable under the TRICARE regime. The hospitals further argue that, even if their claims were appealable, TRICARE does not require them to exhaust their administrative remedies before seeking relief from the courts. Finally, because administrative exhaustion in this case would be futile, inefficient, and inadequate, the hospitals contend, the court should not require exhaustion, either.

### 1. *The Hospitals' Claims Are Administratively Appealable.*

First, the hospitals argue that no administrative remedies are available because their claims cannot be appealed through the TRICARE administrative appeals process. TRICARE regulations define an "appealable issue" as:

> Disputed questions of fact which, if resolved in favor of the appealing party, would result in the authorization of CHAMPUS benefits, or approval as an authorized provider in accordance with this part. An appealable issue does not exist if no facts are in dispute, [*20] if no CHAMPUS benefits would be payable, or if there is no authorized provider, regardless of the resolution of any disputed facts. See § 199.10 for additional information concerning the determination of "appealable issue" under this part.

32 C.F.R. § 199.2. Under § 199.10, certain issues are non-appealable:

> (i) A dispute regarding a requirement of the law or regulation.

> (ii) The amount of the CHAMPUS-determined allowable cost or charge, since the methodology for determining allowable costs or charges is established by this part. . . .

32 C.F.R. § 199.10(a)(6). The hospitals argue that their claims are not appealable because the dispute over whether the MCS contractors must pay them facility charges beyond the CMAC is a "dispute regarding a requirement of the . . . regulation." Id.; id. at § 199.2; id. at § 199.14(a)(5)(xi) (facility charges).

But the Government, in its Statement of Interest, has rejected the hospitals' characterization of the dispute as non-appealable. (Statement of Interest at 14-17.) According to the Government, the hospitals' claims themselves, pleaded as breach of implied-in-fact contract and unjust enrichment, could not have been brought in the TRICARE appeal process [*21] because the claims, couched in those terms, are contract issues between private parties. The real issue, whether TRICARE regulations and policies entitle the hospitals to be paid "as billed" for the claimed facility charges, is according to the Government one that the hospitals can raise through the TRICARE administrative appeal process. The court accords the Government's interpretation of its own regulations, specifically with respect to what is appealable through administrative remedial procedures, substantial deference. Your Home Visiting Nurse Servs. v. Shalala, 525 U.S. 449, 453, 119 S. Ct. 930, 142 L. Ed. 2d 919 (1999); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S. Ct. 2381, 129 L. Ed. 2d 405 (1994) (Courts "must give substantial deference to an agency's interpretation of its own regulations" - - all the more so when "the regulation concerns a complex and highly technical regulatory program.").

Nor is the Government's interpretation -- that the hospitals could in fact appeal their claims through TRICARE's review process -- plainly erroneous or inconsistent with TRICARE regulations. There is no dispute that facility charges, as defined under TRICARE regulations, are paid "as billed" under 32 C.F.R. § 199.10(a)(5). The dispute is thus not [*22] over the requirement of the regulation. Instead, the dispute is over whether the hospitals' claimed charges qualify for reimbursement as facility charges. Moreover, as the Government points out, if a Provider's entitlement to reimbursement for a given charge were a non-appealable issue, all disputes over claim amounts would be non-

appealable -- thus circumventing the administrative appeal process entirely. As such, the court finds that hospitals can bring their claims through the TRICARE appeals procedure.

2. *TRICARE Does Not Require Administrative Exhaustion.*

Thus, administrative remedies are available to the hospitals. But does the TRICARE regime require that the hospitals pursue them before bringing suit in federal court? "Where Congress specifically mandates, exhaustion is required." McCarthy v. Madigan, 503 U.S. at 144. "But where Congress has not clearly required exhaustion, sound judicial discretion governs." Id. Here, Congress has not clearly required exhaustion. See 10 U.S.C. § 1079; 32 C.F.R. § 199.10; (cf. Statement of Interest at 14 ("Plaintiffs . . . *can* take advantage of the TRICARE appeals process. . . .") (emphasis added)); *contrast, e.g.,* Ghana v. Holland, 226 F.3d 175, 177 (3d Cir. 2000). [*23] So it is within the court's discretion whether to require the hospitals to exhaust their administrative remedies before bringing the current suit. McCarthy v. Madigan, 503 U.S. at 144.

3. *The Court Will Exercise Its Discretion To Require Administrative Exhaustion.*

The TRICARE administrative appeal process is available to the hospitals. Further, exhaustion is not clearly required by the TRICARE regime. So the question is whether the court should exercise its discretion to require administrative exhaustion. McCarthy v. Madigan, 503 U.S. at 144-46; Cerro Metal Products v. Marshall, 620 F.2d 964, 970-71 (3d Cir. 1980) (purposes of judicially created exhaustion doctrine).

Each of these two actions boils down to a dispute over unpaid claims. Since TRICARE regulations specifically govern the claims' validity, this dispute calls for a straightforward application of those regulations to the disputed claims. (Northern Michigan D.I. 3; Lakewood D.I. 1); 32 C.F.R. § 199.2(b) (defining "facility charge"); id. at § 199.14(a)(5) (payments due for certain outpatient services). Accordingly, requiring exhaustion would allow the agency to apply its special regulatory expertise to the dispute. Cf. McCarthy v. Madigan, 503 U.S. at 145. [*24] Institutional interests, as reflected in the Statement of Interest of the United States, also favor requiring exhaustion. (See Statement of Interest at 15-17 (hospitals' claims "can and should be raised through the TRICARE administrative appeal process").)

Additionally, exhaustion would not be futile. As discussed above, whether the hospitals are entitled to facility charges as billed under TRICARE regulations is an administratively appealable issue. And if the MCS

contractors deny all of the claims during the initial level of review, the hospitals can appeal that determination to the TRICARE Management Activity. *See 32 C.F.R. § 199.10.*

Requiring exhaustion would also aid judicial efficiency in this case. Should the process fail to resolve the hospitals' dispute, exhausting the administrative process would produce a factual record and the agency's position for later judicial review. In addition, the hospitals have not demonstrated that the TRICARE administrative appeal process would be so burdensome as to weigh against requiring exhaustion in this case; the same thousands of claims at issue in the administrative appeal process would also be at issue in this litigation.

The cases cited [*25] by the hospitals do not change this analysis. While the courts in *Bay Medical* and *Baptist Hospital* did not require administrative exhaustion, those cases involved disputed contractual terms distinct from TRICARE regulations. *Bay Medical, 447 F.3d at 1372-74; Baptist Hospital, 481 F.3d at 340-344* (MCS contractor and hospitals negotiated payment methodologies apart from TRICARE regulations). These decisions do not address whether the court should require administrative exhaustion when hospitals such as the plaintiffs in this case seek reimbursement "strictly in accordance with the regulations that govern TRICARE," (Northern Michigan D.I. 3 at 7; Lakewood D.I. 3 at 7), rather than separate contractual terms negotiated between the contractor and the hospitals providing for alternative payment methodologies. *E.g., Baptist Hospital, 481 F.3d at 340-344.* While the Third Circuit did not require exhaustion in *Nickeo v. Virgin Islands Telephone Corp.,* that case involved a starkly different regulatory scheme. *Nickeo v. Virgin Islands Telephone Corp., 42 F.3d 804, 31 V.I. 351 (3d Cir. 1994).* There, the Court of Appeals declined, in a footnote, to require administrative exhaustion after finding that the statute's [*26] plain language envisioned the availability of both administrative and judicial remedies. *Id. at 807-09, 808 n.3.* Such is not the case here.

As an exercise of its discretion, therefore, the court will require the hospitals to exhaust their available administrative remedies. [7] Accordingly, the court will dismiss the hospitals' claims without prejudice. *Cf. Hofmann v. Hammack, 82 F. Supp. 2d 898, 900 (N.D. Ill. 2000)* (requiring exhaustion of administrative remedies, even though not mandated by CHAMPUS statute, where plaintiff brought tort and contract claims against CHAMPUS fiscal intermediary).

[7]   While requiring exhaustion in these actions,

the court is not referring the matter to the TRICARE Management Activity under the doctrine of primary jurisdiction because the meaning of the regulations here can be determined from their texts. *See Bus. Edge Group, Inc. v. Champion Mortgage Co., 519 F 3d 150, 154 (3d Cir. 2008).*

**E. The Court Need Not Address Whether The Plaintiffs Have Stated Claims Upon Which Relief Can Be Granted.**

Because the court finds that the hospitals are required to exhaust their administrative remedies, the court will not address the merits of the hospitals' substantive claims [*27] for breach of contract and unjust enrichment at this time. *Wilson v. MVM, Inc., 475 F.3d 166, 173 (3d Cir. 2007).*

For the reasons stated above, the court will grant Health Net's and TriWest's motions to dismiss.

Dated: May 30, 2008

/s/ Gregory M. Sleet

CHIEF, UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

> 1. The motion to dismiss filed by Health Net Federal Services, LLC, in C.A. No. 07-039 (D.I. 17) is GRANTED;

> 2. The First Amended Complaint in C.A. No. 07-039 (D.I. 3) shall be DISMISSED without prejudice;

> 3. The motion to dismiss filed by TriWest Healthcare Alliance Corp. in C.A. No. 07-069 (D.I. 11) is GRANTED; and

> 4. The Complaint in C.A. No. 07-069 (D.I. 1) shall be DISMISSED without prejudice.

Dated: May 30, 2008

/s/ Gregory M. Sleet

CHIEF, UNITED STATES DISTRICT JUDGE

# EXHIBIT "B"

8 of 8 DOCUMENTS

**Alan D. Kramer, M.D. v. Kent General Hospital, Inc.**

**85C-AU-20 (Kent)**

**SUPERIOR COURT OF DELAWARE, KENT**

*1992 Del. Super. LEXIS 160*

**March 19, 1991, Submitted**
**February 28, 1992, Decided**

**COUNSEL:** [*1] Roy S. Shiels, Esq., Brown, Shiels & Chasanov, P. O. Drawer F, Dover, DE 19903.

W. Wade W. Scott, Esq., Prickett, Jones, Elliott, Kristol & Schnee, P. O. Box 1328, Wilmington, DE 19899.

**JUDGES:** RIDGELY

**OPINION BY:** HENRY duPONT RIDGELY

**OPINION**

*Decision After Trial Before The Court.*

*Judgment For Defendant On Plaintiff's Complaint.*

*Judgment for Plaintiff On Counterclaim of KGH.*

This letter constitutes the Court's findings of fact and conclusions of law in this breach of contract action after careful consideration of the evidence presented at trial, the proposed findings of fact and conclusions of law submitted by counsel, and the record in this case. Plaintiff Alan D. Kramer ("Dr. Kramer") demands judgment against defendant Kent General Hospital, Inc. ("KGH" and "the hospital") in the amount of $ 1,114,957 for past and future wage loss due to the termination of his medical staff privileges at KGH. KGH counterclaims against Dr. Kramer for $ 7,713 representing outpatient revenues for the second and third year of the contract between Dr. Kramer and KGH. For the reasons stated below, the Court finds in favor of defendant KGH on plaintiff's complaint and in favor of plaintiff Dr. Kramer on the counterclaim [*2] of KGH.

*I. FACTS*

*A. The Complaint of Dr. Kramer*

In 1980, KGH began plans for providing psychiatric services to Kent County residents. A consultant advised KGH that the need for an inpatient psychiatric service should be met by opening the psychiatric service on a closed-staff basis. Under this arrangement, the director of the service would have the exclusive right to provide psychiatric services at KGH. This concept was intended to ensure a uniform approach to patient care and to permit KGH to attract and keep psychiatrists on staff by guaranteeing them income and fringe benefits.

Once the KGH Board of Directors decided to build an inpatient psychiatric unit, it delegated to its Chief Executive Officer, Dennis Klima ("Mr. Klima"), the task of contracting for the services of a director. Dr. Kramer learned of the position which KGH sought to fill through an advertisement in a trade journal, and he began discussing it directly with Mr. Klima. Dr. Kramer's past experience as a psychiatrist was of interest to KGH. Dr. Kramer graduated from Drew University and the New York University School of Medicine. He interned in Maimonides Hospital and was a resident at Bellevue. He was [*3] a Fellow in Child Psychiatry, a Clinical Associate Professor, and Chief of the Girl's Adolescent Unit at Bellevue. He expanded an 11-bed adolescent psychiatric unit to 27 beds at Mount Sinai Hospital while at the University of Connecticut. When Dr. Kramer contacted Mr. Klima, he was employed by the University of Alabama. On August 21, 1981, after preliminary discussions and a personal meeting, Mr. Klima extended a written offer to Dr. Kramer to join KGH as its full-time Chief of Psychiatric Services. The offer noted:

Although I have not yet finalized plans for the psychiatric services to be a "closed service" of our medical staff, with additional members being allowed only after our mutual desire to have certain members join us, I do think this is most important and should not prove problematical for us.

Mr. Klima also enclosed a copy of a medical staff application so that it could be completed for appropriate credentials processing.

By letter dated August 31, 1981, Dr. Kramer responded favorably to the offer and set forth his requirements as to salary, term of the contract, and an

indication that the service would be closed-staffed by the terms "Three-year contract with exclusive [*4] rights to admit to Psychiatric unit" and "All professional staff . . . to be hired and paid by Director." Dr. Kramer indicated that he would complete the application for privileges and submit it as soon as possible. He was then in the process of applying for a Delaware license to practice medicine. By letter dated September 24, 1981, Mr. Klima responded that the various points of Dr. Kramer's letter were acceptable and that the exclusive rights of the director to admit would be addressed at a September 28, 1981 Board meeting. On September 28, 1981, the KGH Board of Directors adopted the following resolution:

WHEREAS, KENT GENERAL HOSPITAL, INCORPORATED, has planned, developed and will be operating and staffing a new health care service, a Psychiatric Unit, in the Hospital; and

WHEREAS, after due consideration and deliberation, the Board of Directors deems it advisable and in the best interest of the Hospital and in the best interest of high quality patient care in the Hospital and in the Psychiatric Unit, and for the effective and efficient management, operation, and delivery of health care and psychiatric services in the Hospital and in the Psychiatric Unit at reasonable cost, to [*5] maintain a closed psychiatric staff in the Hospital and to enter into a contract with a qualified psychiatrist who shall be Director of the Psychiatric Unit and who shall exclusively provide for the provision of all psychiatric services in the Hospital and in the Psychiatric Unit; and

WHEREAS, such an arrangement facilitates the assistance of a qualified psychiatrist in further planning for the Psychiatric Unit, in establishing the operational plan for the provision of psychiatric services, in increasing community knowledge of the psychiatric services offered and the need therefor, and in fund raising for said Unit and programs related thereto; facilitates the effective and efficient administration and management of the Psychiatric Unit; facilitates careful control and direction for the protection of said new service and the Hospital's investment therein and facilities thereof; facilitates the supervision and training of Psychiatric Unit personnel and the interrelationships between said Unit and other departments of the Hospital; affords effective selection, maintenance and utilization of the Hospital's equipment and facilities; assures consistency of service, quality control and [*6] improves the safety of patients; provides for prompt availability of a psychiatrist's specialty services during nights and weekends, as well as during regular weekday working hours; simplifies the problem of scheduling patients and allows the needs of the patients to be met effectively and efficiently at reasonable and fair cost; provides continuous availability of the psychiatrist for consultation with attending physicians; provides

consistency with customary patterns for the administration of the Psychiatric Unit; and promotes the ability of the Hospital and the Psychiatric Unit to deliver high quality patient care efficiently, effectively, and at fair and reasonable cost;

NOW, THEREFORE, BE IT RESOLVED, THAT for the foregoing reasons, Kent General Hospital, Incorporated, shall, until the Board of Directors otherwise determines, maintain a closed psychiatric staff in the Hospital and shall enter into a contract with a qualified psychiatrist who shall be Director of the Psychiatric Unit and who shall exclusively provide for the provision of all psychiatric services in the Hospital and in the Psychiatric Unit.

Between November 1981 and January 1982, the parties discussed more formal [*7] drafts of contracts submitted by each through counsel which included references to the psychiatric service being operated on a closed-staff basis. Mr. Klima and Dr. Kramer discussed that Dr. Kramer's privileges would end with the contract under the closed-staff concept. Meanwhile, Dr. Kramer was involved by January 1982 with setting up the psychiatric unit. KGH had made a considerable investment in the planning and building of the unit in anticipation that Dr. Kramer would be the director. It was in anticipation of his contractual arrangement that the Board of Directors granted Dr. Kramer provisional active staff privileges by mid-January. This is not unusual in that medical staff credentials may proceed faster than the formalization of a physician's contract.

By February of 1982, both Mr. Klima and Dr. Kramer shared the concern that the various contract documents prepared by the lawyers were too complicated and that they themselves should finalize the language on their own. Mr. Klima drafted a February 16, 1982 letter agreement in consultation with Dr. Kramer over the telephone. The paragraph on contract term, termination, and medical privileges agreed upon by the parties reads as [*8] follows:

Kent General Hospital extends this offer with your agreement that it will extend for a period of three (3) years from the date you actually begin your full-time employment at the hospital. It is agreed that the terms expressed in this letter are binding on both parties for the duration of the contract unless amended by mutual agreement. Should you not carry out your responsibilities as described for a period of ninety days, the hospital shall have the right to terminate this agreement, then upon such termination, your medical staff privileges, as current provided shall terminate. If your medical staff privileges are for any reason terminated, then this three (3) year agreement shall also terminate. Should we mutually agree to terminate this three (3) year agreement without cause, you will be allowed to reapply for medical staff privileges as it would be appropriate at that time, and

such reapplication will be treated as if it were an increase in medical staff privileges application.

Both Mr. Klima and Dr. Kramer intended that the psychiatric unit would operate on a closed-staff basis. There was no mutual agreement that Dr. Kramer's privileges would automatically continue [*9] with the end of his contract or that the psychiatric service would cease operating on a closed-staff basis at the end of his contract. To the contrary, it was Mr. Klima's intention to provide for a closed staff with an exclusive contract with the Chief of Psychiatry consistent with the Board's resolution. Upon the termination of the contract, Mr. Klima intended that Dr. Kramer could reapply for privileges under a new chief with a new exclusive contract, or, in the alternative, he could apply for privileges in another department for which he qualified. A contrary understanding was not communicated by Dr. Kramer to Mr. Klima at that time. Once the Psychiatric Unit began operations, Dr. Kramer then contracted with staff consistent with the closed-staff concept authorized by the KGH Board of Directors.

During the three-year term of the contract, administrative differences developed between Dr. Kramer and Mr. Klima. Ultimately, Mr. Klima decided not to renew the contract for administrative reasons and no other. Once that decision was made, Dr. Kramer notified the Executive Committee of the Medical Staff that his contract had not been renewed by the hospital and that he would be leaving [*10] upon its completion to go into private practice. Thereafter, and while his contract was still in effect, Dr. Kramer wrote and addressed various hospital committees to explain his impending departure, to state his dissatisfaction with a lack of appeal for his termination, and to request on February 28, 1985 that the Credentials Committee continue his privileges. This request was not made in a manner consistent with the KGH medical staff by-laws, which required reapplications between April 1 and May 20 each year. At an Executive Committee of the Medical Staff meeting on March 12, 1985, Dr. Kramer was informed that his privileges ended with his contract under the closed-staff concept. The committee agreed to formulate a group to review the reasons the psychiatric unit was a closed staff. The Board of Directors within a month authorized a reconsideration of the closed-staff provision within a reasonable period of time after a new Chief of Psychiatry and staff would have settled into practice at KGH. Mr. Klima notified Dr. Kramer of this by a letter dated April 16, 1985, which also informed Dr. Kramer that his last day of work would be April 19, 1985. Dr. Kramer responded to Mr. Klima [*11] by requesting all hearings due him. When Mr. Klima responded that it was unclear what Dr. Kramer was seeking, there was no further request for a hearing. There are no rights to a hearing or an appeal under the KGH medical staff by-laws when privileges end with a

contract.

Dr. Kramer then engaged in the private practice of psychiatry in Dover from April of 1985 through May of 1986, after which he accepted employment with the University of Alabama.

*B. The Counterclaim of KGH*

The following facts are relevant to KGH's counterclaim. Dr. Kramer agrees that he owes $ 7,713 to the hospital pursuant to the February 16, 1982 letter agreement. He further agrees that $ 1,856 of the total amount represents outpatient revenues for the second contract year, owed as of April 21, 1984, and he agrees that the amount of $ 5,857 was owed as of April 21, 1985, representing outpatient revenue owed the hospital for the third year of the contract.

Dr. Kramer contends these revenues should be offset by an amount he claims is due him for compensatory time he was not permitted to use. When Dr. Kramer first came to the hospital in 1982, he understood that the hospital permitted taking time off for additional [*12] time worked. However, in June of 1984, when he tried to take compensatory time off for extra hours worked, he was docked for that time. Because his effort was rejected, he was compelled to use vacation time. Complaining to Ms. Bailey of Hospital Personnel and Mr. Klima was unproductive, and Dr. Kramer thereafter took vacation days rather than seeking compensatory time.

The number of days so utilized by Dr. Kramer was 27 days, for which he would have received $ 400 per day. This reaches a total of $ 10,700 he would have been paid if he had been able to retain the vacation time and instead utilize compensatory time. This amount exceeds the counterclaim of KGH.

The facts indicate that the half-day limitation policy claimed by Mr. Klima, about which he conceded he never advised Dr. Kramer, was not one generally followed by KGH in dealing with physicians as a matter of actual practice. For example, Dr. Sewell was in charge of the Emergency Room, which utilized a number of staff positions who are permitted compensatory time for additional time spent seeing patients. Dr. Sewell himself on occasion took personal time not charged as vacation when performing administrative work during hours [*13] he was not normally scheduled to work. If that additional work was clinical in nature, he received additional pay. Dr. Buckler was Chief of the Pathology service and was able to take time off without being charged vacation time, based on prior hours worked and based on his own decision. There was no specific limitation on the amount of time he could take on this basis; that determination was up to him. The hospital was aware he did so. Further, this was a common practice among Chiefs of Staff, all of whom were aware of the practice. The five

days requested by Dr. Kramer were for days worked at the hospital, not for being on call. This request was not inconsistent with generally accepted practice as to Chiefs of Staff at KGH, and KGH has made no showing that granting the request to permit Dr. Kramer to be treated as were the other physicians who were Chiefs of Staff would have created any problem as to staffing coverage in the psychiatric unit.

Such other facts as may be necessary to decide the issues presented will be developed, *infra.*

## II. DISCUSSION

### A. The Complaint of Dr. Kramer

The principle claim by Dr. Kramer against Kent General Hospital involves the issue of whether [*14] he was contractually entitled to a hearing when his privileges lapsed at the end of his three-year contract. Under certain circumstances, the corporate by-laws and the by-laws of the medical staff of KGH provide a mechanism for a hearing when a decision is made to terminate the privileges of a physician. These documents are a part of the contract between the hospital and Dr. Kramer. *Anne Arundel General Hospital, Inc. v. O'Brien, Md. App., 432 A.2d 483, 488 (1981).* The other document which is part of the contract is the February 16, 1982 letter agreement. The inquiry is whether the by-laws and the agreement between the parties required the hospital to provide a hearing to Dr. Kramer under the circumstances of the case.

Dr. Kramer contends that the corporate by-laws and the by-laws for the medical staff of Kent General Hospital required that the hospital provide a due process hearing on the issue of his loss of privileges at the end of his contract. The theoretical basis for this contention is that his privileges were not related to the term of the contract and would continue beyond the contract term. Therefore, because his privileges would continue beyond the contract [*15] term, the claim by the hospital that his privileges ended with the contract constituted a termination of his privileges, an action for which a hearing was required under both sets of by-laws.

On the other hand, KGH contends that the Board of Directors initially limited the duration of Dr. Kramer's privileges to the term of his contract pursuant to a closed-staff concept which was based on an exclusive contract with Dr. Kramer to provide psychiatric services. The decision not to renew Dr. Kramer's contract was administrative and, therefore, did not trigger the by-law requirements for a hearing.

Pursuant to the corporate by-laws, the Board of Directors of KGH has the authority to run the corporation. The Board has the exclusive right to appoint physicians to the medical staff, and each appointment is

for a one-year term only. The appointment is renewable each year. In order to renew an appointment, the physician must reapply for privileges between April and May of each year.

Under the corporate by-laws, the Board of Directors has the authority to set up a medical service in a way that will best protect the quality of patient care and meet the needs of the community. Here, the Board [*16] of Directors determined that the community needed an inpatient psychiatric service. The Board determined that the best way to protect the quality of care was to close the staff. Central to the closed-staff concept at KGH was that the director would have a contract to provide psychiatric services exclusively for the hospital. Only physicians hired by the hospital with the agreement of the director could also admit and treat patients in the unit. The decision to operate the psychiatric service on a closed-staff basis was a reasonable exercise of the Board of Director's power to provide for the proper management of the hospital. *Williams v. Hobbs,* Ohio App. 3d, *460 N.E.2d 287, 294 (1983).*

Dr. Kramer contends that the hospital did not operate the psychiatric unit on a closed-staff basis because two physicians, Drs. Cole and Ausejo, did not have a contract with the hospital. The record fails to support this contention. The power to contract was delegated by the Board of Directors to Mr. Klima who, in turn, delegated to Dr. Kramer the authority to hire Dr. Cole and Dr. Ausejo. Dr. Kramer acted as the agent of the hospital in contracting with these physicians. 2A C.J.S. [*17] *Agency* § 5. Dr. Cole had a written contract with the hospital as arranged by Dr. Kramer. On the other hand, Dr. Ausejo had an oral agreement with the hospital to work as a *locum tenens* physician. Dr. Ausejo testified that she and Dr. Kramer agreed to her job description, her work schedule, and her rate of payment. The record shows that she worked in the Psychiatric Unit for several years and was paid for her work. There was an enforceable oral contract of employment agreed to by the parties. *Kazanjian v. New England Petroleum Corp., Pa. Super., 480 A.2d 1153 (1984).* Dr. Ausejo, who was Dr. Kramer's witness, confirmed that she could only admit patients in the unit to be seen by Dr. Cole or Dr. Kramer. At no time was she allowed to treat her own patients at the hospital. Furthermore, Dr. Kramer admitted that these physicians worked in the psychiatric unit with his permission as the Chief of Psychiatry.

Another argument by Dr. Kramer that the Psychiatric Unit was never operated as a closed staff was that he was granted privileges prior to having a contract with the hospital. Dr. Kramer was granted privileges in January 1982. However, by this time, the parties [*18] had orally agreed on the major terms for the contract. Dr. Kramer was to be the director for three years and was to be paid approximately $ 90,000 per year. The hospital

had committed funds to building the unit based on Dr. Kramer becoming the director. Dr. Kramer had committed time to consult on the building project. Where parties have reached an oral agreement, the fact that they intend to reduce the agreement to writing does not prevent enforcement of the oral agreement. *Kazanjian, 480 A.2d at 1157.* Furthermore, Mr. Klima explained that Dr. Kramer would not have been allowed to exercise his privileges until the oral agreement was reduced to writing.

Under the corporate by-laws, a medical staff member at KGH has a right to a hearing whenever the Board determines to reject a recommendation favorable to an applicant with respect to privileges, whenever a recommendation unfavorable to him has been made by the Executive Committee, or whenever the Board determines on its own motion to decrease the clinical privileges of a member of the Medical Staff or revoke his staff membership without prior Joint Conference Committee or Executive Committee of the Medical Staff [*19] action. The Board's actions with respect to Dr. Kramer must be consistent with the requirements of the corporate by-laws. *Dworkin v. St. Francis Hospital, Del. Super., 517 A.2d 302, 306 (1986).* The Executive Committee of the Medical Staff did not make a favorable or unfavorable recommendation concerning Dr. Kramer that the Board of Directors rejected. Furthermore, the Board did not determine on its own motion to revoke Dr. Kramer's staff membership. The Court finds that the Board initially granted Dr. Kramer privileges for a maximum term of three years unless his contract was renewed for a second three-year term. The corporate by-laws empowered Mr. Klima to enter into contracts and to terminate contracts. Mr. Klima properly exercised his authority when he did not renew Dr. Kramer's contract. *Freedman v. Ginsberg, 11th Tex. Civ. App., 430 S.W.2d 5 (1986).* Since his contract was not renewed, his privileges lapsed on the last day of the contractual term. Thus, his privileges automatically lapsed without further Board action. The Board had the power to limit Dr. Kramer's privileges to the term of his contract. *Shulman v. Washington Hospital Center, 222 F. Supp. 59 (D.D.C. 1963).* [*20] Under these circumstances, Dr. Kramer was not eligible for a hearing under the corporate by-laws.

The provision for a hearing under the corporate and medical staff by-laws contemplates a situation where the privileges of the physician are diminished because of ethical and clinical competence issues. Here, Dr. Kramer lost his privileges because of an administrative decision to limit the initial grant of privileges to the term of his exclusive contract with the hospital. Dr. Kramer admits that his contract was not renewed because of administrative issues. There is no contention by anyone that his contract was not renewed because of a deficiency in ethics or competence. Therefore, "There is nothing to defend. . . . The requirement that the hospital hold a hearing on what is essentially a management decision vested in the several governing boards of the private hospital was not contemplated by the charter and by-laws of the hospital." *Anne Arundel General Hospital, Inc., 432 A.2d at 489.*

Furthermore, Dr. Kramer expressly gave up his right to such a hearing. He claims that the February 16, 1982 letter agreement indicates that the only time he could lose his privileges [*21] was in the event he was unable to perform as director for 90 days or where the parties mutually agreed to terminate the contract. The hospital, on the other hand, contends that Dr. Kramer expressly agreed to the loss of his privileges at the termination of his contract with no right to an appeal. The hospital contends that the February 16, 1982 letter is only a partial integration of the parties' agreement and is ambiguous with respect to whether Dr. Kramer's privileges ended in the event his contract was not renewed.

The following rules of construction apply to this case. If a writing is plain or clear on its face, there is no room for interpretation, construction, or a search for the intent of the parties. *Klair v. Reese, Del. Supr., 531 A.2d 219, 223 (1987).* If there appears to be oral agreement not contained in the writing, the extrinsic promise "must ordinarily be shown by the circumstances or by the testimony of disinterested witnesses." *Consolidated Fisheries Co. v. Consolidated Solubles Co., Del. Supr., 112 A.2d 30, 38 (1955).* Where the agreement is only partially integrated, extrinsic evidence is admissible to establish the extrinsic [*22] promise. *Id.* Once it is known what the agreement is, "attention is directed to the meaning of the written terms in light of the surrounding circumstances." *Klair, 531 A.2d at 223.* As long as the Court is aware that doubts and uncertainty lurk in the meaning and application of agreed language, it will consider testimony pertaining to antecedent agreements, communications, and other factors which bear on the issue. *Id.*

The proper interpretation of the February 16, 1982 letter agreement involves the issues of partial integration and ambiguous language. "The test of the completeness of the writing proposed as a contract is the writing itself. . . ." *Scott-Douglas Corp. v. Greyhound Corp., Del. Supr., 304 A.2d 309, 316 (1973).* The February 16 letter agreement expressly states that it was not intended to be a full integration of the agreement. It reads:

Upon your arrival, we should determine whether or not to complete further contractual language to serve our mutual best interests.

Furthermore, the record indicates that the parties attempted to reduce complicated contractual language down to a manageable and non-legal form without the

assistance [*23] of counsel. In this situation, the Court concludes that the February 16, 1982 letter agreement was not intended to be a complete and accurate memorandum of the oral agreement. *Id. at 316.*

There is no dispute that Dr. Kramer and KGH agreed on January 29, 1982 that "all clinical privileges shall terminate, without recourse by Alan D. Kramer, to any hearing and appeal procedures in the Medical Staff By-Laws, if this agreement is terminated." Furthermore, Dr. Kramer's counsel and the hospital's counsel both testified that Dr. Kramer and the hospital agreed to this concept. Dr. Kramer contends that he rejected his agreement to the loss of privileges without appeal rights at the end of the contract by February 16, 1982. In determining if a contract has been formed, the Court looks to the overt acts and statements of the parties, and the subjective intention of a party is irrelevant. *Leeds v. First Allied Conn. Corp., Del. Ch., 521 A.2d 1095, 1097 (1986).* Mr. Klima testified that Dr. Kramer did not tell him of the rejection of this concept. Dr. Kramer admits that he did not tell Mr. Klima that he was rejecting all prior negotiated concepts when they [*24] were drafting the February 16, 1982 letter agreement. Therefore, under the objective theory of contracts, Dr. Kramer orally agreed to the loss of his privileges upon the termination of the contract without recourse to a hearing.

The circumstances of Dr. Kramer's employment with KGH necessitated the loss of privileges at the termination of his contract because of the closed-staff concept. The right to admit and treat psychiatric patients was granted exclusively to Dr. Kramer for three years. Once the contract was not renewed, the basis for his right to exercise his privileges was gone. *Williams,* 460 N.E.2d at 294. To allow Dr. Kramer to have privileges at this point would be allowing Dr. Kramer to compete with the new director. Such a situation directly contradicts the September 28, 1981 Board Resolution because it amounts to creating an open staff. The Court is satisfied that KGH has carried its substantial burden to prove the extrinsic oral agreement by the testimony of Dr. Kramer, counsel for both parties, and the circumstances of the case. *Consolidated Fisheries Co., 112 A.2d at 38.*

Because Dr. Kramer expressly agreed to the loss of his privileges [*25] at the end of the contract without recourse to appeal, KGH was not obligated to provide a hearing to Dr. Kramer. *Anne Arundel General Hospital, Inc., 432 A.2d at 489.* In *Anne Arundel,* plaintiffs were radiologists in a group which had exclusive contract to provide services to the hospital. The radiology department was operated on a closed-staff concept, and only a radiologist in the group with the exclusive contract could provide services. The plaintiffs expressly agreed

that their privileges would end on the last day of the contract. *Id. at 486.* The court held by definition that, under a closed-staff concept based on an exclusive contract, a physician's privileges co-exist with the term of the contract. *Id. at 488.* The court held that the closed-staff concept was a valid exercise of the hospital's authority. *Id.l at 489.* Once the contract ended, the physician's privileges ended. *Id.l.* at 489. Since the loss of privileges was based on an administrative decision and did not implicate ethics or competence of the physician, there was no need for a hearing. *Id.* Using the same reasoning, Dr. Kramer has failed to [*26] establish by a preponderance of the evidence that he is entitled to the relief demanded in his complaint.

*B. The Counterclaim of KGH*

With regard to the counterclaim of KGH, it has been conceded that the sum of $ 7,713 would be due if there is no offset against the third-year accounting due from Dr. Kramer to KGH. The evidence, however, shows there was a general practice at KGH to allow physicians generally, including Chiefs of Staff, compensatory time off when they had worked hours beyond those normally worked and when staffing requirements would not be affected by permitting such compensatory time. When Dr. Kramer asked for days off using a portion of the excess time previously worked, he had a reasonable expectation his working conditions would be the same as other similarly situated professionals based on an implied covenant of good faith and fair dealing. *Gilbert v. El Paso Co., Del. Ch., 490 A.2d 1050 (1984).*

Mr. Klima's denial of the request for compensatory time, normally left to the judgment of the professional involved, without any showing or claim that the staffing of the psychiatric unit at that time could be adversely affected, breached that implied [*27] covenant. The Court will permit the compensatory time accumulated by Dr. Kramer, the value of which was lost upon his termination, to offset the accounting claim of KGH.

\* \* \*

For the above stated reasons, judgment is entered in favor of defendant Kent General Hospital, Inc. on plaintiffs complaint. On the counterclaim of defendant Kent General Hospital, Inc., judgment is entered in favor of plaintiff Alan D. Kramer, M.D.

*IT IS SO ORDERED.*

Henry duPont Ridgely

# EXHIBIT "C"

Case 1:08-cv-00342-SLR    Document 5-4    Filed 08/01/2008    Page 2 of 6

Page 1

1996 U.S. Dist. LEXIS 16238, *; 1996-2 Trade Cas. (CCH) P71,628

24 of 42 DOCUMENTS

**FRED H. ADELMAN, D.O. v. MERCY CATHOLIC MEDICAL CENTER and its assigneds**

**CIVIL ACTION NO. 95-7256**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1996 U.S. Dist. LEXIS 16238; 1996-2 Trade Cas. (CCH) P71,628*

**October 30, 1996, Decided**

**DISPOSITION:** [*1] Defendant's motion to dismiss is granted. Complaint is DISMISSED WITHOUT PREJUDICE. The court will DEFER RULING on all other pending motions.

**COUNSEL:** FRED H. ADELMAN, DO, PLAINTIFF, Pro se, BENSALEM, PA.

For MERCY CATHOLIC MEDICAL CENTER, AND THEIR ASSIGNEDS, DEFENDANT: ARTHUR B. KEPPEL, MYLOTTE, DAVID & FITZPATRICK, PHILADELPHIA, PA USA.

**JUDGES:** LOUIS C. BECHTLE, J.

**OPINION BY:** LOUIS C. BECHTLE

**OPINION**

*MEMORANDUM AND ORDER*

BECHTLE, J.

OCTOBER 30, 1996

Presently before the court is Defendant Mercy Catholic Medical Center's Motion to Dismiss, and Plaintiff Fred H. Adelman, D.O.'s opposition thereto. For the reasons set forth below, the court will grant the motion.

**I. BACKGROUND**

Dr. Fred H. Adelman ("Adelman"), a doctor of osteopathy who resides in Bensalem, Pennsylvania, commenced this civil action seeking damages arising out of Mercy Catholic Medical Center's ("Mercy Catholic") termination of his temporary staff privileges. Adelman, proceeding *pro se* and *in forma pauperis*, asserts claims sounding in breach of contract, defamation, lack of due process, and restraint of trade.

Adelman alleges that on or about September 1, 1990,

the Medical College of Pennsylvania's [*2] Department of Emergency Medicine hired him as an Emergency Physician to work at certain hospitals and medical centers. (Compl. P 4.) A week later, Adelman began work at the Careport facility at Mercy Catholic, a hospital based in Darby, Pennsylvania. *Id.* P 5. The physicians at Careport, including Adelman's supervisor, were staffed by the Medical College of Pennsylvania. *Id.* On October 8, 1990, a Mercy Catholic official invited Adelman to apply for a position on the staff of the hospital's Department of Emergency Medicine. *Id.* P 6. The next day, an administrator and an administrative nurse at Careport sent a disparaging letter about Adelman to Careport's Medical Director. *Id.* P 7.

On October 25, 1990, Adelman's temporary courtesy Emergency Medicine privileges were suspended based on the letter. *Id.* P 8. Over the next week, the privileges were reinstated and then suspended again. *Id.* PP 9-10. On November 9, 1990, Adelman denied the allegations made in the letter in an informal conversation with a supervising doctor. *Id.* P 11.

Later that month, Mercy Catholic notified Adelman that it again suspended his temporary emergency medicine privileges. [*3] *Id.* P 12. The letter also informed him of the need for a hearing with the Medical Board to address the allegations against him. *Id.* The letter also invited Adelman to apply for a job on the medical staff. *Id.* On April 9, 1991, the Medical Board held a hearing on the allegations against Adelman. *Id.* P 14.

On June 26, 1991, the Medical Board recommended to the Board of Directors of Mercy Catholic that it affirm the suspension on Adelman's privileges. *Id.* P 15. On December 5, 1991, Mercy Catholic's Board of Directors adopted this recommendation. *Id.* P 16. Mercy Catholic later sent a notice of its decision to suspend Adelman's privileges to the Department of Health and Human Services ("HHS"). *Id.* P 17.

Adelman commenced this civil action on November

Case 1:08-cv-00342-SLR    Document 5-4    Filed 08/01/2008    Page 3 of 6

Page 2

1996 U.S. Dist. LEXIS 16238, *; 1996-2 Trade Cas. (CCH) P71,628

17, 1995. He seeks damages in excess of $ 300,000.00, punitive damages, costs, attorney's fees. He also requests an order directing Mercy Catholic to instruct HHS to remove from Adelman's files any negative reports caused by Mercy Catholic's actions.

On April 9, 1996, Mercy Catholic moved to dismiss the Complaint pursuant to *Federal Rule of Civil Procedure 12(b)* on two grounds. First, it argues that the court does [*4] not have subject-matter jurisdiction over this civil action. Second, it argues that Adelman has failed to state a claim upon which relief can be granted. On April 22, 1996, Adelman filed a responsive brief. On September 6, 1996, Mercy Catholic moved for sanctions against Adelman arising out of Adelman's failure to permit Mercy Catholic to depose him. Adelman filed a response on October 9, 1996.

For the reasons stated below, the court will grant Mercy Catholic's Motion to Dismiss.

## II. *STANDARDS OF REVIEW*

### A. *Motion to Dismiss under Rule 12(b)(1)*

The Federal Rules of Civil Procedure require each pleading that sets forth a claim for relief to contain "a short and plain statement of the grounds upon which the court's jurisdiction depends." *Fed. R. Civ. P. 8(a)(1)*. Because the federal courts are courts of limited jurisdiction, it is essential that the parties plead allegations of jurisdiction in strict accordance with the rules. This is so because the court must ensure that cases falling outside its limits are not carelessly gathered into the court's sphere. As the United States Supreme Court has stated: "It is to be presumed that a cause lies outside this limited jurisdiction, [*5] and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 128 L. Ed. 2d 391, 114 S. Ct. 1673 (1994)* (citations omitted). Accordingly, a court must dismiss pleadings that do not satisfy this burden under *Federal Rule of Civil Procedure 12(b)(1). See also Fed. R. Civ. P. 12(h)(3)* (requiring the court to dismiss an action "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter").

The Complaint does not allege that the court has subject-matter jurisdiction. In his responsive brief, Adelman asserts that this court has federal question jurisdiction because this civil action "arises under the Constitution, laws, or treaties of the United States." *28 U.S.C. § 1331*. The court finds that it does not have diversity jurisdiction because Adelman and Mercy Catholic are Pennsylvania citizens.

To determine whether a claim "arises under" federal law, the court must apply the "well-pleaded complaint rule." *See Metropolitan Life Ins. Co. v. Taylor, 481 U.S.*

*58, 63, 95 L. Ed. 2d 55, 107 S. Ct. 1542 (1987)*. Under this rule, a civil action "arises under" federal law only if a federal question is presented on [*6] the face of the plaintiff's properly pleaded complaint. *Dukes v. U.S. Healthcare, Inc., 57 F.3d 350, 353 (3d Cir.), cert. denied, 133 L. Ed. 2d 489, 116 S. Ct. 564 (1995)*.

### B. *Motion to Dismiss Under Rule 12(b)(6)*

In addition to a clear and concise statement of the court's subject matter jurisdiction, *Federal Rule of Civil Procedure 8* requires each complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. A pleading containing a claim that does not satisfy this standard is subject to dismissal under *Rule 12(b)(6)*.

In determining whether it should dismiss a complaint in this context, the court must accept as true all of the complaint's well-pleaded allegations of fact, construe all allegations in the light most favorable to the plaintiff, and "determine whether under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township, 838 F.2d 663, 665-66 (3d Cir. 1988), cert. denied, 489 U.S. 1065, 103 L. Ed. 2d 808, 109 S. Ct. 1338 (1989)* (citations omitted). A court should not dismiss a claim under *Rule 12(b)(6)* unless "it appears beyond doubt that the plaintiff can prove no set of [*7] facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)* (footnote omitted).

### III. *DISCUSSION*

Mercy Catholic's motion to dismiss thus requires the court to examine the Complaint to determine, first, whether it lacks jurisdiction over the subject matter of this case and, second, whether the Complaint fails to state a claim upon which relief can be granted. If the court finds that any claim suffers from either one of these defects, it must dismiss the claim.

#### 1. *Count I*

This claim, titled "Lack of Jurisdiction," alleges that Mercy Catholic's by-laws do not empower it to issue temporary staff privileges to an applicant until the applicant has submitted an application for admission to the medical staff for a position as an Emergency Physician, and that Adelman had not submitted such an application. (Compl. PP 19-20.) He alleges that, because of this, Mercy Catholic "had no jurisdictional right" to submit documents to various federal and state regulatory agencies concerning their suspension of Plaintiff's privileges. *Id.* P 21.

It appears that Count I is an attempt to seek recovery on the ground that [*8] Mercy Catholic violated its by-laws. If this is the case, Adelman must set forth a breach

Case 1:08-cv-00342-SLR    Document 5-4    Filed 08/01/2008    Page 4 of 6

Page 3

1996 U.S. Dist. LEXIS 16238, *; 1996-2 Trade Cas. (CCH) P71,628

of contract claim under state law. *See Posner v. Lankenau Hosp., 645 F. Supp. 1102, 1106 (E.D. Pa. 1986)*. This is so because Pennsylvania law states that a hospital's by-laws are "an enforceable contract between a hospital and members of its medical staff." *Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 878 (3d Cir. 1995)*. Even the most liberal interpretation of Count I demonstrates that Adelman has alleged, at best, only a state law claim. Because this claim involves no aspect of federal law, it does not state a federal question that would give rise to subject-matter jurisdiction under *28 U.S.C. § 1331*.

### 2. *Count II*

This count, under the heading of "Slander and Libelous Actions," alleges that Mercy Catholic irreparably harmed Adelman's livelihood and professional and personal reputation by prosecuting him through its by-laws and submitting medical board's results to the regulatory agencies. (Compl. P 24.) Because of Mercy Catholic's conduct, Adelman alleges that he cannot be employed as an internist at a hospital or medical center and his medical license in Pennsylvania has [*9] been revoked, and that he has been brought into disrepute among his neighbors and other persons. *Id.*

Count II is an attempt to set forth a state-law defamation claim. Generally, such claims must be adjudicated under Pennsylvania tort law and involve no reference to, or analysis of, federal law. *Davis v. Glanton, 921 F. Supp. 1421, 1424 (E.D. Pa. 1996)*. The court finds that there is nothing federal about this claim and, therefore, it cannot support federal question jurisdiction.

### 3. *Count III*

This count, titled "Lack of Due Process & Improper Use of Administrative Authority," alleges that Mercy Catholic arbitrarily and maliciously deprived Adelman of his right to a hearing before it terminated his position. (Compl. P 26.) He alleges that Mercy Catholic never provided Adelman with a statement of the specific acts and/or omissions with which it charged Adelman, and Adelman was unable to challenge the adverse recommendation. *Id.* P 27. He avers that, because Mercy Catholic did not give Adelman information about the charges against him, Adelman could not defend his reputation and livelihood as an internist. *Id.* P 28. Adelman further alleges that Mercy Catholic [*10] did not comply with the written provisions of its policy and procedure manual concerning staff disputes when its Board of Directors followed the Medical Board's recommendation that Adelman's temporary staff privileges should remain suspended. *Id.* P 29.

Adelman's accusation that Mercy Hospital did not abide by its procedure manual in suspending his privileges is not a federal claim that would support this

court's jurisdiction under *28 U.S.C. § 1331*. [1]

> 1   If Adelman is attempting to allege that his federal due process rights were violated, and that Mercy Catholic is liable to him under *42 U.S.C. § 1983*, the claim also must be dismissed under *Rule 12(b)(6)*. To state a claim under *§ 1983*, a plaintiff must allege that an alleged violation of his federal due process rights is "fairly attributable to the state." *Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982)*.

### 4. *Count IV*

Count IV, named "Restraint of Trade," alleges only that Mercy Catholic knowingly and maliciously deprived Adelman "of [*11] his livelihood and reputation by having representatives who did practice the same medical specialty as [Adelman] sit on the Medical Board, with the intent to restrict [Adelman's] ability to practice his specialty in the surrounding area." (Compl. P 31.)

Reading Count IV in context with the factual allegations in the Complaint, accepting the allegations as true, and viewing them in the light most favorable to Adelman, the court finds that Adelman is alleging that members of Mercy Catholic's Medical Board, perhaps in conjunction its Board of Directors, revoked Adelman's privileges with the intent to, and for the sole purpose of, excluding Adelman from practicing osteopathic medicine in the Philadelphia area. Adelman contends that Count IV states a claim under *Sections 1* and *2* of the Sherman Act, *15 U.S.C. §§ 1, 2*.

The court finds that a well-pleaded complaint alleging the facts stated would present an antitrust claim under the Sherman Act. Because the Sherman Act is a federal statute, and a Sherman Act claim presents a federal question, the court cannot dismiss Count IV pursuant to *Rule 12(b)(1)*. The court, however, will grant Mercy Catholic's motion under *Rule 12(b)(6)* because [*12] Count IV does not state a claim upon which relief can be granted under the Sherman Act or any other provision of federal law.

Because Counts I, II, and III do not state a federal question that would support this court's exercise of jurisdiction under *28 U.S.C. § 1331*, and because Count IV, which contains a federal question, does not state a claim upon which relief can be granted, the court must dismiss the Complaint. The case, however, will be dismissed without prejudice for three reasons. First, a review of the relevant case law reveals that Adelman has alleged facts that are similar to group boycott cases, and the court can not conclude at this time that Adelman can never prevail under the type of allegation set forth in Count IV. Second, Adelman is a *pro se* plaintiff and is entitled to a liberal construction of his pleading. Third,

Case 1:08-cv-00342-SLR    Document 5-4    Filed 08/01/2008    Page 5 of 6

Page 4

1996 U.S. Dist. LEXIS 16238, *; 1996-2 Trade Cas. (CCH) P71,628

dismissal without prejudice is appropriate in this situation because Mercy Catholic has not persuaded the court that Count IV -- the only <u>federal question</u> -- is barred by the statute of limitations or the doctrine of res judicata. The court will expand on the final reason in the following paragraphs.

### a. Statute of Limitations

The Sherman [*13] Act requires that claims brought under the statute be commenced within four years after the cause of action accrued. *15 U.S.C. § 15b.* The cause of action, if one exists at all, accrued on the date that the defendant allegedly committed a wrongful act. *Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338-39, 28 L. Ed. 2d 77, 91 S. Ct. 795 (1971); In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1172 (3d Cir. 1993)* (restating the Third Circuit's view that "an injurious act within the limitations period may serve as a basis for an antitrust suit."). The last date on which Mercy Catholic is alleged to have engaged in wrongful conduct is December 5, 1991, when its Board of Directors affirmed its Medical Board's recommendation that Adelman's <u>privileges</u> remain suspended on December 5, 1991.

Adelman, therefore, could have commenced a civil suit seeking relief based on the <u>hospital's</u> suspension before *December 4, 1995.* Adelman attached the Complaint to his Motion to Proceed In Forma Pauperis, which was filed on *November 17, 1995.* The court will deem this date as the date this civil action was commenced and conclude that Count IV is not barred by the statute of limitations.

### [*14] b. Res Judicata

Mercy Catholic argues that Count IV is barred because a state court judge has dismissed the claim with prejudice as part of a nearly identical lawsuit in the Court of Common Pleas of Delaware County. (Def.'s Mem. Supp. Dismissal Ex. B) (Complaint, *Adelman v. Mercy Catholic Medical Ctr.*, No. 93-8700.) Adelman had submitted a proposed Order requesting that Count IV be "removed." *Id.* Ex. C. The presiding judge entered an Order dismissing Count IV "with prejudice as requested by the Plaintiff." *Id.* From the papers submitted to the court, it appears that the judge did not reach the merits of Count IV.

The issue, therefore, is whether the state judge's dismissal with prejudice of Count IV bars Adelman from bringing the claim in this federal court under the doctrine of res judicata, also called claim preclusion. As a general rule, federal courts must "give the same preclusive effect to state court judgments that those judgments would be given in the court of the State from which the judgments emerged." *Kremer v. Chemical Constr. Corp., 456 U.S. 461, 72 L. Ed. 2d 262, 102 S. Ct. 1883 (1982); see 28 U.S.C. § 1738.* Under Pennsylvania law, the doctrine of

res judicata holds that a [*15] dismissal with prejudice constitutes an adjudication on the merits, and thus "bars any future suit between the parties or their privies, on the same cause of action.'" *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1429 (3d Cir. 1994)* (quoting *Keystone Bldg. Corp. v. Lincoln Sav. and Loan Ass'n, 468 Pa. 85, 360 A.2d 191, 194 (Pa. 1976)).*

Count IV, however, appears to fit within an exception to this general rule. Pennsylvania courts "would most likely not apply claim preclusion where the original court lacked subject matter jurisdiction." *McCarter v. Mitcham, 883 F.2d 196, 200 (3d Cir. 1989).* The court has found that a well-pleaded Count IV would set forth a Sherman Act claim. The United States Supreme Court has held that federal courts have exclusive jurisdiction over Sherman Act claims. *General Inv. Co. v. Lake Shore & M.S. Ry., 260 U.S. 261, 287, 67 L. Ed. 244, 43 S. Ct. 106 (1922)* (holding that the federal antitrust laws impliedly exclude state court jurisdiction of federal antitrust claims). Therefore, insofar as Count IV sets forth a claim over which federal courts have exclusive jurisdiction, the Court of Common Pleas of Delaware County had no jurisdiction over Count IV, and its [*16] dismissal with prejudice has no preclusive effect on a federal court. Thus, to the extent that Count IV sets forth a Sherman Act claim, it is not barred under Pennsylvania's version of res judicata as interpreted by the Third Circuit.

### 5. Summary

The court has found that the allegations of Counts I, II, and III do not involve claims that arise under federal law. The court interprets Count IV as alleging a potential Sherman Act claim that gives rise to the court's subject-matter jurisdiction under *28 U.S.C. § 1331.* Therefore, the court will dismiss Counts I, II, and III pursuant to *Federal Rule of Civil Procedure 12(b)(1).* Finally, the court will dismiss Count IV without prejudice pursuant to *Rule 12(b)(6).*

In his Amended Complaint, if Adelman chooses to file one, he will be required to comply strictly with *all relevant rules and laws* for setting forth an antitrust claim upon which relief can be granted. [2] The court will expect Adelman to be certain to comply with *Federal Rule of Civil Procedure 11(b).* If the Amended Complaint fails to properly set forth an antitrust claim upon which relief can be granted, the court will dismiss the case with prejudice.

> 2    Should Adelman's Amended Complaint set forth a Sherman Act claim upon which relief can be granted, the court will decide whether it should exercise supplemental jurisdiction over Counts I, II, and III pursuant to *28 U.S.C. § 1367.*

[*17] If Adelman files an Amended Complaint with a satisfactory Sherman Act claim, the court will

1996 U.S. Dist. LEXIS 16238, *; 1996-2 Trade Cas. (CCH) P71,628

expect Mercy Catholic to depose Adelman within two or three weeks of the filing of the amended pleading. The deposition will be governed by the rules set forth in the court's Order of June 9, 1996. Thereafter, the court will consider Mercy Catholic's Motion for Sanctions arising out of Adelman's unexplained failure to attend his deposition on September 5, 1996.

### IV. CONCLUSION

For the reasons set forth above, the court will grant Defendant's motion to dismiss.

An appropriate Order follows.

### ORDER

AND NOW, TO WIT, this 30th day of October,

1996, upon consideration of Defendant Mercy Catholic Medical Center's Motion to Dismiss, and Plaintiff Fred H. Adelman, D.O.'s response thereto, IT IS ORDERED that said motion is GRANTED. The Complaint is DISMISSED WITHOUT PREJUDICE. Plaintiff may file an Amended Complaint within thirty (30) days of the date of this Order.

IT IS FURTHER ORDERED that the court will DEFER RULING at this time on all other pending motions, including Mercy Catholic's Motion for Sanctions.

LOUIS C. BECHTLE, J.

# EXHIBIT "D"

2 of 10 DOCUMENTS

**ROBERT T. FLOYD, Plaintiff, v. SATURN OF NEWARK, Defendant.**

Civil Action No. 04-944-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2006 U.S. Dist. LEXIS 2466*

January 24, 2006, Decided

**PRIOR HISTORY:** *Floyd v. Saturn of Newark, 2005 U.S. Dist. LEXIS 13860 (D. Del., July 11, 2005)*

**COUNSEL:**    [*1]    Robert T. Floyd, Darby, Pennsylvania. Pro Se Plaintiff.

Danielle K. Yearick, Esquire, of TYBOUT, REDFEARN & PELL, Wilmington, Delaware. Attorney for Defendant.

**JUDGES:** Joseph J. Farnan Jr., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Joseph J. Farnan Jr.

**OPINION**

*MEMORANDUM OPINION*

January 24, 2006

Wilmington, Delaware

**Farnan, District Judge.**

Pending before the Court is Defendant's <u>Motion to Dismiss</u> (D.I. 11). For the reasons discussed, the Motion will be granted.

**BACKGROUND**

**I. Factual Background**

In May 2001, Plaintiff leased a 2001 Saturn automobile from Defendant, a car dealership located in Newark, Delaware. Plaintiff entered into a lease agreement with General Motors Acceptance Corporation ("GMAC"), which financed the lease. Pursuant to the terms of the lease agreement, the lease was scheduled to terminate in August 2004, and Plaintiff would have an option to purchase the vehicle at that time. Plaintiff alleges that, in February 2004, he approached a sales agent at Defendant's place of business with regard to exercising his right to purchase the leased vehicle. The sales agent allegedly told Plaintiff that when there were five months remaining [*2] on the lease, GMAC would send Plaintiff a letter excusing the final five lease payments should Plaintiff purchase a new automobile. Plaintiff further alleges that the sales agent told him that he would not have to worry about paying for excess mileage on the leased vehicle.

On May 27, 2004, Plaintiff returned to Defendant's place of business allegedly because only four payments remained on the lease, yet Plaintiff had not received the letter from GMAC, which the sales agent had promised. During the May 27 visit, the sales agent convinced Plaintiff to purchase a gold 2004 Saturn automobile, which Plaintiff financed through a loan with Sun Trust Bank. Plaintiff turned in the leased 2001 Saturn to Defendant at that time. The sales agent then told Plaintiff that he may have to pay for excess mileage on the previously-leased vehicle.

GMAC subsequently billed Plaintiff $ 3,047 for excess mileage on the leased vehicle. On June 2, 2004, Plaintiff sent a letter to GMAC indicating his desire to reacquire the 2001 leased vehicle and to purchase it at the end of the lease term. On June 3, 2004, Plaintiff again wrote to GMAC stating his belief that he had a legal right to purchase the leased [*3] vehicle until August 2004. On June 10, 2004, GMAC allegedly sent a letter to Plaintiff stating that the vehicle had been sold.

On June 10, 2004, Plaintiff returned the gold 2004 automobile to Defendant. Plaintiff alleges that he was subsequently denied credit by other dealerships because the new car loan from Sun Trust Bank appeared on his credit report. On June 14, 2004, Plaintiff returned to Defendant's place of business and purchased a red 2004 Saturn automobile, again financing it through Sun Trust Bank. Plaintiff alleges that both Sun Trust loans ran concurrently until the loan for the gold 2004 Saturn "fell into late status," damaging Plaintiff's credit rating.

**II. Procedural History**

On August 16, 2004, Plaintiff filed a *pro se*

Case 1:08-cv-00342-SLR    Document 5-5    Filed 08/01/2008    Page 3 of 6

Page 2
2006 U.S. Dist. LEXIS 2466, *

Complaint against GMAC and Saturn of Newark. (D.I. 1). The Court construes Plaintiff's Complaint to allege violations of the Truth in Lending Act, *15 U.S.C. § 1601 et seq.,* the Equal Credit Opportunity Act, *15 U.S.C. § 1691 et seq.,* breach of contract, and common law fraud.

GMAC filed a <u>Motion To Dismiss</u> on September 7, 2004 (D.I. 4) and a Renewed <u>Motion To Dismiss</u> on September 28, 2004 (D. [*4] I. 8). On July 11, 2005, the Court granted GMAC's <u>Motion To Dismiss</u> (D.I. 15), concluding that the Court lacked subject matter jurisdiction to hear the case.

Presently before the Court is Defendant Saturn of Newark's <u>Motion To Dismiss</u> (D.I. 11), filed April 26, 2005.

**PARTIES' CONTENTIONS**

By its Motion, Defendant contends that this lawsuit should be dismissed pursuant to *Federal Rules of Civil Procedure 12(b)(4)* and *(5)* due to insufficiency of process and insufficiency of service of process. Specifically, Defendant contends that Plaintiff failed to perfect service within 120 days, that Plaintiff failed to serve a person authorized to receive service, and that Plaintiff failed to name the proper party. Alternatively, Defendant contends that the lawsuit should be dismissed pursuant to *Federal Rule of Civil Procedure <u>12(b)(1)</u>* because the Court lacks subject matter jurisdiction as the amount in controversy is less than $ 75,000 and there is no <u>federal question</u> present in the case.

Plaintiff did not file a response to Defendant's Motion.

**DISCUSSION**

**I. Legal Standard**

A <u>motion to dismiss</u> [*5] under *Rule <u>12(b)(1)</u>* challenges the jurisdiction of the court to address the merits of the plaintiff's complaint. The motion should be granted where the asserted claim is "insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Coxson v. Comm. of Pennsylvania, 935 F. Supp. 624, 626 (W.D. Pa. 1996)* (citations omitted). A <u>motion to dismiss</u> under <u>12(b)(1)</u> may present either a facial or factual challenge to subject matter jurisdiction. *See Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).* The instant case presents a facial challenge because Defendant does not dispute the existence of the <u>jurisdictional facts</u> alleged in the Complaint. Therefore, the Court must accept the facts alleged in the Complaint as true, and draw all reasonable inferences in favor of Plaintiff. *Id.*

**II. Whether The Court Has Subject Matter Jurisdiction**

A. *Diversity of Citizenship*

A federal court has subject matter jurisdiction based on diversity of citizenship when "the matter in controversy exceeds the sum or value of $ 75,000, exclusive [*6] of interest and costs, and is between. . .citizens of different States." *28 U.S.C. § 1332 (2005).*

In his Complaint (D.I. 1), Plaintiff alleges that he is a citizen of Pennsylvania and that Defendant is a citizen of Delaware. Defendant does not dispute Plaintiff's allegations with regard to the parties' citizenship. Rather, Defendant contends that the Court lacks diversity jurisdiction because the amount in controversy is less than $ 75,000.

Accepting the facts alleged in the Complaint as true and drawing all reasonable inferences in favor of Plaintiff, as the Court must when analyzing a <u>motion to dismiss,</u> the Court concludes that Plaintiff has established diversity of citizenship among the parties. However, Plaintiff has not satisfied the jurisdictional amount in controversy. In determining the jurisdictional amount, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indemnification Co. v. Red Cab Co., 303 U.S. 283, 288, 58 S. Ct. 586, 82 L. Ed. 845 (1938).* Dismissal is only appropriate if the court is certain that the jurisdictional amount cannot be met and the claims are insubstantial on their face. *In re LifeUSA Holding Inc., 242 F.3d 136, 143 (3d Cir. 2001).* [*7] Once the defendant challenges the plaintiff's allegations regarding the amount in controversy, the plaintiff must produce sufficient evidence to demonstrate that his or her claims meet the jurisdictional amount. *Suber v. Chrysler Corp., 104 F.3d 578, 583 (3d Cir. 1997).*

In this case, Plaintiff alleges that he is entitled to $ 20,000 in damages. (D.I. 7). Thus, Plaintiff has not satisfied the $ 75,000 threshold to support the exercise of diversity jurisdiction. Further, Plaintiff has not responded to Defendant's <u>Motion To Dismiss,</u> and thus, has failed to come forward with facts necessary to support diversity jurisdiction. Accordingly, the Court concludes that Plaintiff's allegations fail to support diversity jurisdiction.

B. *<u>Federal Question</u>*

Pursuant to *28 U.S.C. § 1331*, federal courts have <u>federal question</u> jurisdiction over "cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 27-28, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983).* [*8]

1. Truth in Lending Act

In his Complaint, Plaintiff alleges that "goods leased to consumers are covered by chapter 5 of the Truth in Lending Act and FTC's regulation M. . ." (D.I. 1 at 2).

The Consumer Leasing Act ("CLA") was enacted in 1976 as an amendment to the Truth in Lending Act ("TLA"), *15 U.S.C. § 1601*. The CLA extends the TLA's credit disclosure requirements to consumer leases; its primary purpose is to "assure a meaningful disclosure of the terms of leases. . .so as to enable the lessee to compare more readily the various lease terms available to him." *15 U.S.C. § 1601(b)*. Because lease financing had become an alternative to credit financing and installment sales contracts, Congress also intended CLA disclosure requirements to "enable comparison of lease terms with credit terms where appropriate." *Id.* The CLA thus requires lessors of personal property to make certain disclosures "in a clear and conspicuous manner" upon entering into a lease. *15 U.S.C. § 1667a*. The CLA applies to all leases for the use of "personal property" having a term "exceeding four months" that have a "total contractual obligation [*9] not exceeding $ 25,000." *15 U.S.C. § 1667(1)*. The statute creates a private right of action against lessors who breach the disclosure requirements. *See 15 U.S.C. § 1667d; 15 U.S.C. § 1640*.

In passing the CLA, Congress also delegated to the Federal Reserve Board authority to "prescribe regulations to update and clarify the requirements and definitions applicable to lease disclosures" and to "publish model disclosure forms to facilitate compliance with the [statute's] requirements." *15 U.S.C. § 1667f(a)(1), (b)(1)*. Those regulations, collectively referred to as "Regulation M", are codified at *12 C.F.R. § 213*. Courts are to defer to these regulations and associated commentary when interpreting the TLA unless they are "demonstrably irrational." *See Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565, 100 S. Ct. 790, 63 L. Ed. 2d 22 (1980)*.

In pertinent part, the CLA requires a lessor to disclose in writing at the inception of a lease:

(4) The amount of other charges payable by the lessee not included in the periodic payments, a description of the charges and that the lessee shall be liable [*10] for the differential, if any, between the anticipated fair market value of the leased property and its appraised actual value at the termination of the lease, if the lessee has such liability;

(5) A statement of the amount or method of determining the amount of any liabilities the lease imposes upon the lessee at the end of the term and whether or not the lessee has the option to purchase the leased property and at what price and time;

* * * *

(11) A statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the term and the amount or method of determining any penalty or other charge for delinquency, default, late payments, or early termination.

*15 U.S.C. § 1667a*.

Regulation M states in pertinent part that the lessor shall disclose the following information:

(d) Other charges. The total amount of other charges payable to the lessor, itemized by type and amount, that are not included in the periodic payments. . . .

(g) Early termination--

(1) Conditions and disclosure of charges. A statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the [*11] lease term; and the amount or a description of the method for determining the amount of any penalty or other charge for early termination, which must be reasonable. . . .

(h) Maintenance and repair - . . .

(2) Wear and use standard. A statement of the lessor's standards for wear and use (if any), which must be reasonable; and

(3) Notice of wear and use standard. In a motor-vehicle lease, a notice regarding wear and use substantially similar to the following: "Excessive Wear and Use. You may be charged for excessive wear based on our standards for normal use." The notice shall also specify the amount or method for determining any charge for excess mileage.

(i) Purchase option. A statement of whether or not the lessee has the option to purchase the leased property, and:

(1) End of lease term. If at the end of the lease term, the purchase price; and

(2) During lease term. If prior to the end of the lease term, the purchase price

or the method for determining the price and when the lessee may exercise this option.

*12 C.F.R. § 213.4.*

Viewing the Complaint (D.I. 1) and Plaintiff's subsequent "More Definite Statement" (D.I. 7) in light of the CLA and [*12] Regulation M, the Court concludes that Plaintiff has failed to state a claim pursuant to the TLA. Plaintiff alleges that he was discouraged from purchasing the 2001 Saturn, but nowhere does Plaintiff allege that Defendant failed to disclose terms in the lease agreement at the time the parties entered into the lease for the 2001 Saturn. In fact, Plaintiff alleges that the lease agreement in Paragraph 20 states that he had a contractual right to purchase the 2001 vehicle "only at the scheduled lease end." (D.I. 7 at 2). Similarly, Plaintiff does not allege that Defendant failed to disclose terms in either of the 2004 transactions.

In the Court's view, Plaintiff's claim with regard to the purchase of the 2001 vehicle is contractual in nature. Plaintiff has alleged no facts whereby relief could be granted pursuant to the TLA or Regulation M. Accordingly, the Court concludes that Plaintiff has not pleaded a <u>federal question</u> under the TLA.

2. Equal Credit Opportunity Act

The Equal Credit Opportunity Act, *15 U.S.C. § 1691 et seq.* ("ECOA"), makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction [*13] . . . on the basis of race, color, religion, national origin, sex or marital status, or age." *15 U.S.C. § 1691(a).* To establish a *prima facie* case under the ECOA a Plaintiff must show that "(1) plaintiff was a member of a protected class; (2) plaintiff applied for credit from defendants; (3) plaintiff was qualified for the credit; and (4) despite qualification, plaintiff was denied credit." *In re Chiang, 385 F.3d 256, 259 (3d Cir. 2004).*

It is not clear from Plaintiff's pleadings whether he is alleging an ECOA violation with regard to the lease agreement executed in 2001, his attempt to purchase the 2001 vehicle in 2004, or the loan transactions with Sun Trust Bank associated with the purchases from Defendant in 2004. Therefore, the Court will analyze all three transactions.

With regard to the lease agreement entered into in 2001, the Court concludes that Plaintiff's claim is time barred. Affirmative claims under the ECOA are subject to a two-year statute of limitations. *See 15 U.S.C. § 1691e(f).* Plaintiff signed the lease agreement in May 2001; he filed his Complaint more than three years later on August 16, 2004. Thus, [*14] the Court concludes that Plaintiff's ECOA claim with regard to the 2001

transaction is time barred.

With regard to the 2004 credit transactions, the Court concludes that no relief could be granted pursuant to the ECOA under any set of facts that could be proved consistent with Plaintiff's allegations. Plaintiff does not allege that Defendant denied him credit. To the contrary, Plaintiff alleges that the gold 2004 vehicle was financed on May 27, 2004 and that a second loan for the red 2004 vehicle was given on June 14, 2004. The only mention of a denial of credit in the pleadings is in reference to non-party automobile dealers that denied Plaintiff credit due to the presence on his credit report of the first Sun Trust Bank loan. Thus, the Court concludes that no relief could be granted pursuant to the ECOA with regard to the 2004 transactions.

With regard to Plaintiff's attempt to purchase the 2001 leased vehicle in 2004, the Court concludes that the ECOA is inapplicable. Plaintiff does not allege that he applied for any credit in 2004 with regard to the purchase of the 2001 vehicle or that he was denied credit based on his membership in a protected class. Rather, Plaintiff alleges [*15] that his 2001 contract was breached by selling the leased vehicle prior to the expiration of the lease agreement. Thus, the Court concludes that no relief could be granted pursuant to the ECOA.

Even assuming that Defendant is a creditor, the Court concludes that Plaintiff has not pleaded a claim under the ECOA. *See Costa v. Mauro Chevrolet, Inc., 390 F. Supp. 2d 720, 729 (N.D. Ill. 2005).* Accordingly, the Court concludes that Plaintiff's Complaint does not include a federal controversy, and therefore, the Court lacks subject matter jurisdiction.

**CONCLUSION**

Because the Court concludes that it lacks subject matter jurisdiction, Defendant's <u>Motion To Dismiss</u> will be granted and this lawsuit will be dismissed pursuant to *Federal Rule of Civil Procedure <u>12(b)(1)</u>.* [1]

> 1  Because the Court concludes that it lacks subject matter jurisdiction, the Court will not address Defendant's argument with regard to insufficiency of process and insufficiency of service of process.

[*16] An appropriate Order will be entered.

**ORDER**

At Wilmington, this 24 day of January 2006, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendant's <u>Motion To Dismiss</u> (D.I. 11) is **GRANTED** and the case is **DISMISSED.**

2006 U.S. Dist. LEXIS 2466, *

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE

# EXHIBIT "E"

1 of 5 DOCUMENTS

**ROBERT D. EHART, Plaintiff, v. ODESSA FIRE COMPANY, BY AND THROUGH ITS BOARD OF DIRECTORS, ET AL., Defendants.**

**Civ. No. 02-1618-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 2244*

**February 2, 2005, Decided**

**DISPOSITION:** Defendants' motion for summary judgment was granted.

**COUNSEL:** [*1] Robert C. McDonald, Esquire of Silverman, McDonald & Friedman, Wilmington, Delaware, for Plaintiff.

David R. Hackett, Esquire of Griffin & Hackett, P.A., Georgetown, Delaware, for Defendants.

**JUDGES:** ROBINSON, Chief Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM OPINION**

Dated: February 2, 2005

Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

Plaintiff Robert D. Ehart filed the present action against defendants Odessa Fire Company ("the Fire Company"), by and through its Board of Directors (collectively "the defendants"), alleging defendants: (1) violated plaintiff's procedural and substantive due process rights; (2) selectively prosecuted and discriminated against plaintiff because of his political and personal views; (3) breached their contract with plaintiff; and (4) intentionally inflicted emotional distress on plaintiff. (D.I. 1 at 7-9) Currently before the court is defendants' motion to dismiss and/or for summary judgment. (D.I. 41) This court has jurisdiction over the present matter pursuant to *28 U.S.C. § 1331.* For the reasons set forth below, the court grants defendants' motion.

**II. BACKGROUND**

Plaintiff [*2] was admitted to the membership of the Fire Company on March 13, 2000. (D.I. 42 at 5) During his time with the Fire Company plaintiff served as a firefighter and an emergency medical technician. (D.I. 42 at 4)

The Fire Company is incorporated under the general corporation laws of the State of Delaware. (D.I. 1 at 2; D.I. 22 at 2; D.I. 43, ex. A) It is managed by a Board of Directors duly elected by the membership. (D.I. 22 at 2) Members of the Fire Company are entitled to participate in the Delaware Volunteer Fireman's Pension Plan, established under Chapter 66A of Title 126 of the Delaware Code, after ten years of full-time active duty. (D.I. 22 at 2) The State provides no contributions to these pension plans. (*Id.*) The Fire Company members may also enroll in the Line of Duty Disability Benefits to Covered Firefighters Plan pursuant to Chapter 67 of Title 18 of the Delaware Code. (*Id.* at 3) Benefits paid to a member for permanent disability under the Disability Plan are exempt from State tax pursuant to *Del. C. Ann. tit. 18, § 6708.* (*Id.*) Training is provided to members of the Fire Company by the Delaware State Fire School pursuant to *Del. C. Ann. tit. 16, § 6613* [*3] . (*Id.*) Fire School attendance fees are paid by defendants. (*Id.*) The Delaware State Fire School is under the control of the State Fire Prevention Commission pursuant to *Del. C. Ann. tit. 16, § 6613.* (*Id.*) The Fire Company's equipment, apparatus and operations are funded by donations from the Odessa community and special purpose appropriations from State and local governments. (D.I. 42 at 6)

Section 8 of the Fire Company's bylaws pertains to suspension, termination and expulsion from membership. According to Section 8:

> For reasons, as listed below, any member may be expelled by an affirmative vote of a majority of members present and voting at any regular or

special meeting provided such member has been notified by certified letter, at least thirty (30) days prior to the meeting at which action is taken, stating the charges against him/her and advising him/her to be present to offer any defense he/she so desires.

Any member that has been expelled from The Odessa Fire Company, shall not be permitted to re-apply for membership for two (2) years from the date of such expulsion.

(D.I. 42 at 6; D.I. 43, ex. B)

Section 8A outlines [*4] the reasons for termination and expulsion:

1). Conviction of a criminal offense as defined by the Title 11, Delaware Code;

2). Conviction of a felony crime;

3). Not being of proper age to join;

4). Application not being filled out honestly;

5). Failure to complete the physical as required by the fire company;

6). Failure to complete the Hepatitis 'B' program as required by the fire company.

7). Membership will also be terminated upon receipt of a letter of resignation.

8). Conduct unbecoming a member of the Odessa Fire Company.

9). Obstructing the business of this Company, bearing false witness or conspiring against it.

(D.I. 42 at 6-7; D.I. 43, ex. B)

On February 12, 2002 defendants sent plaintiff a letter informing him that charges were brought against him and that he was suspended until a full investigation was completed. (D.I. 46, ex. C) According to the letter: "When the investigation is completed there will be a special Directors [sic] meeting, which you will be invited to come and address these allegations. This invitation will be in writing." (Id.) Defendants' February 12th letter did not inform plaintiff of the specific charges brought against [*5] him. (Id.; D.I. 1 at 5)

The Board of Directors conducted an investigation

and held a Directors' meeting on March 4, 2002. (D.I.1 at 5; D.I. 42 at 7) Prior to the meeting the Directors drafted a statement of charges against plaintiff. (D.I. 43 at A-3, ex. C) At the request of the Board of Directors, plaintiff and his counsel met with the Directors on March 4th to review the statement of charges. (D.I. 43 at A-3) Plaintiff was given a copy of the statement of charges against him at this March 4th meeting. (Id.; D.I. 46, exs. D, E)

On March 4, 2002 plaintiff's counsel wrote defendants a letter claiming that defendants had violated plaintiff's due process. (D.I. 1 at 5) On March 5, 2002 defendants notified plaintiff, via certified letter, of a regular meeting of the Fire Company membership scheduled for April 8, 2002, at which plaintiff's expulsion from membership would be considered. (D.I. 42 at 7; D.I. 46, ex. D) The letter advised plaintiff to be present to offer any defense he had. (Id.)

On April 8, 2002, a majority of the members of the Fire Company voted to expel plaintiff from the membership of defendant. (D.I. 22 at 5)

### III. STANDARD OF REVIEW

Because [*6] defendants referred to matters outside the pleadings, their motion to dismiss shall be treated as a motion for summary judgment. See Fed. R. Civ. P. 12(b)(6). A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party [*7] then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202,

*106 S. Ct. 2505 (1986)*. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*

## IV. DISCUSSION

Plaintiff has brought two federal claims against defendant: (1) violation of plaintiff's procedural and substantive due process; [*8] and (2) violation of the *Equal Protection Clause* by "selectively prosecuting and discriminating against [] plaintiff." (D.I. 1 at 7-8) Plaintiff's federal claims arise under *42 U.S.C. § 1983* [1] ("*Section 1983*"). *Section 1983* imposes liability on any person who, under color of state law, deprives another of any rights secured by the Constitution or the laws of the United States. *42 U.S.C. § 1983 (2004)*. A prima facie case under *Section 1983* requires a plaintiff to demonstrate: (1) a person, acting under color of state law; (2) deprived plaintiff of a federal right. *Groman v. Township of Manalapan, 47 F.3d 628, 633. (3d Cir. 1995)*.

[1]    *Section 1983* states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

*42 U.S.C. § 1983 (2004)*.

## [*9] A. Acting Under Color of State Law

Plaintiff has failed to establish that defendants acted under color of state or territorial law. In *Rendell-Baker v. Kohn*, the Supreme Court rejected claims similar to those of plaintiff under circumstances similar to the present action. *457 U.S. 830, 73 L. Ed. 2d 418, 102 S. Ct. 2764 (1982)*. In that case the plaintiff, Rendell-Baker, was a vocational counselor at New Perspectives School, [2] a high school for "maladjusted" students. *Id. at 831-33*. The defendant, Kohn, was the director of the school. *Id. at 831*. Rendell-Baker was fired shortly after becoming

involved in a dispute with Kohn over the role of a student-staff council in the hiring of new teachers. *Id. at 834*. She then filed suit under *Section 1983* alleging she had been discharged in violation of her Constitutional rights. *Id. at 834-35*.

[2]    New Perspectives School was a private institution operated by a board of directors, none of whom were public officials or were chosen by public officials. *457 U.S. at 832*. Public funds accounted for at least 90%, and in one year 99%, of the school's operating budget. *Id*. To be eligible for tuition funding the school had to comply with a variety of regulations concerning matters ranging from recordkeeping to student-teacher ratios to maintaining written job descriptions and written statements describing personnel standards and procedures. *Id. at 833*. Thus, in several respects New Perspectives School was similar to defendant Odessa Fire Company.

[*10]    The *Rendell-Baker* Court identified three factors [3] which were relevant to determining whether New Perspective School acted under color of state law: (1) the extent to which the State funded the school; (2) the extent to which the challenged activity was regulated by the State; and (3) whether the school performed a public function. *Id. at 840-42*. The Court considered each of these factors in determining that New Perspectives School did not act under color of state law. *Id. at 840-43*.

[3]    The Court also identified a fourth factor, namely whether the school had a symbiotic relationship with the State. *457 U.S. at 842-43*. This factor arises from the case of *Burton v. Wilmington Parking Authority*, where the Supreme Court found that because a restaurant was located on public property and its rent contributed to the support of a public garage, the restaurant's refusal to serve African Americans constituted state action. *365 U.S. 715, 6 L. Ed. 2d 45, 81 S. Ct. 856 (1961)*. The *Rendell-Baker* Court dismissed this factor, holding that no such relationship existed between the New Perspectives School and the State. Similarly, this court finds that there is no symbiotic relationship between the Odessa Fire Department and the State of Delaware.

[*11]    In *Rendell-Baker* the Court found that, although virtually all of the school's income was derived from government funding, the school's receipt of public funds did not make the discharge decision acts of the State. *Id. at 841*. In the present matter plaintiff has presented evidence that in 2002, the Fire Company received $ 340,070.94 in funds from the State of Delaware Department of Insurance. (D.I. 45 at 11; D.I.

46, exs. F, G) While this does show that the Fire Company receives funding from the State, it does not show the extent of funding by the State (i.e., the percent of the Fire Company's budget that is paid by the State). Furthermore, defendants showed that not all funding for the Fire Company comes from the State. According to defendants, apparatus and operations are also funded by donations from the community the Fire Company serves. (D.I. 42 at 6; D.I. 43 at A-2) Consequently, this factor marshals against finding that defendants acted under color of state law.

Second, the *Rendell-Baker* court held that New Perspective School's decisions to discharge the petitioners were not compelled or even influenced by any state regulation. *457 U.S. at 841*. The [*12] Court did not consider the numerous other regulations the school had to satisfy in order to be eligible for tuition funding. In the present matter plaintiff has pointed to several Delaware State Statutes, none of which regulate the Fire Company's decision to terminate plaintiff's membership. (D.I. 45 at 7) (admitting "the State does not directly regulate the policies regarding personnel matters in the Fire Company. . . .") Furthermore, the statutes that plaintiff relies upon create minimal regulation. [4] Consequently, the second factor also marshals against finding defendants acted under color of state law.

> [4] Plaintiff claims that the Fire Company is regulated by the State Fire Commission pursuant to Delaware Code Chapter 16, *Section 6619*. *Section 6619* gives the State Fire Commission the power to: (1) authorize new fire companies; (2) prevent the suspension of fire services; (3) resolve disputes of geographical boundaries; and (4) resolve grievances between fire companies. None of these powers control the internal operations of fire companies. The power to authorize a new fire company or prevent suspension of fire services does not equate to controlling the daily activities of a fire company. Furthermore, plaintiff claims that Delaware Code Chapter 16, *Section 6613* requires fire company members to be trained at the Delaware State Fire School. (D.I. 45 at 7) However, *Section 6613* merely creates a state fire school and does not require anyone to be certified by the school. Plaintiff also points to Chapter 16, *Section 6712* as evidence that ambulance attendants and emergency medical technicians must be certified by the state. (D.I. 45 at 7) However, the certification process consists of obtaining and reviewing an applicant's criminal records to make sure the applicants did not commit any serious crimes. This amounts to minimal regulation since all that is required is a cursory examination of records as a prerequisite to occupying a certain position within a fire company. Finally, plaintiff points to Chapter 16, *Section 6711* as evidence that the State governs the operational procedures of fire companies. (D.I. 45 at 7) *Section 6711* gives the State Fire Commission the power to inspect ambulances and make sure that they are properly equipped and satisfy operation standards. Once again, this does not amount to substantial control since this section only provides basic standards for one of the services provided by fire companies.

[*13] Finally, the *Rendell-Baker* court found that New Perspective School's actions were not traditionally the exclusive prerogative of the State. *457 U.S. at 842*. According to the Court:

> There can be no doubt that the education of maladjusted high school students is a public function, but that is only the beginning of the inquiry. Chapter 766 of the Massachusetts Acts of 1972 [which regulated New Perspectives School] demonstrates that the State intends to provide services for such students at public expense. That legislative policy choice in no way makes these services the exclusive province of the State. Indeed, the Court of Appeals noted that until recently the State had not undertaken to provide education for students who could not be served by traditional public schools. That a private entity performs a function which serves the public does not make its acts state action.

*Id. at 842*. Defendants submitted evidence that, outside the City of Wilmington, fire protection services in Delaware are provided by private volunteer fire companies. (D.I. 43 at A-3) Furthermore, "prior to December 1, 1921, the various fire companies of the City [*14] of Wilmington were private companies, owning their own fire houses, engines, and equipment, and the City in its corporate existence, took no part in their management and control." *State ex rel. Volunteer Firemen's Relief Ass'n v. Mayor of Wilmington, 33 Del. 238, 3 W.W. Harr. 238, 134 A. 694, 694 (Del. Super. 1926), rev'd on other grounds, Aetna Cas. & Sur. Co. v. Smith, 36 Del. Ch. 391, 131 A.2d 168 (Del. 1957)*. Thus, with the exception of the City of Wilmington, firefighting in Delaware has never been traditionally the exclusive prerogative of the State. [5]

> [5] Plaintiff relies on *Goldstein v. Chestnut Ridge Volunteer Fire Co., 984 F. Supp. 367 (D. Md. 1997)*, in support of his argument that defendants

were state actors. (D.I. 45 at 9) However, in *Goldstein* the court stated:

> Even if a defendant is deemed to be a state actor, a second inquiry should be made as to whether the conduct at issue in the litigation peculiarly relates to the defendant's performance of a public function. Under this approach a routine employment decision, alleged to have been motivated by unlawful discriminatory animus . . . would not be actionable under *section 1983* . . . .
>
> That limiting doctrine is of no help to Chestnut Ridge in this case, however. Plaintiff alleges that he was disciplined, suspended, and terminated for informing Chestnut Ridge that several of its members lacked necessary training and qualifications. Clearly, these alleged communications directly related to the public function which Chestnut Ridge performs. Accordingly, adverse employment actions taken in reaction to them fall within the purview of *section 1983*.

*Id. at 373*. Plaintiff, however, does not allege that he was fired for communications related to the public function which defendants perform. Consequently, *Goldstein* is uninstructive in the present matter.

[*15] The evidence presented in the present matter indicates that all three of the factors identified by the *Rendell-Baker* Court favor finding defendants did not act under color of state law. Consequently, plaintiff has failed to present evidence creating a genuine issue as to whether defendants acted under color of state law.

**B. Deprivation of a Federal Right**

Even if the defendants were found to be acting under color of state law, plaintiff has failed to demonstrate that defendants violated any federal right.

**1. Due Process**

Plaintiff claims that he was denied due process because he was not given adequate prior notice of the charges against him before the hearing at which he was expelled. Consequently, plaintiff's claim is for violation

of procedural due process. [6] A plaintiff bringing suit under *Section 1983* alleging a state actor deprived him of procedural due process must demonstrate: (1) the plaintiff has a life, liberty, or property interest subject to *Fourteenth Amendment* protection; and (2) the procedures available did not provide plaintiff with due process of law. *Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)*.

> 6    Plaintiff also alleges in his complaint that defendants violated his substantive due process rights by not affording him a fair and proper hearing. (D.I. 1 at 7-8) However, all of the facts that plaintiff provides in the complaint relate to deviations from the procedure set out in defendant Odessa Fire Company's bylaws. (D.I. 1 at 5-7) Furthermore, plaintiff begins the due process section of his opposition by stating: "The requirements of procedural due process apply only to the deprivation of interests encompassed by the *Fourteenth Amendment's* protection of liberty and property." Plaintiff does not even mention substantive due process in his opposition. Finally, under substantive due process, when there is no fundamental right involved, the court must determine whether the governmental action is rationally related to a legitimate state interest. *Rogin v. Bensalem Township, 616 F.2d 680, 689 (3d Cir. 1980)*. Termination of membership in a <u>volunteer fire company</u> does not implicate a fundamental right, meaning defendants' actions must only be rationally related to a legitimate objective. Defendants' actions (e.g., mailing letters updating plaintiff of status, holding meetings to investigate claims, conducting an open hearing to revoke membership) were rationally related to the legitimate objective of ensuring good behavior among its members.

[*16] Plaintiff alleges that he had a property interest [7] in his membership with the Fire Company. (D.I. 45 at 12) In *Versarge v. Township of Clinton*, the Third Circuit considered whether the plaintiff, Versarge, had a property interest in benefits received through his membership in a fire company. *984 F.2d 1359 (3d Cir. 1993)*. Versarge acknowledged that he did not receive monetary compensation for his services, but "claimed that his volunteer position afforded him: (1) training; (2) workers' compensation; and (3) access to the firehouse as a social area." *Id. at 1370*. Although plaintiff in this case does not explicitly state the property interest he had in his membership with the Fire Company, he does claim that he received training and workers compensation. (D.I. 45 at 7, 9) The *Versarge* court stated:

> We find little merit in plaintiff's reliance

on training and workers' compensation as benefits. The utility and value of each of these supposed benefits is inextricably tied to the position from which plaintiff was expelled. Thus, there is no benefit from workers' compensation unless one is injured while working as a volunteer firefighter. Similarly, [*17] there is no benefit from training as a firefighter unless one is working as a volunteer firefighter. We also find little merit in plaintiff's reliance on the use of a firehouse as a social area.

*984 F.2d at 1370.* According to the court, "the Supreme Court has stated that the requirements of due process do not apply when the property interest involved is 'de minimis.'" *Id.* (citing *Goss v. Lopez, 419 U.S. 565, 576, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975)).* The *Versarge* court concluded that the benefits received by plaintiff were de minimis and, therefore, he was not entitled to the constitutional requirements of due process. *Id.* Since plaintiff has not identified any property interests other than those presented in *Versarge,* [8] this court concludes that plaintiff only had a de minimis property interest in his voluntary membership and he is not entitled to the constitutional requirements of due process.

> 7  "Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Board of Regents v. Roth, 408 U.S. 564, 569, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972); see also Gikas v. Wash. School Dist., 328 F.3d 731, 737 n.4 (3d Cir. 2003).* "Membership in a voluntary association is generally viewed as a privilege that may be withheld not as a right that may be independently enforced." *Capano v. Wilmington Country Club, 2001 Del. Ch. LEXIS 127, No. 18037-NC, slip op. at 4 (Del. Ch. Nov. 1, 2001).* Although *Capano* is an unpublished decision and, therefore, not precedential, it does provide guidance on whether membership in a voluntary organization constitutes a property interest.

[*18]

> 8  Plaintiff relies on *Hawkins v. Board of Public Education, 468 F. Supp. 201 (D. Del. 1979),* to support his argument that he had a property interest in his voluntary membership in the Fire Company. (D.I. 45 at 13) Plaintiff Hawkins was employed by defendant Board of Public Education as a "Fireman Custodian" in a middle school in Wilmington. *468 F. Supp. at 203-04.* As Fireman Custodian, Hawkins was responsible for maintaining the heating and air conditioning in the school. *Id. at 204.* When plaintiff was terminated from his position, he sued alleging violation of due process. *Id.* The court concluded that Hawkins has a property interest in continued employment. *Id. at 215. Hawkins* is distinguishable from the present matter, however, in that Hawkins was employed by the Board of Public Education. Employment carries with it tangible benefits (e.g., wages, benefits, etc.) which exceed the de minimis benefits of membership in a voluntary association. Plaintiff was not employed by defendants. Consequently, *Hawkins* does not support plaintiff's argument.

[*19]   Furthermore, plaintiff did not present evidence that a procedural violation occurred. According to the Fire Company's Bylaws, any member may be expelled by an affirmative vote of a majority of members present at any meeting provided: (1) the member is notified by certified letter of the meeting; (2) the notice is at least thirty days prior to the meeting; (3) the letter states the charges against the member; and (4) the letter advises the member to be present and offer any defense they so desire. (D.I. 43, ex. B)

According to plaintiff, on February 12, 2002 personnel of the Fire Company informed him that charges were brought against him and that he was being placed on suspension until a full investigation was completed. (D.I. 45 at 14) Defendants claim that at the Board of Directors meeting held on March 4, 2002, the statement of charges against plaintiff was hand-delivered to plaintiff and his legal counsel. (D.I. 42 at 32; D.I. 43 at A-3) Plaintiff never denies that the statement of charges was hand-delivered to plaintiff at this meeting. [9]

> 9  The evidence of record also demonstrates that plaintiff was notified of the charges on March 4, 2002. For instance, the March 7, 2002 letter refers to "information provided in regards to the charges." (D.I. 46, ex. D) The April 11, 2002 letter informs plaintiff of the Board of Directors' recommendation for expulsion, based upon "the charges present to you on March 4, 2002." (D.I. 46, ex. E) Finally, by affidavit, Scott W. Dunkelberger, chair of the Board of Directors, has averred that the statement of charges against plaintiff was delivered to him at the March 4, 2002 meeting. (D.I. 43 at A-3) Plaintiff has submitted no evidence contrary to the above.

[*20]   The next communication plaintiff mentions in his complaint and his opposition is a March 7, 2002 certified letter from the Fire Company informing plaintiff that the Board of Directors voted unanimously to recommend plaintiff's expulsion from the Fire Company. (D.I. 45 at 14; D.I. 46, ex. D) The March 7th certified

2005 U.S. Dist. LEXIS 2244, *

letter also indicated that on April 8, 2002, thirty-one days after the notice, the general membership would vote on whether to expel plaintiff, and advised plaintiff that he should be present and provide any defenses he so desired. Thus, the March 7th letter: (1) was a certified letter notifying plaintiff of the meeting; (2) gave notice 30 days prior to the meeting; (3) referred to the charges; and (4) advised plaintiff to be present at the meeting and offer any defense. Plaintiff was provided all the process due.

## 2. Equal Protection

"To prevail on an equal protection claim, a plaintiff must present evidence that s/he has been treated differently from persons who are similarly situated." *See Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003).* In the present case, plaintiff does not present any evidence that he has been treated any differently from [*21] persons similarly situated. Furthermore, plaintiff has not even identified a similarly situated group of people who were treated differently. Accordingly, the court finds that plaintiff fails to meet his burden with regard to his equal protection claim. The court grants defendants' motion for summary judgment as to plaintiff's equal protection claim.

### C. Plaintiff's State Law Claims

Plaintiff's remaining claims are grounded in state law. According to *28 U.S.C. § 1367(a)*,

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

As a result, this court is permitted to exercise supplemental jurisdiction over plaintiff's state law claims. However, *28 U.S.C. § 1367(c)* states:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if -
>
> (1) the claim raises a novel or complex issue of [*22] State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Since this court has granted defendants' motion for summary judgment on all claims over which it had original jurisdiction, it declines to exercise supplemental jurisdiction over plaintiff's state law claims.

## V. CONCLUSION

For the reasons set forth above, the court grants defendants' motion for summary judgment in its entirety. An appropriate order shall issue.

Judge: Sue L. Robinson

# EXHIBIT "F"

1997 U.S. Dist. LEXIS 3300, *; 78 Fair Empl. Prac. Cas. (BNA) 1071

8 of 9 DOCUMENTS

**ELVIRA PAMINTUAN, M.D., Plaintiff, v. NANTICOKE MEMORIAL HOSPITAL, INC., a Delaware corporation, Defendant.**

Civil Action No. 96-233-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*1997 U.S. Dist. LEXIS 3300; 78 Fair Empl. Prac. Cas. (BNA) 1071*

**February 24, 1997, Decided**

**NOTICE:** [*1] FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Counts III and IV of complaint dismissed. Defendant's motion for summary judgment on count II granted and summary judgment on count I granted to the extent that it alleges violations of Title VII. Summary judgment to defendant granted to the extent that plaintiff seeks money damages. Defendant's motion to dismiss denied for failure to comply with *Fed. R. Civ. P. 8(a)*.

**COUNSEL:** For plaintiff: Leonard L. Williams, Esquire, Wilmington, Delaware and Brian J. Bartley, Esquire, of Sullivan & Bartley, Wilmington, Delaware.

For defendant: William J. Wade, Esquire, Daniel J. De Franceschi, Esquire and Claudia A. DelGross, Esquire, of Richards, Layton & Finger, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, District Judge

**OPINION BY:** Sue L. Robinson

**OPINION**

*MEMORANDUM OPINION*

ROBINSON, District Judge.

**I. INTRODUCTION**

Plaintiff Elvira Pamintuan, M.D., a fifty-six year old woman of Filipino descent, filed this suit on May 3, 1996. She claims that defendant Nanticoke Memorial Hospital improperly terminated her privileges to admit and treat patients as a gynecologist/obstetrician at the hospital. Plaintiff alleges, in counts I and II, that defendant [*2] violated *42 U.S.C. § 2000e et seq.* ("Title VII") and *42 U.S.C. §§ 1981* and *1981(a)* by discriminating against her on the basis of race, national origin, and gender. In count III, plaintiff contends that defendant discriminated against her on the basis of age, thus violating the Age Discrimination in Employment Act ("ADEA"). Count IV states that defendant's actions violated plaintiff's due process rights. In counts V and VI, plaintiff articulates state common law claims for breach of an implied covenant of fair dealing and intentional infliction of emotional distress. (D.I. 1)

Defendant has filed a motion to dismiss, or in the alternative, for summary judgment. [1] (D.I. 6) The hospital argues that 1) because plaintiff was not an employee of the hospital she does not have standing to pursue a claim under Title VII; 2) plaintiff also failed to file a timely complaint with the EEOC, thus barring her claim; 3) because plaintiff failed to include age discrimination in her complaint to the EEOC, that claim is barred; 4) plaintiff has failed to state a claim under *42 U.S.C. §§ 1981* or *1981(a)*; 5) plaintiff cannot sustain a due process claim in the absence of any alleged state action; [*3] and 6) defendant is immune under the Health Care Quality Improvement Act ("HCQIA") and the Delaware Medical Practices Act.

1 Defendant has not yet filed an answer, and no discovery has taken place.

For the reasons that follow, the court will grant defendant's motion in part and deny it in part.

**II. BACKGROUND**

Plaintiff was born in 1940 and received her medical degree in Manila, Philippines in 1963. She is of Filipino descent. Plaintiff served her internship and residencies in obstetrics and gynecology in Jersey City, New Jersey and Philadelphia, Pennsylvania. (D.I. 1 at PP 7, 9-10) Plaintiff has practiced obstetrics and gynecology in Sussex County, Delaware since 1971, and is board-certified in that specialty. (D.I. 1 at PP 11-12) Throughout her time practicing in Sussex County, plaintiff has had staff privileges at Nanticoke Memorial Hospital. Those privileges have been periodically

renewed, most recently in 1992, and include the privileges to admit, treat, and consult with patients at the hospital. [*4] (D.I. 1 at PP 15-17) A "Reappointment Recommendation Flow Sheet" submitted as an exhibit to the complaint indicates that the department chair, in 1992, rated plaintiff's performance satisfactory in all categories. (D.I. 1 at Ex. B) Defendant contends, and plaintiff does not dispute, that plaintiff is not an employee of the hospital. She does not claim to receive a salary or other compensation from the hospital. Defendant did not pay social security taxes on her behalf, nor did it confer vacation or retirement benefits on her. (D.I. 18 at Ex. 1, P 4)

On August 19, 1993, the obstetrics and gynecology department sent a letter to the Quality Assessment Committee of the Medical Staff of the Hospital ("QA Committee") reporting several recent incidents which raised, in the department's opinion, quality of care issues. (D.I. 8 at Ex. B) In response to this letter, the QA Committee undertook a review of plaintiff's cases over a three year period. The focus of the committee's review was "1) to look at case volume and mix for a three year period," and "2) to present a cumulative summary of problems/issues." (D.I. 8 at Ex. A) As a result of the study, the QA Committee identified several areas [*5] of concern, including "long-standing problems with access and availability," failure to maintain adequate medical records, problems in securing proper insurance authorizations, a low number of major surgeries performed, and a number of specific cases involving "negative outcomes." [2] (D.I. 8 at Ex. A-C) On February 18, 1994, the QA Committee met with plaintiff to discuss the committee's findings. (D.I. 8 at Ex. B) The committee offered several recommendations "to ensure quality care for patients and to ensure that no undesirable trends are developing in [plaintiff's] surgical practice." (D.I. 8 at Ex. B) These recommendations included 1) having a Physician First Assistant present at all major surgeries performed by plaintiff; 2) securing an outside evaluator to observe plaintiff and make recommendations to the committee; or 3) having plaintiff attend an "approved and extensive" OB/GYN clinical training program. (D.I. 8 at Ex. B) The committee expressed the hope that by informally accepting these recommendations, plaintiff could "avoid the necessity of further action, possibly including a peer review action." (D.I. 8 at Ex. B) According to the minutes of the February 18 meeting, plaintiff [*6] agreed orally to the first option but refused to put her agreement in writing. The QA committee would not accept an oral agreement, and a second meeting was scheduled "to finalize the above issues." (D.I. 8 at Ex. B)

_____

2    Briefly stated, said "negative outcomes" included, _inter alia_, a misdiagnosed placenta previa resulting in a total hysterectomy and hemorrhage; a bowel laceration during a hysterectomy, necessitating several more surgeries; and laceration of a fetus's foot during a C-section.

The second meeting took place on March 8, 1994. According to the minutes of that meeting, the QA Committee expressed its willingness to accept plaintiff's oral agreement to secure a physician assistant for major surgeries. Plaintiff, however, stated that she had consulted legal counsel and had decided that even an informal, oral agreement would adversely affect her practice. She proposed instead to obtain a physician assistant for difficult cases, as needed. She also agreed to take steps to improve her availability and [*7] record keeping. The committee agreed to review plaintiff's counterproposal. (D.I. 8 at Ex. C)

On April 13, 1994, plaintiff submitted a note to Dr. Owens, the chair of the QA Committee, stating in relevant part, "I have decided to accept the proposal on the verbal commitment that you have agreed to at the second meeting, rather than have a formal inquiry . . . ." (D.I. 8 at Ex. D) At a meeting held on May 9, 1994, however, plaintiff revoked her agreement, claiming that confidentiality, a key factor in her compliance, had been breached. (D.I. 8 at Ex. E)

The attempt at informal resolution having failed, the QA Committee referred the matter to the Medical Executive Committee, which met on May 31, 1994. After hearing the presentation of Dr. Owens, the Medical Executive Committee decided that imposing the QA Committee's recommendations on plaintiff would be unworkable. Instead, the committee voted unanimously to suspend plaintiff's clinical privileges pending further investigation of the matter. (D.I. 8 at Ex. F) Dr. Richard Simons, president of the Medical Staff, notified plaintiff of the Medical Executive Committee's decision by letter dated the same day. (D.I. 8 at Ex. G) On June [*8] 1, 1994 Dr. Owens submitted a letter to Dr. Simons, on behalf of the QA Committee, summarizing the committee's findings and recommendations and requesting that a formal investigation go forward. (D.I. 8 at Ex. H)

A special meeting of the Executive Committee was held on June 3, 1994, in accordance with the hospital's bylaws, for the purpose of deciding whether to continue plaintiff's suspension and begin a "Professional Review Action." (D.I. 8 at Ex. J) Plaintiff was present at the meeting, and expressed her concerns about confidentiality, the severity of the suspension, and her belief that she was being harassed. She also produced a letter from her attorney, which stated that plaintiff would agree to the terms of the informal intervention previously proposed, with the exception that the physician assistant would be engaged only for three to four weeks, after which time plaintiff's surgical record would be re-

evaluated. (D.I. 8 at Ex. K) The committee decided to reject plaintiff's proposal concerning the informal intervention, and voted unanimously to continue the suspension. In reaching this decision, the committee voiced concerns over the impracticality of obtaining the necessary [*9] assistance during emergencies or high volume periods. The minutes of the meeting also contain a reference to another, apparently more recent case in which plaintiff had been judged by the OB/GYN department to have delivered substandard care. (D.I. 8 at Ex. J) The Medical Executive Committee communicated its decision to plaintiff by letter dated June 6, 1994, and set a date to reconvene on June 15, 1994. This letter, like the May 31 letter, notified plaintiff of her right to request a hearing pursuant to the hospital's bylaws. (D.I. 8 at Ex. L) The parties negotiated over the following weeks, and eventually agreed that plaintiff would take a six month leave of absence, during which her suspension would be terminated and the formal investigation halted. At the end of the leave of absence, plaintiff would reapply for staff privileges, at which time her activities would be evaluated. Plaintiff also agreed to notify the hospital if she were to apply for privileges at any other facility. (D.I. 8 at Ex. M)

On September 26, 1994 plaintiff notified defendant that she had applied for staff privileges at another hospital. She requested that the investigation proceed, and that it be concluded, [*10] if possible, before the end of her leave of absence. (D.I. 8 at Ex. N) An investigating committee was formed and met several times in November 1994. Each member of the investigating committee was assigned a chart, and a total of six of plaintiff's charts were reviewed. (D.I. 8 at Ex. O-Q) The investigating committee presented its report to the Medical Executive Committee on November 30, 1994. Of the six charts reviewed, the investigating committee found "quality issues" in four. In a fifth case, the committee was unable to reach a conclusion due to insufficient documentation of the problems that had occurred. (D.I. 8 at Ex. R) The Medical Executive Committee reviewed the investigating committee's findings and summarized its own conclusions in a letter to plaintiff dated December 13, 1994. In that letter, the executive committee specifically identified the deficiencies it found in plaintiff's performance:

(1) Deficiencies in recognition and appropriate response to patient care problems and management, including timeliness of surgery and decision-making during surgery and timeliness and appropriate management of operative complications. . . .

(2) The deficiencies common [*11] to the specific cases reviewed and the pattern of clinical conduct indicated by

the other information reviewed by the Executive Committee show a decline in clinical competence, including but not limited to decline in surgical technical competence, ability to recognize and appropriately respond to patient care problems in a timely manner, and overall management of surgical cases.

(3) Incomplete charting and failure to complete medical records in a timely manner generally. Specifically, of the six cases which were referred to in the Request for Investigation, there was incomplete progress notes, failure to document laceration of a newborn's foot during C-section and limited documentation of anatomy and procedure in operative notes. These deficiencies were found to be consistent with past deficiencies in charting.

(4) Access, availability, and response time has not been consistent with patient needs and acuity.

(5) [Plaintiff's] unattended delivery rate has been higher than the pooled average of the remainder of the members of the OB/GYN Department.

(6) Inconsistent compliance with the Hospital's Utilization Review Authorization process.

(D.I. 8 at Ex. S) [*12] Based on these findings, the executive committee recommended that the restoration of plaintiff's staff privileges be conditioned on her completion of either a residency retraining program in her specialty or a review course and recertification. In addition, if plaintiff chose the latter option, she would be required to obtain physician assistant coverage and mandatory consultations for each admission to the hospital. As with previous letters, this letter also informed plaintiff of her right to request a hearing. (D.I. 8 at Ex. S) On January 13, 1995 plaintiff invoked her rights under the hospital's bylaws and requested a hearing. (D.I. 8 at Ex. T)

In response to plaintiff's request, the executive committee appointed a judicial review committee and a hearing officer to conduct the hearing. (D.I. 8 at P 20) In accordance with the hospital's bylaws, the judicial review committee comprised members of the medical staff who had not participated in the previous evaluations of plaintiff and were not in direct economic competition with her. [3] (D.I. 8 at P 23) The hearing took place over several days in April and May of 1995. Plaintiff was

Case 1:08-cv-00342-SLR    Document 5-7    Filed 08/01/2008    Page 5 of 13

Page 4
1997 U.S. Dist. LEXIS 3300, *; 78 Fair Empl. Prac. Cas. (BNA) 1071

present and represented by counsel. The judicial review [*13] committee heard opening statements from both parties, took testimony from several witnesses, and reviewed the findings of the investigating committee, plaintiff's records, and numerous letters, articles, and other documents. (D.I. 8 at P 22) Among the evidence presented by plaintiff, the committee heard the testimony of Thomas E. Dyer, M.D., the former chair of OB/GYN at Milford Memorial Hospital. Dr. Dyer expressed the opinion that the hospital had improperly relied on statistically insignificant "anecdotal" evidence against plaintiff in deciding to suspend her privileges:

> In fairness I think that you have to review twenty-five consecutive cases of any practitioner, and also compare him to other people doing the same work. . . .
>
> . . .
>
> If the quality assurance is questioned, the statistical consort that you could make a valid judgment on is twenty-five consecutive cases. And then of course the standard of care is what you're comparing it to, so you want to find out what another practitioner or other practitioners do with the same kind of case. I think that anecdotes are a problem.

(D.I. 14, Ex. C at 8-9) Dr. Dyer further testified on cross examination:

> Q. [*14] If there was say one case where the physician deviated from the standard of care in your hospital, would you view that as a quality problem?
>
> A. No, it's an anecdote.
>
> Q. An anecdote. How many similar cases would have to occur before you would consider that a problem?
>
> A. I would say that malpractice would alarm me, so two or three cases of malpractice would alarm me. Maloccurrence wouldn't bother me, and where the outcome was good, I would say there would be anecdotes.
>
> Q. And how do you define maloccurrences?
>
> A. I think that if a thing can happen it will . . . . There are problems and you're going to have wound infections, you're going to have problems . . . . So presenting, if someone let's say an operating room person or a surgeon

brought me a case and said please look into this doctor on your staff, I think they're doing bad work on a 300 pound patient, after a review like that I would say that's an anecdote, you know, you have to show me how he really tore up a couple of 120 pound women and did a bad job on them, that's a maloccurrence.

(D.I. 14, Ex. C at 45-46)

3    As plaintiff points out, this latter provision meant that none of the doctors who evaluated her performance specialize in obstetrics or gynecology. (D.I. 14 at Ex. D, P 20)

[*15] The judicial review committee issued its decision on August 30, 1995. The committee found that plaintiff had received adequate notice and opportunity to present her position, and had received a fair hearing. The hospital, the committee concluded, had made "more than reasonable efforts" to obtain the facts, and its actions regarding plaintiff had been warranted. The committee specifically rejected plaintiff's allegation that her suspension was pretextual, and found unreasonable Dr. Dyer's suggestion that the evidence against plaintiff was merely anecdotal:

> There has been presented a large volume of evidence of investigations, studies, and proceedings by various Committees which clearly demonstrates that, prior to these evidentiary hearings, there were more than reasonable efforts made to obtain all pertinent facts. There has been no evidence presented to support [plaintiff's] assertion that the investigation and proceedings are part of a hidden agenda or secret conspiracy which stems from some personal animosities, professional jealousies, or financial concerns. Further, this Committee finds unreasonable Dr. Dyer's suggestion that a physician's conduct with respect to a specific [*16] case can be appropriately evaluated only if there are 25 or so similar cases to which the conduct can be compared.

(D.I. 8 at Ex. W) The committee reached this conclusion after what appears to be an extensive and detailed review of hospital records and statistics concerning plaintiff's failure to complete patient charts, numerous incidents where plaintiff arrived late or did not respond at all to calls and pages, several problems concerning Medicaid

Case 1:08-cv-00342-SLR    Document 5-7    Filed 08/01/2008    Page 6 of 13

Page 5
1997 U.S. Dist. LEXIS 3300, *; 78 Fair Empl. Prac. Cas. (BNA) 1071

denials and failure to obtain authorization numbers, and the four specific cases in which the investigating committee found that plaintiff had made serious errors in judgment. Of the four specific cases reviewed, the judicial review committee found serious problems in two. The committee found that plaintiff had "exercised poor judgment," had "failed to recognize that [a] patient was going into hypovolemic shock," had caused "unreasonable delay" in treating a patient, had failed to take action when it was required, had not kept adequate records, and had "placed [a] patient at risk and caused the patient to lose confidence in the Doctor." Moreover, the committee found problematic plaintiff's testimony that her actions in these [*17] cases were in keeping with her normal practice:

> Two additional factors are troublesome in this case. First [plaintiff] seems to argue that she took extraordinary measures in finding the ultrasound report of the previous day and reviewing the records of the patient's previous surgery for cervical problems. However, a review of the patient's history and pertinent prior treatment is expected and not exceptional. Second, [plaintiff] testified she admitted this patient to the Hospital because she seemed so upset and that normally if she saw a patient in the Emergency Room with these symptoms she would tell the patient to go home. In view of the patient's serious condition . . . it seems [plaintiff's] normal practice could present a significant risk.

(D.I. 8 at Ex. W) With respect to the other two cases, the committee was unable to reach a consensus, but did express "concerns relative to [plaintiff's] judgment." (D.I. 8 at Ex. W) The committee also noted that while plaintiff vigorously disputed the investigating committee's conclusions concerning her handling of the four specific cases, she did not dispute any of the evidence with respect to delinquent recordkeeping, [*18] availability and response problems, or utilization review issues. (D.I. 8 at Ex. W) In light of the above, the committee concluded that it was appropriate to require plaintiff to undertake one of the two retraining options offered by the investigating committee as a condition of reinstating her privileges.

Plaintiff appealed the judicial review committee's decision before the hospital's Appeal Board, which is appointed by and reports to the Board of Directors. (D.I. 8 at P 25) The Appeal Board affirmed the decision of the judicial review committee, finding that the hearing was procedurally fair and substantially in accordance with the hospital's bylaws, and that there was substantial evidence

to support the retraining requirement. The Appeal Board noted the "frightening, long-term litany of incomplete charts, lack of availability, high unattended delivery rate, poor response time, and repeated problems in connection with utilization review," and rejected plaintiff's argument that these problems were merely "the administrative side of things" and therefore unimportant. The board also upheld the judicial review committee's appraisal of the four clinical cases at issue. (D.I. 8 at Ex. [*19] X)

On January 29, 1996, the hospital's governing body adopted the opinion of the Appeal Board. (D.I. 8 at P 27) An adverse action report was filed with the Delaware Medical Practice Board approximately two weeks later. The report listed the reasons for the termination of staff privileges as:

> Evidence relating to four clinical cases and non-clinical matters established a pattern of: inadequate recordkeeping; unacceptable delays in providing necessary treatment; exposing patients to unacceptable risks; poor medical judgment; and disregard for hospital policies.

(D.I. 8 at Ex. Y)

On October 11, 1995, after the judicial review committee rendered its decision but before her privileges were formally terminated by the hospital's governing body, plaintiff filed a charge of race, sex, and national origin discrimination with the EEOC. (D.I. 14 at Ex. A)

Although plaintiff does not dispute the underlying facts on which the hospital based her suspension and eventual termination of privileges, she contends that her deficiencies are no worse than those of other doctors at the hospital, and that the review action against her was a pretext for race, national origin, sex, and age [*20] discrimination against her. She maintains that she has had no more than the average number of surgical complications or unattended deliveries, and that she is no less accessible than male or non-minority physicians. (D.I. 14 at PP 30, 32, 34, 36) She includes in her affidavit a list of twenty-five cases with negative occurrences, none of which involved her, between January 1, 1992 and September 1994 that were reported to the OB/GYN department for quality assurance review. (D.I. 14 at Ex. D, P 37) She claims that to the best of her knowledge, no other OB/GYN physician has had his or her privileges terminated during the time plaintiff was a member of the staff. (D.I. 14 at Ex. D, P 39)

Plaintiff notes that the hospital renewed her privileges without comment several times. Plaintiff also points out that she has never had a malpractice verdict entered against her, and that her insurer has settled only

1997 U.S. Dist. LEXIS 3300, *; 78 Fair Empl. Prac. Cas. (BNA) 1071

two malpractice suits against her, for a total of $ 30,000. According to plaintiff, this sum is quite small considering the size of her practice. (D.I. 14 at Ex. D, P 35)

Plaintiff alleges that defendant suspended her privileges in response to a public perception that there were too many [*21] foreign born doctors practicing at the hospital. She states in her affidavit that "sometime after the arrival of Mr. Edward Hancock at Nanticoke Memorial Hospital, the administration disclosed the alleged findings of a study by an outside agency (I believe it was Arthur Andersen) of a purported community concern that there were too many foreign-born doctors practicing at Nanticoke Memorial Hospital." (D.I. 14 at Ex. D, P 25) She notes that the number of minority physicians practicing at the hospital has declined in recent years, from an estimated 70% in the 1970s to about 30% currently. (D.I. 14 at Ex. D, P 27) Defendant has not disputed these figures or the existence of the study referred to by plaintiff in her affidavit.

Plaintiff has also offered the affidavits of physicians and staff members at Nanticoke Memorial Hospital attesting to their perception that female and foreign-born doctors are scrutinized more closely and punished more severely for infractions than male and native born doctors. Salvador C. Penserga, M.D., who was born in the Philippines, states that he "was subjected to extensive and unwarranted quality review measures while non-foreign and Caucasian physicians [*22] under similar circumstances were not subject to such scrutiny . . . ." (D.I. 14 at Ex. E) Three nurses who worked with plaintiff attest that in their opinion, "the surgical complications involving [plaintiff] . . . were not any more severe than surgical complications involving other Caucasian or non-minority physicians . . . . In addition, [plaintiff] was no less accessible for emergency calls . . . ." (D.I. 14 at Ex. G, H, I)

Plaintiff contends that defendant has effectively prevented her from practicing her profession. She claims that Nanticoke Memorial Hospital is the only hospital within one hour's driving distance from her office, [4] and that her privileges at the hospital are essential to her livelihood. (D.I. 14 at Ex. D, P 7) She also states that as a result of the hospital's action against her, and its subsequent reporting of such action, as required by law, to the National Practitioner Data Bank, she lost her temporary privileges at Kent General Hospital and was denied privileges at two other Delaware hospitals. (D.I. 14 at Ex. D, PP 23-24)

4 Defendant disputes this contention, stating that there are six hospitals with OB/GYN facilities within one hour's driving distance from plaintiff's office. Defendant also contends that plaintiff has used one of those hospitals, the Beebe Medical Center, for admissions of her patients in the past.

(D.I. 18 at Ex. 1, P 5)

## [*23] III. DISCUSSION

Plaintiff concedes that she cannot maintain an action under the ADEA due to her failure to include age discrimination in her complaint to the EEOC. Plaintiff also acknowledges that she has not alleged any state action on the part of defendant, and that in the absence of state action she cannot state a due process claim. Accordingly, counts III and IV of the complaint will be dismissed without further discussion. As to the remaining counts, because defendant has presented to the court materials outside the pleadings, the court will consider defendant's motion one for summary judgment pursuant to *Fed. R. Civ. P. 12(b)* and *56*.

### A. Summary Judgment Standard

Summary judgment should be granted only if a court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. Once the moving party has carried its initial burden, the nonmoving party [*24] "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id. at 587*. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (citations omitted). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. This court, however, must "view the underlying facts and all reasonable inferences therefrom in the light [*25] most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)* (citation omitted).

### B. Title VII Claims

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation,

Case 1:08-cv-00342-SLR    Document 5-7    Filed 08/01/2008    Page 8 of 13

Page 7

1997 U.S. Dist. LEXIS 3300, *; 78 Fair Empl. Prac. Cas. (BNA) 1071

terms, conditions, or privileges of his employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 20003-2(a)(1). Defendant argues that plaintiff has no standing to sue under Title VII because she was not an employee of the hospital.

Both of the circuit courts that have addressed this specific question have held that a physician with staff privileges at a hospital does not qualify as an employee for purposes of Title VII. *Alexander v. Rush North Shore Medical Center, 101 F.3d 487 (7th Cir. 1996); Diggs v. Harris Hospital-Methodist, Inc., 847 F.2d 270 (5th Cir. 1988).*

Plaintiff relies in large part on *Doe v. St. Joseph Hospital, 788 F.2d 411 (7th Cir. 1986)* for the proposition that a physician with staff privileges may be considered an employee under Title VII. In *Alexander v. Rush North Shore Medical Center,* however, which was decided two months [*26] after plaintiff filed her brief, the Seventh Circuit expressly overruled its prior holding in *Doe. Alexander v. Rush North Shore Medical Center, 101 F.3d at 491-92.* In *Doe,* the court had held that although a physician with staff privileges was not technically an employee of the hospital, the hospital could be held liable under Title VII if its actions interfered with the physician's economic opportunities. *Doe v. St. Joseph Hospital, 788 F.2d at 425.* In *Alexander,* the court instead applied a five-part, control oriented test to determine whether the physician was an employee or an independent contractor, the latter of which is not protected by Title VII. *Alexander v. Rush North Shore Medical Center, 101 F.3d at 492-93.* The court considered 1) the amount of control held by the purported employer, including such issues as scheduling and supervision of actual performance; 2) the nature of the work, including whether the "employee" was trained on the job or brought specialized skills to the workplace; 3) whether the "employee" provided his or her own equipment, maintenance, workplace, or licenses; 4) how the "employee" was compensated, including whether the "employer" [*27] provided benefits; 5) the actual and expected length of time on the job. [5] *Id. at 492.* Of these factors, the court placed the most emphasis on the right to control. *Id. at 493.* Applying these factors to the situation of a staff physician at a hospital, the court noted that the doctor

did not supply his own equipment or assistants, but he did possess significant specialized skills . . . he was responsible for billing his patients and he collected his fees directly from them; he never received any compensation, paid vacation, private office space, or any other paid benefits from [the hospital]; he had the authority to exercise his own independent discretion concerning the care he delivered to his

patients based on his professional judgment as to what was in their best interests; he was not required to admit his patients to Rush North Shore; and he was free to associate himself with other hospitals if he wished to do so.

*Id.* Because the day-to-day performance of the work remained predominantly within the control of the doctor rather than the hospital, the court concluded that the doctor was an independent contractor and not an employee. *Id.*

> 5 As the court noted in *Alexander,* the Supreme Court has adopted a nearly identical test for determining whether an individual is an employee under the Employee Retirement and Income Security Act ("ERISA"), which defines "employee" in exactly the same manner as does Title VII. *Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-24, 117 L. Ed. 2d 581, 112 S. Ct. 1344 (1992).*

[*28] In *Diggs v. Harris Hospital-Methodist, Inc.,* the Fifth Circuit found that even under a more liberal "economic realities" test, a physician with staff privileges was not an employee under Title VII:

> As a matter of economic reality, [plaintiff] is dependent upon having hospital staff privileges in order to pursue her medical practice. There was no evidence submitted at trial, however, that privileges at Harris Hospital were necessary to her practice or that denial of staff privileges at Harris Hospital hampered her ability to obtain staff privileges at any other Fort Worth hospital. Furthermore, . . . while the hospital supplies the tools, staff and equipment utilized by [plaintiff] in delivering medical care at the hospital, and while it imposes standards upon those permitted to hold staff privileges, the hospital does not direct the manner or means by which [plaintiff] renders medical care.

*Diggs v. Harris Hospital-Methodist, Inc., 847 F.2d at 272.*

Although the Third Circuit has not addressed the specific question of whether a staff physician in plaintiff's position can be considered an employee under Title VII, the court has expressed approval of a [*29] test similar to that used by the Seventh Circuit in

Case 1:08-cv-00342-SLR    Document 5-7    Filed 08/01/2008    Page 9 of 13

Page 8
1997 U.S. Dist. LEXIS 3300, *; 78 Fair Empl. Prac. Cas. (BNA) 1071

*Alexander*. In a case involving the ADEA, the court applied a hybrid "right to control/economic realities" test which had been developed in Title VII cases in other circuits. *EEOC v. Zippo Mfg. Co., 713 F.2d 32 (3d Cir. 1983).* The factors considered by the court in *Zippo* included:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnished the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.*, by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

[*30] *Id. at 37.*

It is true that plaintiff in the case at bar has had a long standing association with defendant, and that defendant supplied the equipment and staff that plaintiff utilized while treating patients at the hospital. In addition, unlike the plaintiff in *Diggs*, plaintiff in this case has claimed that defendant's actions will prevent her from practicing at any other hospital because the adverse action was reported to the National Data Bank. Most of the other factors looked at in all three of the cases discussed above, however, weigh strongly in favor of the conclusion that plaintiff was not an employee of Nanticoke Memorial Hospital. Defendant claims, and plaintiff does not dispute, that the hospital paid her no salary or other benefits and that it paid no social security taxes on her behalf. The record amply demonstrates that plaintiff brought specialized medical skills to the workplace and operated quite independently. Although she was subject to certain hospital rules and standards,

plaintiff's work was not directly supervised. She maintains her own office several blocks from the hospital and, in her own words, merely "utilized" the hospital to admit and treat her [*31] patients when a hospital setting was necessary for their care. (D.I. 14 at Ex. D, P 7) Moreover, while plaintiff contends that she is now unable to secure privileges at any other hospital, she does not claim that her relationship with Nanticoke Memorial Hospital, while it existed, was exclusive. In fact, defendant claims, and plaintiff does not dispute, that she admitted patients to another facility, the Beebe Medical Center, while also having privileges at Nanticoke Memorial Hospital.

Based on these factors, the court concludes that plaintiff was not an employee of defendant, and that she cannot, therefore, maintain an action under Title VII. Accordingly, the court will grant summary judgment in favor of defendant on plaintiff's Title VII claims.

### C. *Section 1981* Claims

With respect to plaintiff's claims under *42 U.S.C. § 1981*, defendant argues that plaintiff failed to plead her claims with the specificity required by *Fed. R. Civ. P. 8(a)(2)*. Rule 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The essence of this rule, as the Supreme Court has declared repeatedly, is fair notice:

> The [*32] Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Conley v. Gibson, 355 U.S. 41, 47, 2*



Case 1:08-cv-00342-SLR     Document 5-7     Filed 08/01/2008     Page 10 of 13

Page 9

1997 U.S. Dist. LEXIS 3300, *; 78 Fair Empl. Prac. Cas. (BNA) 1071

*L. Ed. 2d 80, 78 S. Ct. 99 (1957).*

In the case at bar, defendant claims that because plaintiff's complaint does not name the male and Caucasian doctors who allegedly received better treatment, it does not meet the requirements of the rule. In response, plaintiff contends that defendant is seeking to impose a heightened pleading standard. Heightened pleading standards, which the Third Circuit as well as other courts had imposed on complaints alleging civil rights violations, were rejected by the Supreme Court in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993). See also Brader v. Allegheny General Hospital, 64 F.3d 869, 876-77 (3d Cir. 1995)* (holding that *Leatherman,* which involved a complaint asserting violations of *42 U.S.C.* [*33] *§ 1983,* applies generally).

Defendant does not dispute plaintiff's contention that the court cannot impose a heightened pleading standard. It argues, however, that the complaint, which does not identify the individuals who plaintiff claims received preferential treatment or the situations in which such treatment occurred, does not provide fair notice of the basis for plaintiff's claims. Defendant points to *Steward v. Bank of New York,* CA No.95-306-JJF (D. Del. Mar. 29, 1996) in which the court, while acknowledging the demise of the heightened pleading standard, dismissed a Title VII complaint under *Rule 8(a)(2).* In that case, the plaintiff had alleged that male employees were offered participation in a conflict resolution program and were treated more leniently for similar infractions. The complaint did not, however, name the male employees alleged to have received this favorable treatment. *Id.* at 10-12. Similarly, in the case at bar, the complaint states only that

> upon information and belief, the Professional Review Action and the preceding informal administrative proceedings were disparate to the actions and/or inaction by the Hospital in connection with comparable [*34] or more serious scenarios

involving non-Filipino[,] . . . native born[, and/or] . . . male . . . physicians. . . . Upon belief, such discrimination was intention on the part of the Hospital, its officer[s], its employees and/or its agents.

(D.I. 1 at PP 39-40, 44) On its face, the complaint is insufficient to meet the notice pleading requirements of *Fed. R. Civ. P. 8(a)(2).* However, in her brief, affidavit, and other supporting documents, plaintiff has provided much more specific information to support her claim. Such information indicates to the court that an amendment to the complaint would not be futile, and that an amendment which includes the information provided by plaintiff in her supporting documentation would be sufficient under *Rule 8.* As defendant has not yet filed an answer to the complaint, plaintiff may amend as of right under *Fed. R. Civ. P. 15(a).* Therefore, although the complaint is deficient, the court will deny defendant's motion to dismiss provided that plaintiff amends her complaint in a timely manner. Because *§ 1981* prohibits only racial discrimination, *Patterson v. McLean Credit Union, 491 U.S. 164, 172, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989);* [*35] *Saint Francis College v. Al-Khazraji, 481 U.S. 604, 609, 95 L. Ed. 2d 582, 107 S. Ct. 2022 (1987),* the court will grant summary judgment against plaintiff on Count II of the



1997 U.S. Dist. LEXIS 3300, *; 78 Fair Empl. Prac. Cas. (BNA) 1071

complaint, which alleges gender discrimination.

### D. The Health Care Quality Improvements Act

Defendant contends that the Health Care Quality Improvements Act ("HCQIA"), *42 U.S.C. § 11101 et seq.*, immunizes the hospital from liability for damages stemming from plaintiff's state common law claims. [6] To qualify for immunity under the HCQIA, defendant must have undertaken a professional review action:

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedure as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3). A professional review action shall be presumed to have met the preceding standards necessary [*36] for the protection set out in *section . . . [. . . 11111(a)]* unless the presumption is r e b u t t e d b y a preponderance of the evidence.

6  The HCQIA expressly does not apply to damages under any civil rights statute, including *§ 1981. 42 U.S.C. § 11111(a)(1)(D).*

7  The statute defines "professional review action" as

an action or recommendation of a professional review body which is taken or made in the conduct of a professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

*42 U.S.C. § 11151(9).*

*42 U.S.C. § 11112(a).* As defendant correctly notes, plaintiff has the burden of establishing that the hospital did not meet the standard for immunity under the statute. *Brader v. Allegheny General Hospital*, [*37] *64 F.3d at 879.*

Plaintiff contends that "summary judgment may be granted only where there is no dispute of material fact as to whether the defendant has acted fairly." (D.I. 13 at 35) She claims that the Judicial Review Committee's refusal to review the records of other staff physicians at the hospital for comparative purposes, as well as its rejection of the testimony of Dr. Dyer, plaintiff's expert at the hearing, raise a factual issue as to the fairness of defendant's actions. The court cannot agree with plaintiff's position. As defendant correctly points out, plaintiff has the burden of establishing that the procedures followed by defendant did not meet the standards set out in the HCQIA. *Id.* The facts as to what the Judicial Review Committee did are not in dispute. A flat assertion that those procedures are not fair is not sufficient to rebut the presumption raised by *§ 11112(a).* As required by the HCQIA, plaintiff had an opportunity to present her evidence to the Judicial Review Board and to argue its relevance and probative weight. The fact that the board rejected her evidence does



Case 1:08-cv-00342-SLR    Document 5-7    Filed 08/01/2008    Page 12 of 13

Page 11

1997 U.S. Dist. LEXIS 3300, *; 78 Fair Empl. Prac. Cas. (BNA) 1071

not automatically mean that the procedures followed were unfair. The court, therefore, [*38] finds that the HCQIA immunizes defendant from money damages stemming from plaintiff's state law claims. However, because plaintiff has requested injunctive relief as well as money damages, the court will not grant summary judgment on those counts of the complaint.

**E. Delaware Medical Practices Act**

Defendant claims that it is entirely immune from suit on the basis of the Delaware Medical Practices Act. According to the relevant section of that statute:

> The Board of Medical Practice, the Medical Society of Delaware, their members, or the members of any committees appointed thereby, and members of hospital and osteopathic medical society committees, or of a professional standards review organization established under federal law (or other peer review committee or organization), whose function is the review of medical records, medical care and physicians' work, with a view to the quality of care and utilization of hospital or nursing home facilities, home visits and office visits, shall not be subject to, and shall be immune from, claim suit, liability, damages or any other recourse, civil or criminal, arising from any act or proceeding, decision or determination undertaken [*39] or performed or recommendation made so long as each member acted in good faith and without malice in carrying out the responsibilities, authority, duties, powers and privileges of the offices conferred by law upon

them under this chapter . . . or any other provisions of the Delaware law, federal law or regulations, or duly adopted rules and regulations of the aforementioned committees, organizations and hospitals, good faith being presumed until proven otherwise, with malice required to be shown by the complainant.

*24 Del. C. § 1768(a).* Plaintiff argues 1) that the Delaware statute cannot confer immunity from federal civil rights laws, and 2) that immunity from state law suits extends only to the committees and members thereof enumerated in the statute, not to the hospital itself. In its reply brief, defendant concedes that the Delaware Medical Practices Act cannot immunize defendant from plaintiff's *§ 1981* claim. As to plaintiff's second argument, defendant contends that because the various committees that evaluated plaintiff's performance were acting on behalf of the hospital, the court should consider the hospital itself as a peer review organization. Such an approach, [*40] defendant contends, would further the purpose of the statute, which is to protect peer review bodies from suits by doctors who are merely unhappy with the results.

Neither party has cited any case law on this issue, and the court has not located any relevant authority. The court, therefore, must look to the plain language of the statute, which does not include hospitals in its grant of immunity. Moreover, extending such immunity to hospitals themselves, rather than just to the peer review committees and the individuals that compose them, is not necessary to effect the intent of the General Assembly. The committees that evaluated plaintiff, and the individuals who served on them, were able to make their decisions free of the threat of liability, and there is no indication that if the hospital itself is subject to suit, these committees will be unable to do their work in the future. The court, therefore,



1997 U.S. Dist. LEXIS 3300, *; 78 Fair Empl. Prac. Cas. (BNA) 1071

will not extend the scope of immunity beyond that which is explicitly granted by the plain language of the statute.

## IV. CONCLUSION

For the reasons discussed above, the court will dismiss counts III and IV of the complaint, which allege age discrimination and due process [*41] violations, respectively. The court will grant defendant's motion for summary judgment on count II, and will grant summary judgment on count I to the extent that it alleges violations of Title VII. As to counts V and VI, plaintiff's state law claims, the court will grant summary judgment to defendant to the extent that plaintiff seeks money damages. The court will deny defendant's motion to dismiss for failure to comply with *Fed. R. Civ. P. 8(a)*; however, plaintiff will be required to amend the complaint in a timely fashion.

An order shall issue.



# EXHIBIT "G"

7 of 11 DOCUMENTS

**ROBERT L. FIELD, Plaintiff, v. DANIEL H. HALL, individually and as a member of the Delaware State Police, JAY SIPPLE, individually and as a member of the Delaware State Police, BEEBE MEDICAL CENTER, a corporation of the State of Delaware, JANE DOE MYERS, an unidentified nurse and employee of Beebe Medical Center, JOHN DOE "C", and unidentified member of the staff of the Beebe Medical Center, JOHN DOE "B", an unidentified member of the staff of Beebe Medical Center, Defendants.**

**Civil Action No. 93-415 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1995 U.S. Dist. LEXIS 8418*

**May 19, 1995, Decided**

**NOTICE:**    [*1] NOT FOR PUBLICATION

**COUNSEL:** Bruce A. Rogers, Esq., Georgetown, Delaware; attorney for plaintiff.

Jeffrey M. Taschner, Esq., Department of Justice, Wilmington, Delaware; attorney for defendants Hall and Sipple.

Mason E. Turner, Jr., Esq., of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Delaware; attorney for defendants Beebe Medical Center, Jane Doe Myers, John Doe "C", and John Doe "B."

**JUDGES:** Murray M. Schwartz, Senior District Judge

**OPINION BY:** Murray M. Schwartz

**OPINION**

*MEMORANDUM OPINION*

Dated: May 19, 1995

Wilmington, Delaware

**Murray M. Schwartz, Senior District Judge**

**I. INTRODUCTION**

Plaintiff Robert L. Field has filed this civil rights suit under *42 U.S.C. § 1983* alleging violations of his *Fourth, Fifth,* and *Fourteenth Amendment* rights under the Constitution of the United States. He has also alleged violation of his rights under Title 21, Chapter 27, of the Delaware Code pertaining to "Refusal and Consent to Chemical Testing," and Article I, sections six and seven

of the Delaware Constitution. Specifically, plaintiff has averred that following his arrest for driving under the influence of alcohol (DUI), defendants forcibly and unlawfully withdrew [*2] his blood to determine his blood alcohol content without a search warrant and without exigent circumstances.

Plaintiff originally named as defendants Beebe Medical Center, three Beebe personnel, and numerous Delaware officials, including, *inter alia*, the Governor of the State of Delaware, the Attorney General, the Secretary of Public Safety, and the Superintendent of the Delaware State Police. Plaintiff also named several Delaware State Police Troopers.

In response to plaintiff's complaint, the State filed a 12(b)(6) motion for failure to state a claim. The Court [1] granted the motion in part and dismissed the action as to all of the state officials named, except for two Delaware State Police defendants, Daniel H. Hall and Jay Sipple. The Court also dismissed all of plaintiff's claims invoking the privilege against self-incrimination under the *Fifth Amendment* and Article I, section 7 of the Delaware State Constitution.

> 1    United States District Court Judge Joseph Farnan ruled on the 12(b)(6) motion and issued an order and memorandum opinion. D.I. 42 - 43, *Field v. Carper,* No. 93-415 (D. Del. filed June 22, 1994).

[*3] Presently before the Court are cross summary judgment motions from each of the three "sets" of parties: the state trooper defendants, the Beebe Hospital (Beebe) defendants, and plaintiff. Docket Item ("D.I.") 65, 68, 62. The Court held a hearing on the summary judgment motions in this matter on May 9, 1995. This Court's jurisdiction is based upon the existence of a

federal question under *28 U.S.C. § 1331*; the Court also has supplemental jurisdiction over plaintiff's state law claims pursuant to *28 U.S.C. § 1367*.

For the reasons that follow, summary judgment will be granted as to all the defendants and denied as to the plaintiff.

## II. FACTUAL BACKGROUND

The undisputed facts necessary for an understanding of the issues before the Court may be recounted briefly. On August 28, 1991, at about 2 a.m. on a southbound stretch of Route 1 in Dewey Beach, Delaware State Trooper defendant Daniel H. Hall stopped plaintiff after observing him driving his vehicle erratically. D.I. 67 at 93, 120-21, 227-32. After stopping the plaintiff, Hall noticed an odor of alcohol about plaintiff and observed plaintiff's eyes to be bloodshot and watery. *Id.* at 270. At Hall's direction, Field exited [*4] his vehicle. *Id.* at 270-71. Hall then requested Field to undergo field sobriety testing, which Field refused to do. *Id.* at 271. Hall arrested Field for driving while intoxicated and placed him, handcuffed, into Hall's patrol car. *Id.* at 236, 272.

As per police protocol, Hall transported plaintiff to nearby Beebe Hospital for a blood alcohol test. *Id.* at 274, 305-07. His language peppered with profanities, plaintiff incessantly protested against being taken for a blood test, declaring "you better get some f---ing backup units because you're going to need them." *Id.* at 239-40, 242. In addition, Delaware State Police procedure mandated the presence of another officer at the scene of the blood draw, so Hall radioed for assistance. *Id.* at 240, 275. Trooper Micheal Maher met plaintiff and Hall at Beebe Hospital. *Id.* at 277.

At the hospital, Hall instructed an emergency room nurse, defendant Cheryl Myers, to prepare to withdraw blood from plaintiff's arm for a blood alcohol level. *Id.* at 275. After removing plaintiff's handcuffs, the state troopers ordered plaintiff to sit on a table in an examining room in Beebe's emergency department. *Id.* at 244, 258. [*5] Plaintiff repeatedly stood up to get off the table; the troopers kept repositioning him back onto the table. *Id.* at 258. Field has testified that in so doing, the troopers did not "slam" him back onto the table or cause him any injury. *Id.* Because of plaintiff's continuing verbal resistance and anger, *id.* at 242, Hall asked Beebe security personnel to fetch leather restraining straps as a precaution. *Id.* at 240-41, 278. The restraints were readied for the exclusive use of the policemen; the Beebe personnel were not to participate in the physical restraint of the DUI suspect. *Id.* at 278-79. These straps were eventually brought into plaintiff's view but not used. *Id.* at 257.

Troopers Hall and Maher held plaintiff's arms tightly during the venipuncture procedure to prevent plaintiff from hurting himself and the others in the room. *Id.* at 261-62. Results of the blood test showed plaintiff's blood alcohol around 0.18%, well above the threshold for DUI. *Id.* at 246; *see also id.* at 202 (legal limit of intoxication is 0.1%).

Prior to his Delaware Superior Court trial on the charge of DUI, Field filed a motion to suppress the results of the blood test, [*6] alleging violations of his *Fourth Amendment* rights under the United States Constitution and Article I, section six of the Delaware State Constitution. *Id.* at 4. At the hearing on the motion in Superior Court for Sussex County, Judge William Swain Lee ruled from the bench that Trooper Hall had probable cause for the arrest of plaintiff for DUI. *Id.* at 62. In his letter opinion fully addressing the issues litigated at the hearing, Judge Lee denied plaintiff's motion to suppress the results of the blood alcohol test. *Id.* at 93-95. Specifically, he found that probable cause existed not only the arrest, but also for the withdrawal of blood for the blood alcohol test. *Id.* at 94. Judge Lee also found that defendant Hall did not read to Field the provisions of the state's implied consent law under the Motor Vehicle Code, *21 Del. C. § 2741*. *Id.* at 93. Under Delaware law, plaintiff was deemed to have impliedly consented to the blood test for alcohol.

Subsequently, a state Superior Court jury found plaintiff guilty of operating a motor vehicle under the influence of intoxicating liquor. D.I. 67 at 2. Plaintiff did not appeal the judgment. *Id.*

## III. CROSS MOTIONS [*7]  FOR SUMMARY JUDGMENT

### A. Plaintiff's contentions

Plaintiff has filed for summary judgment, arguing that the forcible withdrawal of his blood violates both his federal and state constitutional rights and his statutory right to refuse such a procedure under Title 21 of the Delaware Code. He contends that it is the practice of the Delaware State Police to forcibly withdraw blood from persons who refuse to perform roadside sobriety tests and that this practice contravenes 21 *Del.C.*, Chapter 27. D.I. 63 at 4. Plaintiff cites *21 Del.C. § 2740* for the proposition that he, as the accused, should have been given the option to refuse all sobriety testing and simply give up his driver's license or driving privileges for one year, the statutory minimum. *Id.* at 8-9. In other words, plaintiff maintains that the Delaware state police unilaterally and impermissibly deprive citizens of their right to decline to undergo sobriety testing.

Plaintiff next argues that defendants failed to secure a warrant, even though there was a nearby magistrate office open 24 hours per day and there were no exigent circumstances to justify the warrantless intrusion into his person. D.I. 63 [*8]  at 13-14. Plaintiff criticizes this

bypassing of the magistrate as an official policy of the Delaware state police as pronounced by defendant Sipple and implemented by defendant Hall. *Id.* at 14.

Plaintiff also claims that while the nurse was withdrawing the blood sample, Troopers Hall and Maher not only used "great force" in holding plaintiff's arms still, but also threatened Field with the use of a leather collar and straps to restrain him. D.I. 64 at 14-15, 17. Plaintiff asserts that the physical threats and actions constituted the use of excessive force as a matter of law, as his protestations were merely and exclusively verbal. *Id.* at 15.

Finally, plaintiff maintains that <u>Beebe Hospital</u> and its staff are similarly liable under the same state law provisions and *42 U.S.C. § 1983*, presumably because of the <u>hospital's</u> concerted action with the state trooper defendants.

## B. Defendant Troopers' contentions

Defendant Hall is the state trooper who was directly involved with the events in this case. Defendant Sipple was the Traffic Lieutenant at the time of the incident who had instructed Trooper Hall and other officers on how to proceed when dealing with a DUI suspect. [*9] D.I. 67 at 308.

Although all the state defendants moved for 12(b)(6) dismissal, the Court did not dismiss these defendants because there were several issues outstanding: whether Trooper Hall had probable cause to arrest Field for DUI and force him to submit to blood testing, and whether the means and procedures implemented by the officers were reasonable. D.I. 42 at 8, *Filed v. Carper*, No. 93-415 (D. Del. filed June 22, 1994). Defendants Hall and Sipple now argue at summary judgment that the record is clear that probable cause did exist, as found by the state court, and that the issue is barred from relitigation in this forum under the doctrine of collateral estoppel. D.I. 66 at 9. They maintain that because there was probable cause, defendants' actions in obtaining the blood sample were lawful and thus there were no civil rights violations. The troopers also argue that under Delaware law, they had discretion *not* to advise plaintiff of the refusal provision of *21 Del.C. § 2740*. They also state that because plaintiff was not so advised, he was deemed under *§ 2740* to have impliedly consented to the blood alcohol test. D.I. 73 at 8-9.

The state troopers also argue that [*10] the restraint of plaintiff's arms for blood sampling did not constitute excessive or unreasonable force under prevailing constitutional law. Finally, these defendants argue that they are cloaked with qualified immunity because their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would not have known. D.I. 66 at 11.

## C. The <u>Beebe Hospital</u> defendants' contentions

The <u>Beebe Hospital</u> defendants similarly argue that because the issue of probable cause has been judicially determined, it cannot be relitigated in this action. D.I. 69 at 6. <u>Beebe</u> also maintains that there was no excessive force used by its staff because the nurse merely withdrew the blood without incident. *Id.* at 7. <u>Beebe</u> next argues that the <u>hospital</u> and its employees are shielded under *21 Del.C. § 2748*, a provision granting immunity to medical personnel who, absent malice or gross negligence, withdraw blood samples from accused DUI suspects. *Id.* In short, <u>Beebe</u> contends that because its employees were merely following state law, and the state police's actions were lawful, <u>Beebe</u> cannot be held to have violated any of plaintiff's civil rights.

[*11] Finally, <u>Beebe</u> argues that it is not an arm of the state, and thus there is no <u>state action</u> as required for a *§ 1983* claim. *Id.* at 9.

## IV. DISCUSSION

### A. Legal Standard for Summary Judgment

Under the Federal Rules of Civil Procedure, the Court shall grant a motion for summary judgment if it determines "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. "Material facts" are those which, under applicable substantive law, might affect the outcome of the case. *Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. at 248 (1986))*.

The burden of proof also plays a role in deciding summary judgment motions. Summary judgment will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear [*12] the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The moving party bears the initial burden of demonstrating the absence of material issues of fact, regardless of which party has the burden of persuasion at trial. *Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir.) (in banc), cert. dismissed, 483 U.S. 1052 (1987)*. To oppose successfully the motions for summary judgment, the nonmoving party must go beyond the pleadings by introducing affidavits and other evidence which will create a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. at 324*.

In determining whether there is a genuine issue of

material fact, "inferences . . . drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion. The non-movant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." *Valhal Corp. v. Sullivan Assoc., Inc.,* 44 F.3d 195, 200 (3d Cir. 1995) (quoting *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. [*13] 1038, 50 L. Ed. 2d 748, 97 S. Ct. 732 (1977)). In drawing these inferences, the Court may not make credibility determinations or weigh evidence. *Petruzzi's IGA Supermarkets v. Darling-Delaware,* 998 F.2d 1224, 1230 (3d Cir.), cert. denied, 114 S. Ct. 554 (1993).

These standards do not change when the parties files cross motions for summary judgment. *Southeastern Pennsylvania Transit Auth. v. Pennsylvania Pub. Util. Comm'n,* 826 F. Supp. 1506, 1512 (E.D. Pa. 1993), aff'd, 27 F.3d 558 (3d Cir. 1994). Rather, the Court must consider the motions independently. *Williams v. Philadelphia Hous. Auth.,* 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994). In essence, the Court's inquiry for each motion is directed at "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby,* 477 U.S. at 251-52.

**B. Claims Against the State Police Defendants** [2]

2   Currently pending are claims against Delaware State Police Troopers Hall and Sipple in both their official and individual capacities. *See* D.I. 43, Order (Farnan, J.). In *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989), the United States Supreme Court held that neither a state nor its official acting in their official capacity are "persons" subject to suit under 42 U.S.C. § 1983. *See also* D.I. 42, *Field v. Carper,* No. 93-415 (D. Del. filed June 22, 1994) (discussing dismissal of claims brought against state officials in their official capacity). Accordingly, the Court will dismiss the § 1983 claims against Hall and Sipple in their official capacity.

[*14] **1. *Section 1983***

Field has brought his federal claims under 42 U.S.C. § 1983, which provides in pertinent part that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation

of any rights, privileges, or immunities secured by the constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

*42 U.S.C. § 1983.* The statute, by its terms, creates no substantive rights; rather, it "merely provides remedies for deprivations of rights established elsewhere." *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1995 WL 138433 at *4 (3d Cir. March 31, 1995) (quoting *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985) (plurality opinion). Thus, a plaintiff claiming a violation of rights under § 1983 is required to demonstrate: (1) a person deprived him of a federal right; and (2) the person acted under color of state law. *Groman v. Township of Manalapan,* [*15] 47 F.3d 628, 633 (3d Cir. 1995) (citing *Gomez v. Toledo,* 446 U.S. 635, 640, 64 L. Ed. 2d 572, 100 S. Ct. 1920 (1980)). Field asserts that his *Fourth* and *Fourteenth Amendment* rights under the United States Constitution were violated when the defendants forcibly withdrew his blood for the blood alcohol test under the authority of 21 Del.C. § 2740 et seq. Plaintiff has also brought an analogous claim under Article I, section six of the Delaware Constitution.

Under the *Fourth Amendment to the United States Constitution,* people have a right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Similarly, the Delaware Constitution guarantees that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures. . . ." Del. Const. art. I, § 6. The Supreme Court of Delaware has held that this state constitutional provision is "substantially identical" to its federal analog, *Rickards v. State,* 45 Del. 573, 77 A.2d 199, 204 (Del. 1950), and "a violation of the latter is necessarily a violation of the former." *State v. Prouse,* 382 A.2d 1359, [*16] 1362 (Del. 1978), aff'd, 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979). See also *State v. Phillips,* 366 A.2d 1203, 1207 (Del Super. Ct. 1976) (these analogous provisions "unquestionably" protect the same interests). Thus, if Field states a claim under the *Fourth Amendment,* he also states a corresponding claim under the Delaware Constitution.

An analysis of Field's *Fourth* and *Fourteenth Amendment* claims begins with the United States Supreme Court's decision in *Schmerber v. California,* 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966). In *Schmerber,* the Court ruled that the petitioner could not maintain a *Fourth Amendment* search and seizure claim when a police officer, upon probable cause but without a warrant, instructed <u>hospital</u> staff to withdraw a blood sample from an individual arrested for driving under the

influence of alcohol. The Supreme Court also summarily rejected the petitioner's *Fourth Amendment* claim, stating that under those circumstances, the withdrawal did not offend his due process rights. *Id. at 759-60.*

In evaluating the petitioner's *Fourth Amendment* claim, the *Schmerber* Court first noted that there was clearly probable cause [*17] for the police officer to arrest and charge the petitioner with DUI. *Id. at 770.* The Court next considered whether the officer was justified in requiring petitioner to submit to the blood test without first obtaining a search warrant. *Id.* Recognizing that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system," the Court concluded that under those "special facts," the officer did not contravene the *Fourth Amendment* by securing the blood alcohol evidence without a warrant. *Id. at 771.* Thus, if the police had probable cause to arrest for the DUI, they could proceed without use of excessive force in procuring a blood sample even in the face of a suspect's refusal. *Id. at 770-72; Hammer v. Gross, 932 F.2d 842, 844-45 (9th Cir.) (en banc), cert. denied, 502 U.S. 980 (1991).*

At the 12(b)(6) stage in this litigation, the Court declined to dismiss plaintiff's *Fourth Amendment* claim because there was an issue as to whether "Trooper Hall lacked probable cause to arrest Field for DUI and was, therefore, not justified in requiring Field to submit to a blood test." D.I. 42 at 8. At summary [*18] judgment, the State Police defendants have submitted evidence that probable cause did exist for Field's DUI arrest and that this issue was fully and fairly litigated in Field's state court criminal proceeding and is thus precluded from being re-adjudicated in this forum.

At the hearing on the summary judgment motions, plaintiff conceded that be is collaterally estopped from litigating the issue of probable cause. The Court agrees. Where the conduct underlying an alleged *§ 1983* was the subject of a state court criminal proceeding in which the parties were afforded a full and fair opportunity to litigate the federal claims, the doctrine of issue preclusion, formerly called collateral estoppel, is applied. [3] *Allen v. McCurry, 449 U.S. 90, 104, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980); Ashford v. Skiles, 837 F. Supp. 108, 112 (E.D. Pa. 1993).* Consistent with promoting comity between federal and state courts, issue preclusion requires that this Court grant "full faith and credit" to state judicial proceedings. *28 U.S.C. § 1738; Allen v. McCurry, 449 U.S. at 96; Gregory v. Chehi, 843 F.2d 111, 116 (3d Cir. 1988).*

[3]    As the Third Circuit Court of Appeals has pointed out, "issue preclusion now substitutes for collateral estoppel." *Arab African Int'l Bank v. Epstein, 958 F.2d 532, 533 n.1 (3d Cir. 1992)*

(quoting *Gregory v. Chehi, 843 F.2d 111, 116 (3d Cir. 1988)).* Both the United States Supreme Court and the Restatement of Judgments (Second) use the term "issue preclusion." *Arab African Int'l Bank, 958 F.2d at 533 n.1* (citations omitted).

[*19]

When determining whether a state judicial or administrative proceeding precludes litigation in a subsequent federal court action, a federal court must "apply the same preclusion rules as would the courts of that state." *Edmundson v. Borough of Kennett Square, 4 F.3d 186, 189 (3d Cir. 1993)* (citing *Allen v. McCurry, 449 U.S. at 95-105*). Therefore, this Court must apply Delaware law in deciding whether plaintiff is precluded from relitigating the issue of probable cause.

Under Delaware law, if a court has previously decided an issue of fact necessary to its judgment, that decision forecloses relitigation of the issue in a subsequent suit on a different case of action involving a party to the first case. *Messick v. Star Enterprise, 655 A.2d 1209, 1211 (Del. 1995).* "The test for applying collateral estoppel requires that 1) a question of fact essential to the judgment, 2) be litigated and 3) determined 4) by a valid and final judgment." *Id.,* quoting *Taylor v. State, 402 A.2d 373, 375 (Del. 1979).*

Here, Judge Lee of the Delaware Superior Court has previously adjudicated that there was probable cause under *Schmerber* for Trooper Hall to arrest Field for DUI. This [*20] issue was decided by the court in its ruling on Field's motion to suppress the results of the alcohol test in the criminal action involving prosecution of Field's DUI. Probable cause was an issue central to the Superior Court's inquiry. Plaintiff litigated this issue fully at the suppression hearing; the state court ruled in a valid and final judgment. Therefore, under Delaware law, the issue of probable cause cannot be relitigated in this forum. The first prong of *Schmerber* has thus been satisfied in this case.

*Schmerber* also requires an analysis of the means and procedures used in obtaining plaintiff's blood alcohol sample. *Schmerber v. California, 384 U.S. at 768.* The *Schmerber* Court held that extraction of blood samples is highly effective yet commonplace; with its minimum quantity of blood required, the procedure involves "virtually no risk, trauma, or pain." *Id. at 771.* Here, however, plaintiff alleges that procedures used by the state troopers in restraining him during the venipuncture involved excessive force in contravention of his rights under the *Fourth Amendment.*

In the excessive force portion of his brief, plaintiff appropriately recites the analysis [*21] the Court must perform under *Graham v. Connor, 490 U.S. 386, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989),* as "whether the

officer's actions were objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor, 490 U.S. at 396.* This reasonableness inquiry necessarily involves careful attention to the circumstances of the police action, which are often uncertain, rapidly evolving, and possibly posing an immediate threat to the safety of the officers or others. *Id.; Groman v. Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995).* Further, the reasonableness of the force used by the state troopers is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor, 490 U.S. at 396.*

In this case, Troopers Hall and Maher knew they were confronted with a drunken, belligerent suspect who was clearly averse to the phlebotomy procedure. Plaintiff, with liberal use of profanity, continuously voiced animosity toward the officers. Plaintiff refused to remain seated while waiting for the phlebotomist, requiring the officers [*22] to repeatedly replace him to his seat. Given plaintiff's agitated state, it was not unreasonable for the officers in that situation to anticipate heightened hostility on plaintiff's part as the time for the venipuncture became imminent. Considering also the fact that plaintiff was no longer handcuffed, it was not only reasonable but also prudent for the officers to have available the leather restraining belts used in the hospital for unruly patients.

Plaintiff alleges the officers used "great force" when they held his arms still while the nurse inserted the needle into his arm. However, plaintiff also concedes that the officers "thought I was going to swing" at either them or the nurse, indicating the officers were merely restraining plaintiff to prevent him from hurting himself or others during the needle stick procedure. D.I. 67 at 262-63. They used no more force than was reasonable to carry out their objective of obtaining the blood evidence from plaintiff.

Summary judgment is appropriate in this case if, as a matter of law, the evidence would not support a reasonable jury finding that the troopers' actions were objectively unreasonable. *Groman v. Township of Manalapan,* [*23] *47 F.3d at 634.* Without commenting on the weight of the evidence, the Court holds that the Delaware police troopers' actions were objectively reasonable in their procurement of plaintiff's blood alcohol sample.

Finally, plaintiff's *Fourteenth Amendment* due process claim is largely subsumed under the above *Fourth Amendment* excessive force analysis. *See Graham v. Connor, 490 U.S. 386, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989)* (physically intrusive governmental conduct analyzed under the *Fourth Amendment,* not the more generalized notion of substantive due process). Under the

precepts in *Schmerber,* the withdrawal of plaintiff's blood by the skilled hospital technician, even in the absence of consent, is not a violation of the constitutional right to due process. *Schmerber v. California, 384 U.S. 757, 760, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966)* (citing *Breithaupt v. Abram, 352 U.S. 432, 436-37, 1 L. Ed. 2d 448, 77 S. Ct. 408 (1956)).* Summary judgment in favor of the police defendants is thus appropriate as to this claim as well.

**2. State law claims against the State Police Defendants** [4]

> 4    The state law claims against these state defendants in their official capacities must be summarily dismissed. A "suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the *Eleventh Amendment.*" *Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984).* Here, the claims against these state officials in their official capacities are barred because the state is the real party in interest, and the state has not unequivocally consented to suit. *Muth v. Central Bucks Sch. Dist., 839 F.2d 113, 128 (3d Cir. 1988), rev'd on other grounds, 491 U.S. 223 (1989); Laskaris v. Thornburgh, 661 F.2d 23, 25 (3d Cir. 1981), cert. denied, 469 U.S. 886, 83 L. Ed. 2d 196, 105 S. Ct. 260 (1984); see also Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 n.1, 87 L. Ed. 2d 171, 105 S. Ct. 3142 (1985)* (state must present an "unequivocal indication" of consent to federal jurisdiction); *Mitchell v. Commission on Adult Entertainment Establishments of Delaware, 12 F.3d 406, 408 (3d Cir. 1993)* (same).

[*24] Plaintiff also raises an issue concerning Delaware's Motor Vehicle implied consent law, under which anyone operating a motor vehicle within the state of Delaware is deemed to have constructively consented to testing for alcohol or drugs by an officer having "probable cause to believe" the operator was DUI. *Seth v. State, 592 A.2d 436, 443 (Del. 1991). Section 2740* provides that:

> Any person who drives, operates or has in actual physical control a vehicle . . . within this state shall be deemed to have given his consent, subject to this section and *§ 4177* of this title to a chemical test or tests of his blood, breath and/or urine for the purpose of determining the presence of alcohol or a drug or drugs. The testing may be required of a person when an officer has probable cause to believe the person was driving, operating or in physical control of a vehicle in

violation of *§ 4177* or *2742* of this title, or a local ordinance substantially conforming thereto.

*21 Del.C. § 2740. Section 4177* is Delaware's motor vehicle statute prohibiting a motorist from operating a vehicle "while under the influence of alcohol" or drugs. *21 Del.C. § 4177. Section 2742* provides, [*25] *inter alia,* that "if a person refuses to permit chemical testing, after being informed of the penalty of revocation for such refusal, the test shall not be given but the police officer shall report the refusal to the Department [of Motor Vehicles]." *21 Del.C. § 2742 (a).* Under *§ 2741,* the accused DUI offender's "driver's license and/or driving privileges shall be revoked for a period of at least 1 year . . ." *21 Del.C. § 2741 (a).* Thus, if the officer informs the DUI suspect of the penalties for refusing the alcohol testing, and the suspect persists in his refusal, the test may not be forcibly administered.

Plaintiff cites the above language from *21 Del.C. §§ 2741-42* for the proposition that Trooper Hall was obligated to inform plaintiff that he could refuse the blood testing and opt for a statutorily prescribed term of revocation of his driver's license. [5] In *Seth v. State, 592 A.2d 436 (Del. 1991),* the Supreme Court of Delaware rejected this same argument, holding that "the reading of the implied consent law by an officer to the accused is now stated in permissive language." *Id. at 444.* In so holding, the court emphasized provisions of *§§ 2741-42* [*26] that plaintiff overlooks: "the police officer *may,* however, take reasonable steps to conduct such chemical testing even without the consent of the person if he seeks to conduct such test or tests without informing the person of the penalty of revocation for such refusal and thereby invoking the implied consent law," *21 Del.C. § 2742 (a)* (emphasis added); "at the time a chemical test specimen is required, the person *may* be informed that if testing is refused, the person's driver's license and/or driving privilege shall be revoked for a period of at least 1 year," *21 Del.C. § 2741 (a)* (emphasis added). Accordingly, this Court holds that a police officer who has probable cause to arrest for DUI is not required to inform the accused of the penalties under Delaware's Implied Consent Law for refusal to submit to chemical testing. Since Trooper Hall did not so inform plaintiff, and there was probable cause to arrest plaintiff for DUI, plaintiff was deemed under Delaware law to have consented to the withdrawal of blood for alcohol testing.

> 5  In plaintiff's brief on his motion for summary judgment, he argued there is a genuine issue of material fact as to whether Trooper Hall *did* recite the statutory penalties for refusal to submit to testing, and as to whether plaintiff had invoked his right to refuse all alcohol testing. D.I. 63 at

18-19. At the hearing on the summary judgment motions in this matter, however, plaintiff conceded that the implied consent issue had been previously litigated in the suppression hearing, and that Judge Lee had found that Trooper Hall did not at any time read to Field the provisions of the implied consent law. *See* D.I. 67 at 93 (Letter Opinion, Lee, J.). Plaintiff also conceded that similar to the issue of probable cause, he is likewise precluded from litigating again the issue of his being informed of the penalties contained in *21 Del.C. § 2741.*

[*27] Finally, plaintiff criticizes Trooper Hall for proceeding straight to Beebe Hospital for blood testing even though a magistrate was available for the securing of a search warrant. Given the above discussions of *Schmerber's* exception to the warrant requirement and Delaware's statutory scheme, this argument merits no discussion.

### 3. Qualified Immunity

Because the Court has found no constitutional or statutory violations to have been committed by defendants Hall and Sipple in this case, there is no need to reach defendants' invocation of the qualified immunity doctrine.

### C. The Beebe Hospital Defendants

Plaintiff has also alleged all of the above claims against Beebe Hospital and Beebe Hospital staff involved in the withdrawal of the blood alcohol test. Plaintiff has the burden of demonstrating that the Beebe defendants deprived him of a federal right, and in doing so, they deprived him of that right while acting under color of state law. *Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995)* (citing *Gomez v. Toledo, 446 U.S. 635, 640, 64 L. Ed. 2d 572, 100 S. Ct. 1920 (1980)).* If plaintiff cannot show that Beebe and its staff were state actors [*28] in his alleged deprivation of constitutional rights, privileges or immunities, there is no liability under *§ 1983* for these defendants not acting under color of law. *Id.* (citing *Versarge v. Township of Clinton, N.J., 984 F.2d 1359, 1363 (3d Cir. 1993)); see also Mark v. Borough of Hatboro, 51 F.3d 1137, 1995 WL 138433* at *4 (3d Cir. March 31, 1995)* (under *§ 1983,* "under color of law" treated as the same as state action).

Beebe Hospital is a private entity, D.I. 69 at 9, and as such, it is generally not considered an arm of the state. Where, as here, the actors are not state or municipal officials, but are private individuals or associations, the Court must examine whether their activity can nevertheless be deemed to be under color of law. *Groman v. Township of Manalapan, 47 F.3d at 638.*

The precise nature and scope of the state action

requirement has been a topic of ongoing judicial elaboration. *Quinn v. Kent Gen. Hosp., 617 F. Supp. 1226, 1232-33 (D. Del. 1985)* (citing *Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351-59, 42 L. Ed. 2d 477, 95 S. Ct. 449 (1974); Moose Lodge No.107 v. Irvis, 407 U.S. 163, 171-179, 32 L. Ed. 2d 627, 92 S. Ct. 1965 [*29] (1972); Burton v. Wilmington Parking Auth., 365 U.S. 715, 721-26, 6 L. Ed. 2d 45, 81 S. Ct. 856 (1961); Shelley v. Kraemer, 334 U.S. 1, 13-23, 92 L. Ed. 1161, 68 S. Ct. 836 (1948); Civil Rights Cases, 109 U.S. 3, 11-14, 27 L. Ed. 835, 3 S. Ct. 18 (1883)).* This analysis can be difficult, but it is grounded in a clear and fundamental requirement "that the defendant in a *§ 1983* action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Groman v. Township of Manalapan, 47 F.3d at 638.* A private party's action is not transformed into one under color of state law merely by some tenuous connection to state action. *Id.* The issue is not whether the state was somehow involved in the relevant events, but rather whether the action taken can be fairly attributed to the state itself. *Id.* (citing *Jackson v. Metropolitan Edison Co., 419 U.S. 345, 42 L. Ed. 2d 477, 95 S. Ct. 449 (1974)).* The United States Supreme Court has stated, "We must ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor." *NCAA v. Tarkanian, 488 [*30] U.S. 179, 192, 102 L. Ed. 2d 469, 109 S. Ct. 454 (1988).* [6] Beebe hospital's relationship to the police defendants in this case is therefore crucial. *Id.*

> [6] Under prevailing federal case law, there are three traditional approaches to the state actor analysis. The first inquiry questions "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state." *Mark v. Borough of Hatboro, 51 F.3d 1137, 1995 WL 138433 at *5 (3d Cir. March 31, 1995) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004-05, 73 L. Ed. 2d 534, 102 S. Ct. 2777 (1982)).* The second inquiry asks whether "the private party has acted with the help of or in concert with state officials." *Mark v. Borough of Hatboro, 1995 WL 138433 at *5.* Finally, there may be circumstances where "the State has so far insinuated itself into a position of interdependence with ... the acting party that it must be recognized as a joint participant in the challenged activity." *Id. at *6 (quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 725, 6 L. Ed. 2d 45, 81 S. Ct. 856 (1961)).*

Plaintiff has not designated which, if any, of these three theories he brings his *§ 1983* action against the Beebe defendants.

[*31]  Beebe Hospital is but one of many hospitals

in the state of Delaware that received a letter from the State Attorney General in November 1989. This letter concerned itself with several Delaware hospitals that were refusing to permit emergency room staff to withdraw blood at the direction of the police from drivers the police had probable cause to believe were DUI. D.I. 69 at Exhibit E; D.I. 67 at 356. The Attorney General's letter directed the hospitals to cooperate with police who lawfully request medical assistance in obtaining blood alcohol samples from DUI suspects. D.I. 69, Exhibit E. The letter also set forth current *Fourth Amendment* jurisprudence, including *Schmerber v. California, supra,* and explained the lawful bases under both federal and Delaware law for hospitals to accommodate state and local authorities in securing toxicological evidence in DUI cases. [7] Finally, the Attorney General underscored the requirement that the hospitals comply with lawful police requests by reminding the hospitals of the provisions of *11 Del.C. § 1244,* Hindering Prosecution. *Id.*

> [7]   The Attorney General's letter also cited chapter 27 of Delaware's Motor Vehicle code, which provides in part that:
>
> > Only duly licensed physicians, registered nurses, licensed practical nurses or other persons trained in medically accepted procedures for the drawing of blood and employed by a hospital or other health care facility, acting at the request of a police officer, may withdraw blood from a person submitting to a chemical test under this subchapter....
>
> *21 Del.C. § 2746.*

[*32]   Viewing these facts in the light most favorable to plaintiff, the Court assumes, without deciding, that plaintiff has established state action on the part of the Beebe defendants. The Court next inquires whether the conduct of these defendants violated any federal or state right as alleged by plaintiff in his complaint.

Contrasted with the actions of the state police defendants in this case, the involvement of the Beebe defendants was minimal. Beebe merely afforded the state police the means for accomplishing the state's lawful evidentiary search. It is undisputed that defendant Myers, the phlebotomist, was the only Beebe employee who directly participated in plaintiff's blood withdrawal. The record demonstrates that Myers merely accessed plaintiff's vein in accordance with accepted procedure, and that the venipuncture was swift and unremarkable.

1995 U.S. Dist. LEXIS 8418, *

Neither Myers nor any other Beebe employee participated in physically restraining plaintiff. The Beebe security personnel brought in leather restraining straps at the trooper's request; however, use of the straps were to be handled exclusively by the police. It is obvious the Beebe defendants violated no federal or state rights of plaintiff.    [*33]    ⁸ Therefore, the Court will grant summary judgment as to the Beebe defendants.

     8  The Beebe defendants also argue that even if they did violate plaintiff's legal rights, absent gross negligence or malice, they are immune from liability under the Delaware Motor Vehicle code section that states:

          A duly licensed physician, medical technician or registered nurse withdrawing a blood sample under this Subchapter and a hospital employing such physician, technician or nurse shall not be liable for civil damages for any acts or omissions arising out of the taking of such sample, provided, however, this section shall not relieve such person from civil liability for any malicious act or gross negligence perpetrated in taking the blood.

*21 Del.C. § 2748.* However, the Court declines to

rule on Beebe's immunity argument in light of its holding that the state troopers did not violate any rights of plaintiff under state or federal law.

     Additionally, as discussed above in part I, plaintiff's claims against the state defendants under federal and Delaware constitutional law alleging violation of his privilege against self-incrimination were dismissed previously pursuant to *Fed. R. Civ. P. 12(b)(6).* D.I. 43. Similarly, any self-incrimination claim remaining against the Beebe defendants must also fail. *See* D.I. 42, *Field v. Carper,* No. 93-415 (D. Del. filed June 22, 1994) (discussing well settled principles of federal and Delaware law in support thereof).

**[*34] V. CONCLUSION**

     For the reasons discussed, the Court holds as a matter of law that the actions of the defendants did not violate plaintiff's *Fourth, Fifth,* and *Fourteenth Amendment* rights under the Constitution of the United States. The defendants also did not contravene any provisions under Delaware statutory' or constitutional law. The Court will therefore grant summary judgment in favor of defendants Daniel H. Hall, Jay Sipple, the Beebe Medical Center, Cheryl Myers ("Jane Doe Myers"), and Beebe staff John Does B and C and deny plaintiff's motion for summary judgment.

     An appropriate order will issue.

# EXHIBIT "J"

16 of 110 DOCUMENTS

**JOSEPH L. D'ALESSANDRO and JOHN A. FRANKLIN, Plaintiffs, v. AMERICAN CIVIL LIBERTIES UNION, EXECUTIVE DIRECTOR ANTHONY D. ROMERO, PRESIDENT NADINE STROSSEN, LEGAL DIRECTOR STEVEN SHAPIRO, DIRECTOR CAROLINE FREDRICKSON, DONNA MCKAY, GERI E. ROZANSKI, and EMILY TYNES, Defendants.**

**Civ. No. 06-212-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 82237*

**November 8, 2006, Decided**

**COUNSEL:** [*1] Joseph L. D'Alessandro, Plaintiff, Pro se, Joseph L. D'Alessandro, Lewes, DE.

John A. Franklin, Plaintiff, Pro se, John A. Franklin, Dagsboro, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM**

Joseph L. D'Alessandro and John A. Franklin ("the plaintiffs") filed this civil rights action on March 30, 2006, alleging violations of *5 U.S.C. § 556, 18 U.S.C. §§ 1961-1964, 18 U.S.C. §§ 241* and *242, 42 U.S.C. § 1983*, and the Delaware Constitution. (D.I. 2.) An amended complaint as filed on May 8, 2006. (D.I. 6.) The plaintiffs appear *pro se* and on September 28, 2006, were granted *in forma pauperis* status pursuant to *28 U.S.C. § 1915*. (D.I. 12.) The court now proceeds to review and screen the amended complaint pursuant to *28 U.S.C. § 1915*. For the reasons discussed below, the complaint is dismissed as frivolous pursuant to *28 U.S.C. § 1915(e)(2)(B)*.

**I. THE COMPLAINT**

The plaintiffs allege that the American Civil Liberties [*2] Union ("ACLU"), its executive director, president, and several directors violated their rights under the *First, Ninth,* and *Fourteenth Amendments to the United States Constitution.* More particularly, the plaintiffs allege the defendants violated their constitutional rights through the federal courts by reason of the ACLU's "radical agenda which undermines our

nation's moral and religious heritage." (D.I. 6, at 10.) The plaintiff alleges that ACLU policies and actions "strip faith in God from the public square while promoting anti-family and pro-homosexual initiatives." *Id.* The plaintiffs specifically point to the recent *First Amendment* pledge of allegiance, "one nation under God" case to support their allegations. *Id.* at 14. The plaintiffs seek punitive and exemplary damages and ask that all proceeds be donated to the Salvation Army and other organizations damaged by the ALCU.

**II. STANDARD OF REVIEW**

When a litigant proceeds in forma pauperis, *28 U.S.C. § 1915* provides for dismissal under certain circumstances. *Section 1915(e)(2)(B)* provides that the court may dismiss a complaint, at any time, if the action is frivolous, malicious, fails to [*3] state a claim upon which relief may be granted or seeks monetary relief from a defendant immune from such relief. An action is frivolous if it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams, 490 U.S. 319, 325, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989).*

The court must "accept as true factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)*(citing *Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993)).* Additionally, *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim when "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Haines v. Kerner, 404 U.S. 519, 520-521, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)*(quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).* Inasmuch as the plaintiffs proceed *pro se,* the court construes the complaint liberally. *Haines v. Kerner, 404*

2006 U.S. Dist. LEXIS 82237, *

*U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972).*

## III. ANALYSIS

### A. Administrative Procedure Act

[*4] The amended complaint references in the same sentence, § 556 of the Administrative Procedure Act ("APA") and the U.S. District Courts. *Section 556* applies to hearings required by *section 553* (i.e., rule making) or *554* (i.e., adjudications after agency hearing) of the APA. The APA defines "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia." *Franklin v. Massachusetts, 505 U.S. 788, 800, 112 S. Ct. 2767, 120 L. Ed. 2d 636 (1992)* (citing *5 U.S.C. §§ 701(b)(1), 551(1)*).

While not clear, it may be that the plaintiffs seek review of rulings or decisions rendered in U.S. District Courts. However, as noted above, courts of the United States are specifically exempted from the APA. Notably, the amended complaint makes no reference to any federal agency or ruling issued therefrom. The APA is inapplicable to this case and any attempt to use it is frivolous. Therefore, the court will dismiss [*5] any such claims pursuant to *28 U.S.C. § 1915(e)(2)(B)*.

### B. Criminal Statutes

The plaintiffs attempt to raise civil causes of actions under criminal statutes, specifically the RICO statute, *18 U.S.C. §§ 1961-1964*, and criminal civil rights conspiracy under *18 U.S.C. §§ 241* and *242*.

### 1. Civil RICO

The plaintiffs refer to the Racketeer Influenced and Corrupt Organizations Act ("RICO") statute, *18 U.S.C. §§ 1961, et seq.* in their amended complaint. A *private* cause of action arises under RICO, *§ 1964(c)*, which states, in pertinent part, that "[a]ny person injured in his business or property by reason of a violation of *section 1962* of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the costs of the suit, including a reasonable attorney's fee." *18 U.S.C. § 1964(c)*.

This case alleges violations of the plaintiffs' constitutional rights and makes no reference to injury to their business or property. Thus, in the absence of the [*6] requisite injury to "business or property", the plaintiffs have not stated a civil RICO claim. *See 18 U.S.C. § 1964(c)* (only authorizing *private* cause of actions for persons injured in their "business or property"); *Chadda v. Burcke, 180 Fed. Appx. 370, 372 (3d Cir. 2006)*. Accordingly, the court will dismiss the claim as frivolous pursuant to *28 U.S.C. § 1915(e)(2)(B)*.

### 2. 18 U.S.C. §§ 241 and 242

These criminal statutes refer to violation of civil rights and are the criminal analogue of *42 U.S.C. § 1983*. They do not, however, provide a *private* cause of action for recovery in a civil suit. *United States v. City of Philadelphia, 482 F. Supp. 1248, 1260 (E.D. Pa. 1979), aff'd, 644 F.2d 187 (3d Cir. 1980); Taxacher v. Torbic, 2000 U.S. Dist. LEXIS 15193, 2000 WL 641616, at * 14 (W.D. Pa. Feb. 23, 2000)* (noting that there is no *private* cause of action under *18 U.S.C. § 241* ); *Leveto v. Lapina, 2000 U.S. Dist. LEXIS 1972, 2000 WL 331902, at *20 (W.D. Pa. Feb.5, 2000)* (noting that there is no [*7] *private* cause of action under *18 U.S.C. § 242*). *See also Cok v. Cosentino, 876 F.2d 1, 2 (1st Cir. 1989)* ("Only the United States as prosecutor can bring a complaint under *18 U.S.C. §§ 241 -242*."). Hence, the court will dismiss as frivolous the plaintiffs' claims brought under *18 U.S.C. §§ 241* and *242*.

### C. 42 U.S.C. § 1983

The plaintiffs also allege a civil rights violation pursuant to *42 U.S.C. § 1983* and name as the defendants the ACLU and is officers and directors. The ACLU is a *private,* nonprofit organization, http://www.aclu.org. *West's Encyclopedia of American Law* (1998), http://www.answers.com. The ACLU and its officers and directors are not "state actors" as that term is defined under *§ 1983*.

To state a claim under *42 U.S.C. § 1983*, the plaintiffs must allege "the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)* [*8] (citing *Parratt v. Taylor, 451 U.S. 527, 535, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981))* (overruled in part on other grounds *Daniels v. Williams, 474 U.S. 327, 330-31, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)*). To act under "color of state law" a defendant must be "clothed with the authority of state law." *West, 487 U.S. at 49.* The ACLU is a *private* organization whose mission is to preserve the protections and guarantees of the *Bill of Rights of the U.S. Constitution*. http://www.aclu.org. Quite simply, the ACLU, its officers, directors and employees are not "clothed with the authority of state law." *See Reichley v. Pennsylvania Dep't of Agric., 427 F.3d 236, 244-45 (3d Cir. 2005); Biener v. Calio, 361 F.3d 206, 216-17 (3d Cir. 2004).* Accordingly, they are not amenable to suit under *§ 1983*. Therefore, the *§ 1983* claims are dismissed pursuant to *28 U.S.C. § 1915(e)(2)(B)*.

2006 U.S. Dist. LEXIS 82237, *

**D. Supplemental State Claims**

Because the amended complaint fails to state a federal claim, the court declines to exercise jurisdiction over the plaintiffs' supplemental state law claim alleging a violation of the Delaware constitution. *28 U.S.C. § 1367* [*9] ; *De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003).*

**IV. CONCLUSION**

For the above stated reasons the court finds that the complaint fails to state a claim pursuant to *42 U.S.C. § 1983.* An appropriate order will be entered dismissing the case

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

November 8, 2006

Wilmington, Delaware

**ORDER**

At Wilmington this 8th day of November, 2006, for the reasons set forth in the Memorandum issued this date, the plaintiffs' complaint is DISMISSED without prejudice as frivolous pursuant to *28 U.S.C. § 1915(e)(2)(B).* Amendment of the complaint would be futile. *See Grayson v. Mayview State Hosp., 293 F.3d 103, 111 (3d Cir. 2002); Borelli v. City of Reading, 532 F.2d 950, 951-52 (3d Cir. 1976).*

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT "I"

1 of 10 DOCUMENTS

**STEVEN D. HUMES, Plaintiff, v. STATE OF DELAWARE COURT OF COMMON PLEAS, SUPERIOR COURT OF DELAWARE, STATE OF DELAWARE DEPARTMENT OF JUSTICE, TROOPER LAFFERTY, TROOPER SGT. JONES, CAPTAIN CHARLES J. SIMPSON, LT. WILLIAM T. FORD, LT. PAUL E. SMENTKOWSKI, LT. MARK DANIELS, DELAWARE STATE POLICE TROOP 2 AND INTERNAL AFFAIRS, FEDERAL BUREAU OF INVESTIGATION, HON. ALEX SMALLS, SHERRY SIMMONS, JANE DOE, SHAWN MARTYNIAK, INTERNATIONAL CHIROPRACTIC PEDIATRIC ASSOCIATION, and OHM CHIROPRACTIC, Defendants.**

**Civ. No. 06-59-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 68729*

**September 25, 2006, Decided**

**COUNSEL:** [*1] For Steven Humes, Plaintiff, Pro se.

For State, Defendant: Stephani Ballard, Esq., Delaware Department of Justice, Wilmington, Delaware.

For Federal Bureau of Investigation, Defendant: Patricia C. Hannigan, Esq., United States Department of Justice, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, Chief Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM OPINION**

September 25, 2006

Wilmington, Delaware

Sue L. Robinson, **Chief Judge**

**I. INTRODUCTION**

Presently before the court is the motion to amend complaint filed by plaintiff Steven Humes (D.I. 11), the motion to dismiss the complaint (D.I. 9) filed by the State of Delaware defendants ("State Defendants") [1] (D.I. 9), and the motion to dismiss of defendant Federal Bureau of Investigation (D.I. 25) ("FBI").

    1  "State Defendants" include: State of Delaware Court of Common Pleas, Superior Court of Delaware, State of Delaware Department of Justice, Trooper Lafferty, Trooper Sgt. Jones,

Captain Charles J. Simpson, Lt. William T. Ford, Lt. Paul E. Smentkowski, Lt. Mark Daniels, Delaware State Police Troop 2 and Internal Affairs, Hon. Alex Smalls, Sherry Simmons, Jane Doe and Shawn Martyniak.

[*2] The complaint makes various constitutional and statutory claims and seeks both equitable and monetary relief. For the reasons that follow, plaintiff's motion to amend complaint (D.I. 11) will be granted. However, the motions to dismiss filed by State Defendants (D.I. 9) and the FBI (D.I. 25) will also be granted. All additional claims presented in plaintiff's amended complaint (D.I. 11) against the existing defendants and the additional parties he names therein will be dismissed as well.

**II.  FACTUAL  AND  PROCEDURAL BACKGROUND** [2]

    2  The following factual background information is taken from the parties' submissions and does not constitute findings of fact. These facts are reviewed in the light most favorable to the plaintiff.

Plaintiff's complaint arises out of a civil dispute which took place in or around January 2004 relating to the provision of computer services to defendant International Chiropractic Pediatric Association ("ICPA"). (D.I. 11 at 4) Maintaining that his services were not paid for by [*3] ICPA, plaintiff contacted the Delaware State Police and requested that the State file criminal charges against ICPA's employees. (See D.I. 12 at attachment 1) In connection with this incident, plaintiff was arrested on February 11, 2004 and later charged with

Misuse of Computer Information under *11 Del. C. § 935*. (D.I. 20) Plaintiff was convicted of this charge in the Court of Common Pleas on October 27, 2004. (Id.) He filed an appeal with the Superior Court on November 11, 2004. (Id.) That appeal is currently pending. (See D.I. 20.) [3]

> 3    Attached to State Defendants' reply brief in support of <u>motion to dismiss</u> complaint, is a memorandum from Judge Cooch. (D.I. 20) Insofar as such ruling is a matter of public record, the document may be relied upon without converting State Defendants' motion into one for summary judgment. See *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)*.

[*4] Plaintiff also contacted the Delaware State Police, including its internal affairs unit, requesting that his allegations of misconduct by Delaware and Pennsylvania State Troopers be investigated. (See D.I. 12 at attachments 1-4; D.I. 11 at 8-9) In June 2005, plaintiff contacted the FBI to request that its agents investigate the Delaware State Police for alleged violations of his constitutional rights. (D.I. 11 at 24) The FBI refused to undertake such inquiry. (Id.; D.I. 26 at 2)

On February 15, 2006, State Defendants filed a <u>motion to dismiss</u> plaintiff's complaint. (D.I. 9) Plaintiff thereafter filed a motion to amend complaint (D.I. 11) wherein he adds the following parties: Shawn Martyniak, [4] individually and in his official capacity; Judge Alex Smalls of the Court of Common Pleas, individually and in his official capacity; select members of Judge Smalls' staff, [5] individually and in their official capacities; ICPA; and, Ohm Chriopractic. (Id. at P A-C) Plaintiff further amends his complaint to add individual capacity suits against each of the named Delaware State Troopers (Id. at P 2), to request a "Three Judge Trial" (Id. at P 4), and to interpose a variety [*5] of additional constitutional and statutory claims.

> 4    Shawn Martyniak, Deputy Attorney General, appears to be the prosecuting attorney in plaintiff's criminal prosecution.
> 5    Among Judge Smalls' staff, plaintiff names Sherry Simmons and Jane Doe ("Alex Smalls court Assistant"). (D.I. 11 at P A)

Plaintiff filed a motion for order of protection (D.I. 13) on February 22, 2006, which was denied. (D.I. 16) Plaintiff filed a motion for reconsideration of my order (D.I. 18), which was also denied. (D.I. 21) On May 30, 2006, the FBI filed a <u>motion to dismiss</u>. (D.I. 25)

### III. STANDARD OF REVIEW

In analyzing a <u>motion to dismiss</u> pursuant to *Rule 12(b)(6)*, the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. See *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)*. "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, [*6] and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed pursuant to a *Rule 12(b)(6)* motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. Where the plaintiff is a pro se litigant, the court has an obligation to construe the complaint liberally. See *Haines v. Kerner, 404 U.S. 519, 520-521, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972); Gibbs v. Roman, 116 F.3d 83, 86 n.6 (3d Cir. 1997); Urrutia v. Harrisburg County Police Dep't., 91 F.3d 451, 456 (3d Cir. 1996)*. The moving party has the burden of persuasion. See *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*.

### IV. DISCUSSION

#### A. Plaintiff's Amended Complaint

Pursuant to *Rule 15(a) of the Federal Rules of Civil Procedure*, a "party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served...." *Fed. R. Civ. P. 15(a)* [*7] . A <u>motion to dismiss</u> pursuant to *Fed. R. Civ. P. 12(b)(1)* and *12(b)(6)* does not constitute a "responsive pleading" for purposes of *Rule 15(a)*. See *Kelly v. Delaware River Joint Commission et al., 187 F.2d 93, 94 (3d Cir. 1951)* ("We agree with the Court of Appeals for the First Circuit...that a <u>motion to dismiss</u> is not a responsive pleading..."); *Airport Investors Ltd. P'ship v. Neatrour, 2004 U.S. Dist. LEXIS 1391, Civ. A. 03-831, 2004 WL 225060, *1 (D. Del. February 3, 2004)* (defendant's "<u>motion to dismiss</u> is not a responsive pleading within the meaning of *Rule 15(a)*") (citing *Kelly, 187 F.2d at 94*). Because State Defendants and the FBI have not served a responsive pleading, plaintiff's motion to amend his complaint (D.I. 11) will be granted. [6]

> 6    Because plaintiff may amend as a matter of right, the court will not here address State Defendants' contention that the amendments are futile. See *In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1434 (3d Cir. 1997)* (futility as cause for denial of leave to amend complaint). However, for the reasons discussed infra, plaintiff's claims in his amended complaint against all defendants fail for lack of subject matter jurisdiction or, alternatively, for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(1), 12(b)(6)*.

2006 U.S. Dist. LEXIS 68729, *

## [*8] B. Count One - Failure to Prosecute and Equal Protection Claim

In count one, plaintiff seeks equitable and monetary relief against the Delaware State Police, the Delaware Department of Justice, and Shawn Martyniak, individually and in his official capacity, for failure to prosecute pursuant to his requests, and because plaintiff was "intentionally treated differently than other citizens based on his sex, age, and social economic status." [7] (D.I. 11 at 6-9)

> 7    Although he does not specify the source of this claim, which ostensibly suggests differential treatment, it is presumed that plaintiff alleges a violation of the due process and *equal protection clauses of the Fourteenth Amendment*.

### 1. Immunity

The *Eleventh Amendment* proscribes any suit against a state, or against a state agency or department or state official where "the state is the real, substantial party in interest," unless the state consents to suit. *Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100-101, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984);* [*9] see *MCI Telecom. Corp v. Bell Atlantic of Penn., 271 F3d 491 (3d Cir. 2001)* (states are generally immune from private suits in federal court). The *Eleventh Amendment* is a "jurisdictional bar which deprives federal courts of subject matter jurisdiction." *Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 694 (3d Cir.1996)* (citing *Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 98-100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)).*

Because the Delaware State Police and Department of Justice are duly constituted state agencies whose *Eleventh Amendment* immunity has not been waived, they are immune from suit. [8] Accordingly, plaintiff's claims against these agencies are dismissed.

> 8    "In determining whether Congress has abrogated a state's *Eleventh Amendment* Immunity, a 'simple but stringent test' is applied. This two-prong test requires that: (1) Congress 'unequivocally express its intent to abrogate;' and (2) Congress act according to a valid exercise of power in abrogating state immunity." *Jamison v. Delaware, 340 F. Supp.2d 514, 516-17 (D. Del. 2004)* (citing *Lavia v. Penn. Dep't. of Correc., 224 F.3d 190, 196 (3d Cir. 2000).* As federal jurisdiction is limited in nature and must be demonstrated by the party seeking to invoke it, because plaintiff has not shown waiver of immunity, this court does not have jurisdiction to entertain suits against the Delaware State Police and Department of Justice. See *McNutt v. G.M.*

*Acceptance Corp., 298 U.S. 178, 189, 56 S. Ct. 780, 80 L. Ed. 1135 (1936). 42 U.S.C. § 1983,* to the extent plaintiff invokes it, is not such a waiver.

[*10] As to plaintiff's claim against Martyniak, a plaintiff may sue a state official for money damages, but "when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officers are nominal defendants." *Ford Motor Co. v. Department of Treasury of State of Indiana, 323 U.S. 459, 464, 65 S. Ct. 347, 89 L. Ed. 389 (1945)* (overruled on other grounds). Plaintiff's claim against Shawn Martyniak in his official capacity for monetary damages, therefore, is dismissed.

### 2. Standing to Raise Claim of Non-Prosecution

Plaintiff alleges that the "Delaware State Police and Department of Justice are bound by law to have performed [an] investigation [of ICPA and Jeanne Ohm [9]] and initiate charges when they are warranted, as in this matter." (D.I. 11 at 10) Although neither State Defendants nor the FBI specifically address the issue, the court has an independent duty to determine standing to raise his claim of non-prosecution. See *Boeing Co. v. Van Gemert, 444 U.S. 472, 488, 100 S. Ct. 745, 62 L. Ed. 2d 676 (1980)* ("Although respondents have not challenged Boeing's standing, [*11] we are obligated to consider the issue sua sponte, if necessary.") To have standing before the court, in other words, the right to "have the court decide the merits of the dispute or of particular issues," plaintiff must show that he has suffered invasion of a legally protected interest. *Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975);* see *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).* The case law makes clear that "a private citizen lacks a judicially cognizable interest in the prosecution or non-prosecution of another." [10] *Linda R.S. v. Richard D., 410 U.S. 614, 619, 93 S. Ct. 1146, 35 L. Ed. 2d 536 (1973).* Where the interest alleged to be harmed is not legally cognizable, the "irreducible constitutional minimum" of standing is absent. *Lujan, 504 U.S. at 560.* Construing all facts and inferences in favor of the non-moving party, it is evident that plaintiff's claim for non-prosecution fails to allege injury to a legally protected interest. As plaintiff lacks standing to raise the issue of the non-prosecution of another, this claim is dismissed.

> 9    Plaintiff does not specify the nature of the Ohm's relationship to ICPA other than to allege that she is an "officer" of the company. Such allegation will be accepted as true for purposes of State Defendants' motion.

[*12]

> 10    See also *Rosquist v. Jarrat Construction*

*Corp.*, 570 F. Supp. 1206, 1207 (D.C. NJ. 1983) ("'[t]he federal courts have customarily refused to order prosecution of particular individuals at the instance of private persons.'") (citing *Linda R.S.*, 410 U.S. at 619); *Fulson v. City of Columbus*, 801 F. Supp. 1 (S.D. Ohio 1992) ("Thus, courts have generally declined to recognize standing on the part of victims of crimes to bring a § 1983 action based upon lack of prosecution of others."); *Sattler v. Johnson*, 857 F.2d 224, 227 (4th Cir. 1988) (no constitutional right under *Equal Protection Clause* to secure prosecution of another).

### 3. Equal Protection

Plaintiff avers that he was "intentionally treated differently than other citizens based on his sex, age and social economic status..." Insofar as this allegation is an attempt to invoke the *Fourteenth Amendment*, this effort must also fail. [11] Plaintiff makes no factual allegations to support a claim of purposeful discrimination on the part of Martyniak. Summary allegations [*13] or legal conclusions, unsupported by facts, are not sufficient to withstand a <u>motion to dismiss.</u> *Del Signore v. McKeesport*, 680 F. Supp. 200, 203. Plaintiff's *Fourteenth Amendment* claim against defendant Martyniak is dismissed accordingly.

> 11  This court recognizes, of course, that where a decision to prosecute is based on an individual's race "or some other impermissible factor," "an equal protection claim may be stated." *Fulson*, 801 F. Supp. at 6; see e.g. *Mody v. City of Hoboken*, 758 F. Supp. 1027 (D. N.J. 1991) (exercise of prosecutorial discretion based on race may violate *equal protection clause*).

### B. Count Two - Failure to Prosecute and Prosecutorial Misconduct

In rambling fashion, plaintiff implicates a slew of defendants in his second count. He appears to make out claims against Captain Charles J. Simpson, Lt. William T. Ford, Lt. Paul E. Smentkowski, Lt. Mark Daniels, Trooper Lafferty, Sgt. Jones, Shawn Martyniak, the Delaware State Police and Delaware Department [*14] of Justice for failure to prosecute Jeanne Ohm and/or ICPA. [12] (D.I. 11 at 13-15) For reasons previously discussed, each of these claims is barred by *Eleventh Amendment* immunity and/or fails to state a claim. [13]

> 12  All claims are asserted against these individuals in their official and individual capacities, and include the failure to investigate witness tampering by Jeanne Ohm during his criminal trial. (D.I. 11 at P 41) Although plaintiff alleges that these defendants deprived him of

"life, liberty, and property" (id. at PP 40, 44), this averment is clearly a reiteration of plaintiff's "failure-to-prosecute" charge.

> 13  See discussion of *Eleventh Amendment* immunity in supra section III(B)(1), and plaintiff's lack of standing to bring a claim for non-prosecution of others in supra section III(B)(3).

Plaintiff also contends that defendant Martyniak "used a suicide note in the sentencing phase of the trial and falsely stated that the plaintiff threatened the Delaware State Police and asked Judge [*15] Smalls for jail time." (Id. at P 42) He seeks $ 250,000 in monetary damages, plus costs. (Id. at 15-16) Whether or not plaintiff here alleges sufficient facts to constitute actionable misconduct, his claim is nevertheless barred by prosecutorial immunity. A prosecutor is absolutely immune from private lawsuits seeking monetary damages arising from "activity taken while in court, such as the presentation of evidence or legal argument, as well as selected out of court behavior 'intimately associated with the judicial phases' of litigation." *Martinez v. O'Neill*, 2005 WL 3307285, *3 (D. Del. 2005) (quoting *Giuffre v. Bissell*, 31 F.3d 1241, 1251 (3d Cir. 1994)); see also *Imbler v. Pachtman*, 424 U.S. 409, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1975). Accepting the facts as alleged by plaintiff, because the alleged impropriety occurred during the in-court sentencing phase of the trial, Martyniak is immune from suit. This claim, therefore, is dismissed.

### C. Count Three - Judicial Misconduct

Plaintiff offers a variety of claims against the Delaware Court of Common Pleas, Judge Alex Smalls, and select members of his staff arising from his criminal prosecution in that [*16] court. He recounts examples of judicial impropriety, inter alia, failure to properly consider plaintiff's motions, partiality, denial of right to counsel, to call witnesses, to confront prosecution witnesses, and tampering and delay relating to the production of the trial transcript. (D.I. 11 at PP 54-70) Seeking $ 2 million in damages, plaintiff grounds his claims in the *Sixth* and *Fourteenth Amendments*. (Id. at PP 23, 76-77.)

"It is a well-settled principle of law that judges are generally 'immune from a suit for money damages.'" *D'Alessandro v. Robinson*, 210 F. Supp.2d 526, 529 (D. Del. 2002) (quoting *Figueroa v. Blackburn*, 208 F.3d 435, 440 (3d Cir. 2000)). "Judges are immune from suit even if the action complained of was taken in error, was done maliciously, or was in excess of judicial authority." *D'Alessandro*, 210 F. Supp.2d at 529; see *Stump v. Sparkman*, 435 U.S. 349, 356 n.6, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978). Immunity also applies in cases where the judge acts in conspiracy with other lawyers in the

2006 U.S. Dist. LEXIS 68729, *

case. *Dennis v. Sparks, 449 U.S. 24, 27, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980)* (affirming dismissal of conspiracy claims against judge based [*17] on doctrine of judicial immunity). Judges may be sued only for "non-judicial acts" and for acts "taken in the complete absence of jurisdiction." *D'Alessandro, 210 F. Supp.2d at 530* (citing *Figueroa, 208 F.3d at 440*). "The relevant cases demonstrate that the factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his official capacity." *Stump, 435 U.S. at 362.*

It is clear from plaintiff's amended complaint that each of the acts complained of related to management of the trial itself, that is to say, acts normally performed by a judge, and were taken by Judge Smalls in his official capacity. It would be a stretch of the imagination indeed to find that Judge Smalls's conduct was so far divorced from his official duties so as to subject him to liability.

Because Judge Smalls is immune from suit in this matter, so too are the named members of his staff. See *McArdle v. Tronetti, 961 F.2d 1083, 1085 (3d Cir. 1992)* (psychiatrist [*18] conducting psychiatric examination at request of judge shared in judicial immunity as an "integral part of the judicial process."); *Pierson v. Ray, 386 U.S. 547, 554, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967)*, overruled on other grounds by *Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. Therefore, all claims against defendants Judge Alex Smalls, Sherry Simmons, Jane Doe and the Court of Common Pleas are dismissed.

## D. Count Four - FBI's Failure to Prosecute

Plaintiff brings a fourth claim against the FBI, alleging that its refusal to investigate State of Delaware officials for their handling of his complaints against ICPA and its employees violates his right to equal protection of the laws under the *Fourteenth Amendment*. (D.I. 11 at 23-25) He seeks equitable relief in the form of a injunction restraining the FBI from "displaying any and all web pages or other information media implying that matters of civil rights violations will be investigated", as well as a court order mandating that the FBI "perform [its] duties under the law and perform an investigation of the alleged civil rights violations made against the Delaware State Police and Delaware Department of Justice" (Id. [*19] at PP 95-96) In the alternative, plaintiff requests unspecified damages to compensate him for "violations of his rights." [14] (Id. at P 97)

14   Plaintiff requests damages from defendants "jointly and severally." (D.I. 11 at P 97) Because plaintiff's claims against all defendants are dismissed, the court does not address the issue

plaintiff raises of joint and several liability.

Whether under plaintiff's chosen constitutional theory or any other, the case law is emphatic, as discussed above, that a private citizen has no interest in the criminal prosecution of another. *Linda R.S., 410 U.S. at 619 (1973)*. Plaintiff makes no allegation that the FBI denied his request to investigate on the basis of his membership in a category protected by the *Fourteenth Amendment*. Plaintiff, therefore, lacks standing to bring a claim against the FBI for failure to prosecute. Plaintiff's claim against the FBI, accordingly, is dismissed.

## E. Count Five - Constitutional Claims Against the Superior Court of Delaware

[*20]   In his fifth claim, plaintiff has sued the Superior Court of Delaware, where his conviction is currently on appeal. Plaintiff complains of delays in obtaining the trial transcript from the Court of Common Pleas and general unfairness. (D.I. 11 at 28-29) On the basis of the *Sixth* and *Eighth Amendments*, he asks that the action be removed from the Superior Court and that "the unjust ruling of the Delaware State Court of Common Pleas" be reversed. (Id. at 115.)

Simply stated, plaintiff's suit against the Superior Court of Delaware, an arm of the State, is barred by the *Eleventh Amendment*. See *Pennhurst, 465 U.S. at 100-101*. [15] The claim, therefore, is dismissed. [16]

15   See discussion of *Eleventh Amendment* immunity, supra section III(B).
16   This court has no authority to "remove" a pending state criminal action into the federal system. See *28 U.S.C. § 1441*. Further, even if *Eleventh Amendment* immunity were unavailable to defendant Superior Court, this court would deny the requested relief pursuant to the *Younger* abstention doctrine which, with limited exceptions not applicable here, precludes federal intervention in pending state court proceedings. See *Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971)*; see generally *Yang v. Tsui, 416 F.3d 199 (3d Cir. 2005)* (describing Younger absention).

## [*21] F. Count Six - Breach of Contract Claim Against ICPA

In the final count of his amended complaint, plaintiff presents a claim against ICPA and Ohm Chiropractic for breach of contract. [17] (D.I. 11 at P 142) He requests $ 810 from defendants, plus incidental damages, a further $ 60,000, and costs. (Id. at 144-146) He also seeks injunctive relief preventing ICPA from "using or accessing any and all data or other information gained illegally by the unauthorized transfer from the unpaid products and services of Plaintiff." (Id. at P 146)

17   Plaintiff is emphatic that he seeks damages *only* for breach of contract, noting that "[t]his matter intentionally does not seek any action involving, Statutes of Fraud, Slander, or other TORT actions. . . ". (D.I. 11 at P 141)

It is "incumbent on the plaintiff to properly allege [federal jurisdiction]," and the court is under the duty to point out defects in jurisdiction. *McNutt, 298 U.S. at 183; Louisville & N. R. Co. v. Mottley, 211 U.S. 149, 152, 29 S. Ct. 42, 53 L. Ed. 126 (1908).* [*22] Because this court is without jurisdiction to entertain this claim, plaintiff's sixth count is dismissed sua sponte.

Plaintiff seeks to invoke the diversity jurisdiction of this court under *28 U.S.C. § 1332*, which provides for original jurisdiction of the district court where the parties are "citizens of different States" and the amount in controversy "exceeds the sum or value of $ 75,000." (D.I. 11 at 35) Plaintiff alleges an amount in controversy of $ 60,810 - less than the statutory minimum. [18] (Id. at P 144-146) Neither will plaintiff's request for injunctive relief establish jurisdiction. "In injunctive actions, it is settled that the amount in controversy is measured by the value of the right sought to be protected by the equitable relief." *In re Corestates Trust Fee Litigation, 39 F.3d 61, 65 (3d Cir. 1994)* (citing *Smith v. Adams, 130 U.S. 167, 175, 9 S. Ct. 566, 32 L. Ed. 895 (1889)).* Where plaintiff does not specify the value of the right to be protected from ICPA's or Ohm Chiropractic's access to the disputed data, and where it appears in any event to be a sum measured in the hundreds, rather than in the thousands of dollars, plaintiff's [*23] request for injunctive relief does not establish the jurisdictional minimum. Thus, because he has not discharged his burden of pleading an amount in controversy greater than the statutory minimum, plaintiff's attempt to invoke federal diversity jurisdiction must fail. [19]

18   Although plaintiff requests costs, the language of *28 U.S.C. § 1332* makes clear that the jurisdictional minimum is "exclusive of interest and costs." And considering that plaintiff alleges damages of $ 60,000 resulting from a breach of contract for $ 810, this court doubts whether plaintiff's averment is made in good faith. See *St. Paul Mercury Indemnity Corp. v. Red Cab Co., 303 U.S. 283, 58 S. Ct. 586, 82 L. Ed. 845 (1938)* ("the sum claimed by plaintiff controls if the claim is apparently made in good faith.").

19   *28 U.S.C. § 1653* provides that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." However, the provision has been interpreted to provide for amendment of a complaint where a plaintiff has made a deficient allegation of jurisdiction, but where federal jurisdiction nevertheless appears to exist. See *Newman-Green, Inc. V. Alfonzo-Larrain, 490 U.S. 826, 831, 109 S. Ct. 2218, 104 L. Ed. 2d 893 (1989)* ("§ 1653 speaks of amending 'allegations of jurisdiction,' which suggests that it addresses only incorrect statements about jurisdiction that actually exists, and not defects in the jurisdictional facts themselves."). Here, because plaintiff has already once amended his complaint and because subject matter jurisdiction does not in fact exist, § 1653 is inapposite.

[*24]   Nor may plaintiff avail himself of alternate bases of federal subject matter jurisdiction. Breach of contract claims are governed by state law and do not present a federal question under *28 U.S.C. § 1331* or *§ 1343*. [20] Additionally, because plaintiff's allegations against ICPA and Ohm Chiropractic do not share a common nucleus of operative fact with his claims against the State Defendants and the FBI, the claims together do not "form part of the same case or controversy under Article III of the United States Constitution." *28 U.S.C. § 1367(a)*. [21] Accordingly, they do not fall under the supplemental jurisdiction of the federal court under *28 U.S.C. § 1367*. Plaintiff's claims against ICPA and Ohm Chiropractic, therefore, are dismissed. [22]

20   *42 U.S.C. § 1983* is, of course, "not a jurisdictional statute; it only fashions a remedy." *Gonzalez v. Young, 560 F.2d 160 (3rd Cir. 1977)*, aff'd sub nom. *Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 99 S. Ct. 1905, 60 L. Ed. 2d 508 (1979)*.

[*25]

21   Moreover, even if the allegations against ICPA and Ohm Chiropractic shared a common nucleus of operative fact with Plaintiff's remaining claims, having dismissed each of those claims, the court declines to exercise supplemental jurisdiction over count six pursuant to *28 U.S.C. § 1367(c)(3)*.

22   In sum, it appears that plaintiff's breach of contract claim is best raised in state court.

### G. Request for a Three Judge Trial

In his amended complaint, plaintiff adds a request for a "three judge trial." (D.I. 11 at P 4) *28 U.S.C. § 2284* provides for a "three-judge court" "when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." Plaintiff's request for a three judge trial, therefore, is denied.

### V. CONCLUSION

For the reasons stated, plaintiff's motion to amend

2006 U.S. Dist. LEXIS 68729, *

his complaint is granted. (D.I. 11) The motion to dismiss the complaint (D.I. 9). filed by State Defendants and the motion [*26] to dismiss of defendant Federal Bureau of Investigation (D.I. 25) are granted. An appropriate order will issue.

## ORDER

At Wilmington this 25th day of September, 2006, for the reasons set forth in the court's memorandum opinion of today's date in this matter;

IT IS HEREBY ORDERED that:

1. The motion to amend the complaint by plaintiff Steven D. Humes (D.I. 11) is granted.

2. The motion to dismiss filed by State Defendants [1] (D.I 9) is granted.

     1  "State Defendants" include: State of Delaware Court of Common Pleas, Superior Court of Delaware, State of Delaware Department of Justice, Trooper Lafferty, Trooper Sgt. Jones, Captain Charles J. Simpson, Lt. William T. Ford, Lt. Paul E. Smentkowski, Lt. Mark Daniels, Delaware State Police Troop 2 and Internal Affairs, Hon. Alex Smalls, Sherry Simmons, Jane Doe and Shawn Martyniak.

3. The motion to dismiss filed by the Federal Bureau of Investigation (D.I. 25) is granted.

4. Plaintiff's request for a "three judge trial" is denied.

5. Plaintiff's remaining [*27] claims against International Chiropractic Pediatric Association and Ohm Chiropractic are hereby dismissed without prejudice.

Sue L. Robinson

United States District Judge

# EXHIBIT "J"

16 of 110 DOCUMENTS

**JOSEPH L. D'ALESSANDRO and JOHN A. FRANKLIN, Plaintiffs, v. AMERICAN CIVIL LIBERTIES UNION, EXECUTIVE DIRECTOR ANTHONY D. ROMERO, PRESIDENT NADINE STROSSEN, LEGAL DIRECTOR STEVEN SHAPIRO, DIRECTOR CAROLINE FREDRICKSON, DONNA MCKAY, GERI E. ROZANSKI, and EMILY TYNES, Defendants.**

**Civ. No. 06-212-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 82237*

**November 8, 2006, Decided**

**COUNSEL:** [*1] Joseph L. D'Alessandro, Plaintiff, Pro se, Joseph L. D'Alessandro, Lewes, DE.

John A. Franklin, Plaintiff, Pro se, John A. Franklin, Dagsboro, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM**

Joseph L. D'Alessandro and John A. Franklin ("the plaintiffs") filed this civil rights action on March 30, 2006, alleging violations of *5 U.S.C. § 556, 18 U.S.C. §§ 1961-1964, 18 U.S.C. §§ 241* and *242, 42 U.S.C. § 1983*, and the Delaware Constitution. An amended complaint as filed on May 8, 2006. (D.I. 6.) The plaintiffs appear *pro se* and on September 28, 2006, were granted *in forma pauperis* status pursuant to *28 U.S.C. § 1915*. (D.I. 12.) The court now proceeds to review and screen the amended complaint pursuant to *28 U.S.C. § 1915*. For the reasons discussed below, the complaint is dismissed as frivolous pursuant to *28 U.S.C. § 1915(e)(2)(B)*.

**I. THE COMPLAINT**

The plaintiffs allege that the American Civil Liberties [*2] Union ("ACLU"), its executive director, president, and several directors violated their rights under the *First, Ninth*, and *Fourteenth Amendments to the United States Constitution*. More particularly, the plaintiffs allege the defendants violated their constitutional rights through the federal courts by reason of the ACLU's "radical agenda which undermines our nation's moral and religious heritage." (D.I. 6, at 10.) The plaintiff alleges that ACLU policies and actions "strip faith in God from the public square while promoting anti-family and pro-homosexual initiatives." *Id.* The plaintiffs specifically point to the recent *First Amendment* pledge of allegiance, "one nation under God" case to support their allegations. *Id.* at 14. The plaintiffs seek punitive and exemplary damages and ask that all proceeds be donated to the Salvation Army and other organizations damaged by the ALCU.

**II. STANDARD OF REVIEW**

When a litigant proceeds in forma pauperis, *28 U.S.C. § 1915* provides for dismissal under certain circumstances. *Section 1915(e)(2)(B)* provides that the court may dismiss a complaint, at any time, if the action is frivolous, malicious, fails to [*3] state a claim upon which relief may be granted or seeks monetary relief from a defendant immune from such relief. An action is frivolous if it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams, 490 U.S. 319, 325, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989).*

The court must "accept as true factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)*(citing *Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993)*). Additionally, *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim when "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Haines v. Kerner, 404 U.S. 519, 520-521, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)*(quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*). Inasmuch as the plaintiffs proceed *pro se*, the court construes the complaint liberally. *Haines v. Kerner, 404*

*U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972).*

## III. ANALYSIS

### A. Administrative Procedure Act

[*4] The amended complaint references in the same sentence, § 556 of the Administrative Procedure Act ("APA") and the U.S. District Courts. *Section 556* applies to hearings required by *section 553* (i.e., rule making) or *554* (i.e., adjudications after agency hearing) of the APA. The APA defines "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia." *Franklin v. Massachusetts, 505 U.S. 788, 800, 112 S. Ct. 2767, 120 L. Ed. 2d 636 (1992)* (citing *5 U.S.C. §§ 701(b)(1), 551(1)).*

While not clear, it may be that the plaintiffs seek review of rulings or decisions rendered in U.S. District Courts. However, as noted above, courts of the United States are specifically exempted from the APA. Notably, the amended complaint makes no reference to any federal agency or ruling issued therefrom. The APA is inapplicable to this case and any attempt to use it is frivolous. Therefore, the court will dismiss [*5] any such claims pursuant to *28 U.S.C. § 1915(e)(2)(B).*

### B. Criminal Statutes

The plaintiffs attempt to raise civil causes of actions under criminal statutes, specifically the RICO statute, *18 U.S.C. §§ 1961-1964,* and criminal civil rights conspiracy under *18 U.S.C. §§ 241 and 242.*

### 1. Civil RICO

The plaintiffs refer to the Racketeer Influenced and Corrupt Organizations Act ("RICO") statute, *18 U.S.C. §§ 1961, et seq.* in their amended complaint. A <u>private</u> cause of action arises under RICO, *§ 1964(c),* which states, in pertinent part, that "[a]ny person injured in his business or property by reason of a violation of *section 1962* of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the costs of the suit, including a reasonable attorney's fee." *18 U.S.C. § 1964(c).*

This case alleges violations of the plaintiffs' constitutional rights and makes no reference to injury to their business or property. Thus, in the absence of the [*6] requisite injury to "business or property", the plaintiffs have not stated a civil RICO claim. *See 18 U.S.C. § 1964(c)* (only authorizing <u>private</u> cause of actions for persons injured in their "business or property");

*Chadda v. Burcke, 180 Fed. Appx. 370, 372 (3d Cir. 2006).* Accordingly, the court will dismiss the claim as frivolous pursuant to *28 U.S.C. § 1915(e)(2)(B).*

### 2. *18 U.S.C. §§ 241* and *242*

These criminal statutes refer to violation of civil rights and are the criminal analogue of *42 U.S.C. § 1983.* They do not, however, provide a <u>private</u> cause of action for recovery in a civil suit. *United States v. City of Philadelphia, 482 F. Supp. 1248, 1260 (E.D. Pa. 1979), aff'd, 644 F.2d 187 (3d Cir. 1980); Taxacher v. Torbic, 2000 U.S. Dist. LEXIS 15193, 2000 WL 641616, at * 14 (W.D. Pa. Feb. 23, 2000)* (noting that there is no <u>private</u> cause of action under *18 U.S.C. § 241* ); *Leveto v. Lapina, 2000 U.S. Dist. LEXIS 1972, 2000 WL 331902, at *20 (W.D. Pa. Feb.5, 2000)* (noting that there is no [*7] <u>private</u> cause of action under *18 U.S.C. § 242*). *See also Cok v. Cosentino, 876 F.2d 1, 2 (1st Cir. 1989)* ("Only the United States as prosecutor can bring a complaint under *18 U.S.C. §§ 241 -242.").* Hence, the court will dismiss as frivolous the plaintiffs' claims brought under *18 U.S.C. §§ 241 and 242.*

### C. *42 U.S.C. § 1983*

The plaintiffs also allege a civil rights violation pursuant to *42 U.S.C. § 1983* and name as the defendants the ACLU and is officers and directors. The ACLU is a <u>private,</u> nonprofit organization, http://www.aclu.org. *West's Encyclopedia of American Law* (1998), http://www.answers.com. The ACLU and its officers and directors are not "state actors" as that term is defined under *§ 1983.*

To state a claim under *42 U.S.C. § 1983,* the plaintiffs must allege "the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under <u>color of state law</u>." *West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)* [*8] (citing *Parratt v. Taylor, 451 U.S. 527, 535, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981))* (overruled in part on other grounds *Daniels v. Williams, 474 U.S. 327, 330-31, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)).* To act under "color of state law" a defendant must be "clothed with the authority of state law." *West, 487 U.S. at 49.* The ACLU is a <u>private</u> organization whose mission is to preserve the protections and guarantees of the *Bill of Rights of the U.S. Constitution.* http://www.aclu.org. Quite simply, the ACLU, its officers, directors and employees are not "clothed with the authority of state law." *See Reichley v. Pennsylvania Dep't of Agric., 427 F.3d 236, 244-45 (3d Cir. 2005); Biener v. Calio, 361 F.3d 206, 216-17 (3d Cir. 2004).* Accordingly, they are not amenable to suit under *§ 1983.* Therefore, the *§ 1983* claims are dismissed pursuant to *28 U.S.C. § 1915(e)(2)(B).*

**D. Supplemental State Claims**

Because the amended complaint fails to state a federal claim, the court declines to exercise jurisdiction over the plaintiffs' supplemental state law claim alleging a violation of the Delaware constitution. *28 U.S.C. § 1367* [*9] ; *De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003).*

**IV. CONCLUSION**

For the above stated reasons the court finds that the complaint fails to state a claim pursuant to *42 U.S.C. § 1983.* An appropriate order will be entered dismissing the case

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

November 8, 2006

Wilmington, Delaware

**ORDER**

At Wilmington this 8th day of November, 2006, for the reasons set forth in the Memorandum issued this date, the plaintiffs' complaint is DISMISSED without prejudice as frivolous pursuant to *28 U.S.C. § 1915(e)(2)(B).* Amendment of the complaint would be futile. *See Grayson v. Mayview State Hosp., 293 F.3d 103, 111 (3d Cir. 2002); Borelli v. City of Reading, 532 F.2d 950, 951-52 (3d Cir. 1976).*

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE